Adam S. Affleck, Bar #5434 (adam-affleck@rbmn.com)
**RICHARDS BRANDT MILLER NELSON**
111 East Broadway, Suite 400
Salt Lake City, UT 84111
Telephone: 801-531-2000
Facsimile: 801-532-5506

Attorneys for Sheet Metal Works, Inc.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH
## CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>SHEET METAL WORKS, INC.,<br><br>Debtor. | Bankruptcy Case. No. 19-28320<br>(Chapter 11)<br><br>Judge Joel T. Marker |

**CHAPTER 11 PLAN**

**(Amended as of July 19, 2020)**

## Table of Contents

                                                                                    **Page**

**BACKGROUND** ...................................................................................................... 1

   *A.*      *Description and history of the Debtor's business.* ............................... 1

   *B.*      *Liquidation analysis.* ....................................................................... 1

   *C.*      *Ability to make payments and operate without further*

           *reorganization.* ............................................................................... 2

**SUMMARY OF THE PLAN** ...................................................................................... 2

**CHAPTER 11 PLAN PROVISIONS** ........................................................................ 3

   ARTICLE 1  DEFINITIONS ................................................................................. 3

   ARTICLE 2  TREATMENT OF ADMINISTRATIVE EXPENSES ......................... 5

   ARTICLE 3  CLASSIFICATION AND TREATMENT OF ALLOWED
              SECURED CLAIMS ..................................................................... 7

   ARTICLE 4  CLASSIFICATION AND TREATMENT OF PRIORITY
              CLAIMS ..................................................................................... 11

   ARTICLE 5  CLASSIFICATION AND TREATMENT OF UNSECURED
              CLAIMS ..................................................................................... 11

   ARTICLE 6  CLASSIFICATION AND TREATMENT OF INTERESTS ............... 13

   ARTICLE 7  IMPAIRMENT OF CLAIMS ............................................................ 13

   ARTICLE 8  PROVISIONS FOR DISPUTED CLAIMS ........................................ 13

   ARTICLE 9  MEANS FOR EXECUTION AND IMPLEMENTATION
              OF THE PLAN ............................................................................ 13

   ARTICLE 10 LEASES ........................................................................................ 18

   ARTICLE 11 EXECUTORY CONTRACTS ........................................................... 18

   ARTICLE 12 PAYMENTS .................................................................................. 19

   ARTICLE 13 BAR DATES, DEADLINES, OBJECTION TO CLAIMS ................ 20

   ARTICLE 14 EFFECT OF CONFIRMATION ...................................................... 21

   ARTICLE 15 GUARANTOR AND THIRD-PARTY LIABILITY ......................... 22

   ARTICLE 16 MODIFICATION OF PLAN ............................................................ 22

ARTICLE 17 DEFAULT ........................................................................................... 23

ARTICLE 18 RETENTION OF JURISDICTION...................................................... 24

ARTICLE 19 FINAL DECREE ................................................................................ 25

ARTICLE 20 CLAIMS RETAINED UNDER THE PLAN ...................................... 25

ARTICLE 21 MISCELLANEOUS ........................................................................... 26

**CERTIFICATE OF SERVICE** ...................................................................................... **27**

## **EXHIBITS**

A.    Liquidation Analysis.

B.    Post-Confirmation Cash Projections

C.    Administrative Expenses.

D.    Secured Claims and Payment Terms.

E.    Replacement Notes.

F.    Priority Claims.

G.    Unsecured Claims.

H.    Interests.

I.    Pre-Petition Leases and Executory Contracts.

# BACKGROUND

A.    *Description and history of the Debtor's business.* The Debtor[1] is a Utah corporation, which is wholly-owned by Ralph C. Montrone ("**RC Montrone**"). Since May 2001, the Debtor has been in the business of sheet metal fabrication and installation. On October 10, 2019, approximately one month before its bankruptcy filing, the Debtor merged with Explore Management, LLC ("**Explore**"). At the time of the merger, Explore was a Utah limited liability company (also wholly-owned by RC Montrone) that held manufacturing assets that were, and continue to be, used by the Debtor in its business. The Debtor's chapter 11 bankruptcy filing (on November 8, 2019) was necessitated by several events including (1) the termination of an operating line of credit by its financing bank (Bank of the West), (2) property settlement issues and other complications (including litigation involving the Debtor) arising from the divorce of RC Montrone and Katharine Fay Amalie Montrone ("**Katy Montrone**"), who, prior to the divorce, owned 50% of the Debtor and Explore and who functioned as the financial officer of both the Debtor and Explore, and (3) a lawsuit seeking payment of $657,888.96, plus fees and costs, filed against the Debtor by Thermal West Industrial, Inc. ("**Thermal West**").

B.    *Liquidation analysis.* To confirm the Plan, the Court must find that creditors who do not accept the Plan will receive at least as much under the Plan as they would receive in a chapter 7 liquidation as of the date of the Effective Date of the Plan. A

---

[1] Capitalized words are defined terms. The definitions (if not provided above) are contained in Article 1 of this Plan.

liquidation analysis prepared by the Debtor is attached hereto as Exhibit A. This liquidation analysis shows that, if the Debtor assets were liquidated on the Effective Date, the proceeds from the sale of the Debtor's assets would go primarily to its secured creditors and that amounts in excess would be insufficient to pay administrative expenses and priority claims—meaning that general unsecured creditors would receive nothing.

       *C.*     *Ability to make payments and operate without further reorganization.* To confirm the Plan, the Court must also find that the Reorganized Debtor will have sufficient cash to pay amounts necessary to be paid as of the Effective Date of the Plan and over the life of the Plan (including payments in the amounts provided under the Plan and to maintain current operations). Attached as Exhibit B is a chart showing projections prepared by the Debtor through November 2020. These projections show that the Debtor will be able to perform its plan without the need for further liquidation or reorganization.

## **SUMMARY OF THE PLAN**

This Plan proposes to pay holders of Allowed Claims from the profits arising from the operations of the Reorganized Debtor. The Plan provides for six classes of Allowed Secured Claims, two classes of Allowed Priority Claims, and two classes of Allowed Unsecured Claims. In general, the Plan provides for the payment in full to the holders of Allowed Secured Claims, Allowed Priority Claims, and one of the two classes of Allowed Unsecured Claims. Holders of claims classified in the second class of Allowed Unsecured Claims will receive a distribution of 20% of their Allowed Unsecured Claims over time from future profits of the Reorganized Debtor. All creditors and parties in interest should

refer to the provisions of the Plan for classification and treatment of Claims and Interests.

A Disclosure Statement that provides more detailed information regarding this Plan and

the rights of creditors has been circulated with the Plan. **Your rights may be affected.**

**You should read these papers carefully and discuss them with your attorney, if you**

**have one. (If you do not have an attorney, you may wish to consult one.)**

## CHAPTER 11 PLAN PROVISIONS
### ARTICLE 1
### DEFINITIONS

1.1.    "Allowed Administrative Expense" means any cost or expense of the Estate

that is allowed under § 503(b) of the Bankruptcy Code by a final and non-appealable order

of the Court after notice and a hearing and shall also include any fees and charges assessed

against the Estate under 28 U.S.C. § 1930.

1.2.    "Allowed Claim" means any debt represented by a proof of Claim that is

filed (including a claim that is deemed filed under § 1111(a) of the Bankruptcy Code) that

is allowed under § 502(a) of the Bankruptcy Code and is not a Disputed Claim.

1.3.    "Allowed Interest" means any interest represented by a proof of Claim that

is filed (including an interest that is deemed filed under § 1111(a) of the Bankruptcy Code)

that is allowed under § 502(a) of the Bankruptcy Code and is not a Disputed Interest.

1.4.    "Allowed Secured Claim" means an Allowed Claim to the extent of the value

of property of the Estate that serves as collateral for the Allowed Claim.

1.5.    "Allowed Unsecured Claim" means an Allowed Claim that is not secured by

a lien on property of the Estate.

1.6.    "Bankruptcy Code" means Title 11 of the United States Code.

1.7.    "Claim" means any claim as defined by § 101(5) of the Bankruptcy Code.

1.8.    "Confirmation" means the entry of the order of the Court confirming this Plan.

1.9.    "Confirmation Hearing" means the first date set for hearing on the confirmation of the Plan.

1.10.    "Court" means the United States Bankruptcy Court for the District of Utah, Central Division.

1.11.    "Debtor" means Sheet Metal Works, Inc.

1.12.    "Disputed Claim" means any claim or interest which is identified in the Exhibits attached to this Plan as disputed or any claim for which an objection has been filed by the Debtor, the Reorganized Debtor, or any other party in interest.

1.13.    "Effective Date" means 14 days after Confirmation.

1.14.    "Estate" means the estate created and described under § 541 of the Bankruptcy Code.

1.15.    "Estate Cash" means all cash in the possession of the Debtor that is property of the Estate whether it is unencumbered or represents the "cash collateral" of a holder of an Allowed Secured Claim.

1.16.    "Explore" means Explore Management, LLC.

1.17.  "Ordinary Course Administrative Expense" means any Administrative Expense that has been incurred in the ordinary course of the Debtor's business and that would be otherwise payable without Court approval but is not due by its terms until at, or after, Confirmation including, without limitation, post-petition employee wages and benefits, post-petition accounts payable, etc.

1.18.  "Pending Administrative Expense" means any cost or expense of the Estate that may be allowable under § 503(b) of the Bankruptcy Code and is not barred but has not been allowed by final order of the Court.

1.19.  "Petition Date" means November 8, 2019.

1.20.  "Plan" means this plan of reorganization.

1.21.  "Reorganized Debtor" means the Debtor after the Effective Date.

1.22.  "Schedules" means the schedules and statement of financial affairs filed by the Debtor on November 22, 2019.

1.23.  "Titled Vehicles" means those vehicles identified in Table 2 and Table 3 of Exhibit A (Liquidation Analysis).

## ARTICLE 2
## TREATMENT OF ADMINISTRATIVE EXPENSES

2.1.  *Ordinary Course Administrative Expenses.* After the Effective Date and unless otherwise agreed, Ordinary Course Administrative Expenses shall be paid when they become due in the ordinary course of the Debtor's (and the Reorganized Debtor's) business. Notwithstanding any other provision herein, holders of Ordinary Course

Administrative Expenses shall not be required to obtain an order allowing their Ordinary

Course Administrative Expenses as a condition to payment by the Reorganized Debtor.

2.2     *Allowed Administrative Expenses*. Unless otherwise agreed or provided for

in this Plan, on the Effective Date, the Reorganized Debtor shall pay all Allowed

Administrative Expenses which remain unpaid at Confirmation. An estimate of Allowed

Administrative Expenses is included as part of Exhibit C.

2.3     *Pending Administrative Expenses*. Unless otherwise agreed or provided for

in this Plan, on the day that a Pending Administrative Expense becomes an Allowed

Administrative Expense, the Reorganized Debtor shall pay such Allowed Administrative

Expense. An estimate of Pending Administrative Expenses is included as part of Exhibit

C.

2.4     *Agreement with Richards Brandt Miller Nelson.* The Reorganized Debtor

shall (unless otherwise agreed) pay Richards Brandt Miller Nelson's Allowed

Administrative Expense in payments of not less than $5,000 per month, with the first

payment due on the first day of the first full calendar month following the Effective Date

or the date that Richards Brandt Miller Nelson's Pending Administrative Expenses

becomes an Allowed Administrative Expense.

2.5     *U.S. Trustee Fees*. Unless otherwise agreed, on the Effective Date, the

Reorganized Debtor shall pay all fees then owing to the U.S. Trustee. Any U.S. Trustee's

Fees that become due between the Effective Date and the entry of the final decree shall be

paid by the Reorganized Debtor in accordance with 28 U.S.C. § 1930(a)(6). An estimate of U.S. Trustee's Fees is included as part of Exhibit C.

2.6     *Subordination of Allowed Unsecured Claims*. The Reorganized Debtor's payment obligation to holders of the foregoing Administrative Expenses shall have priority over the Reorganized Debtor's payment obligation to holders of Allowed Unsecured Claims in Classes U2 such that Administrative Expenses must be paid in full prior to any payment to holders of Class U2 Claims.

## ARTICLE 3
## CLASSIFICATION AND TREATMENT OF ALLOWED SECURED CLAIMS

3.1     *Bank of the West's claims.*

3.1.1     *Class BW1*—shall consist of the Allowed Secured Claim of Bank of the West under Loan No. 3501 in the pre-petition amount of $14,187.59 (plus post-petition interest and fees and subject to objection) to the extent secured by its first-position, pre-petition, lien on the Debtor's equipment, inventory, accounts, and general intangibles in the amount set forth in Exhibit D.

3.1.2     *Class BW2*—shall consist of the Allowed Secured Claim of Bank of the West under Loan No. 6429 in the pre-petition amount of $24,032.73 (plus post-petition interest and fees and subject to objection) to the extent secured by its first-position, pre-petition, lien on the Debtor's equipment, inventory, accounts, and general intangibles in the amount set forth in Exhibit D.

3.1.3  *Class BW3*—shall consist of the Allowed Secured Claim of Bank of the West under Loan No. 0018 in the pre-petition amount of $81,739.11 (plus post-petition interest and fees and subject to objection) to the extent secured by its first-position, pre-petition, lien on the Debtor's equipment, inventory, accounts, and general intangibles in the amount set forth in Exhibit D.

3.1.4  *Class BW4*—shall consist of the Allowed Secured Claim of Bank of the West under Loan No. 0026 in the pre-petition amount of $609,384.83 (plus post-petition interest and fees and subject to objection) to the extent secured by its first-position, pre-petition, lien on the Debtor's equipment, inventory, accounts, and general intangibles in the amount set forth in Exhibit D.

3.1.5  *Treatment of Classes BW1 through BW4.* The amounts owed by the Debtor to Bank of the West under each of its Allowed Secured Claims shall be consolidated into one payment obligation that shall be evidenced by a single note (the "**BW Consolidated Note**") in the form attached as Exhibit E-1 to be executed by the Reorganized Debtor on the Effective Date. Upon execution of the BW Consolidated Note, all defaults under Bank of the West's loan and security documents shall be deemed cured as to the Reorganized Debtor and the Reorganized Debtor's property serving as collateral. Payment terms under the BW Consolidated Note (which are set forth in Exhibit D) are incorporated in the BW Consolidated Note attached as Exhibit E-1. Bank of the West shall retain all pre-petition lien rights

8

in all collateral to secure amounts owed under the BW Consolidated Note. Bank of the West shall also be granted an additional security interest in all of the Titled Vehicles. The Reorganized Debtor shall execute, or authorize the filing of, financing statements or certificates of title, etc. as may be reasonably requested by Bank of the West to perfect its security interests. If not sold by the Debtor before Confirmation, the Debtor will, according to reasonable terms requested by Bank of the West, sell its 2016 Ford Mustang VIN XXX0405 (one of the Titled Vehicles) and pay the net proceeds (after payment of the senior lien of Ford Motor Credit and expenses of sale) to Bank of the West. Further, as provided in Article 16, nothing in this Plan or the modification of Bank of the West's pre-petition rights shall act as a waiver or release of any rights that Bank of the West may have any third party or against property that is not property of the Estate or of the Reorganized Debtor. Until the BW Consolidated Note is paid in full, the Reorganized Debtor shall not make payments to holders of Class U2 Claims or pay any dividends on account of its stock; provided, however, that the Reorganized Debtor may pay dividends to its shareholders from time to time in amounts necessary to enable the shareholders to pay income taxes and make estimated tax payments to satisfy their liabilities under federal and state law which arise solely because of their ownership of the Reorganized Debtor's stock.

3.2    *Ford Motor Credit*

3.2.1    *Class FMC1*—shall consist of the Allowed Secured Claim of Ford Motor Credit under Loan No. XXX2405 in the pre-petition amount of $2,128.68 (plus post-petition interest) to the extent secured by its first-position, pre-petition lien on the Debtor's 2014 Ford Mustang (VIN XXX0405). The amounts owed by the Debtor to Ford Motor Credit under Loan No. XXX2405 shall be evidenced by a new note (the "**FMC1 Note**") in the form attached as Exhibit E-2 to be executed by the Reorganized Debtor on the Effective Date. Upon execution of the FMC1 Note, all defaults under Ford Motor Credit's loan and security documents shall be deemed cured as to the Reorganized Debtor and the Reorganized Debtor's property serving as collateral. Payment terms under the FMC1 Note (which are set forth in Exhibit D) are incorporated in the FMC1 Note attached as Exhibit E-2. Ford Motor Credit shall retain all pre-petition lien rights in all collateral to secure amounts owed under the FMC1 Note. The Reorganized Debtor shall execute, or authorize the filing of, title documents as may be reasonably requested by Ford Motor Credit to perfect its lien.

3.2.2    *Class FMC2*—shall consist of the Allowed Secured Claim of Ford Motor Credit Company under Loan No. XXX9010 in the pre-petition amount of $17,528.38 (plus post-petition interest) to the extent secured by its first-position, pre-petition lien in the Debtor's 2017 F-550 pick-up truck (VIN XXX5069). The

10

amounts owed by the Debtor to Ford Motor Credit under Loan No. XXX9010 shall be evidenced by a new note (the "**FMC2 Note**") in the form attached as Exhibit E-3 to be executed by the Reorganized Debtor on the Effective Date. Upon execution of the FMC2 Note, all defaults under Ford Motor Credit's loan and security documents shall be deemed cured as to the Reorganized Debtor and the Reorganized Debtor's property serving as collateral. Payment terms under the FMC1 Note (which are set forth in Exhibit D) are incorporated in the FM2 Note attached as Exhibit E-3. Ford Motor Credit shall retain all pre-petition lien rights in all collateral to secure amounts owed under the FMC2 Note. The Reorganized Debtor shall execute, or authorize the filing of, title documents as may be reasonably requested by Ford Motor Credit to perfect its lien.

## ARTICLE 4
## CLASSIFICATION AND TREATMENT OF PRIORITY CLAIMS

4.1     *Class P1*—shall consist of all Allowed Unsecured Claims entitled to priority under § 507(a)(4) and (a)(5) of the Bankruptcy Code (employee wages and benefits) in the amounts set forth in Exhibit F. Unless otherwise agreed by the holder, Class P1 Claims shall be paid in full on the Effective Date.

4.2     *Class P2*—shall consist of all Allowed Unsecured Claims entitled to priority under § 507(a)(8) of the Bankruptcy Code (income and employment taxes) in the amounts set forth in Exhibit F. Class P2 Claims shall be paid in 48 equal installments beginning on the first day of the calendar month following the Effective Date.

# ARTICLE 5
## CLASSIFICATION AND TREATMENT OF UNSECURED CLAIMS

5.1    *Class U1*—shall consist of Allowed Unsecured Claims in the pre-petition

amounts set forth in Exhibit G, the holders of which have preserved their rights to assert

and record a construction lien on the project property for materials or services provided by

the timely filing a notice of preliminary lien under the provisions of Utah Code Ann. § 38-

1a-101 et seq. All Class U1 Claims shall be paid in full upon the payment by the customer

to the Reorganized Debtor. To the extent that payment is not made by the customer relating

to the project property, the Reorganized Debtor shall pay such Class U1 Claim in the same

manner and subject to the same terms as Claims in Class U2.

5.3    *Class U2*—shall consist of all Allowed Unsecured Claims, which do not

qualify under Class U1, in the pre-petition amounts set forth in Exhibit G. The Reorganized

Debtor shall pay 20% of the Allowed Unsecured Claim of each holder of a Class U2 Claim

on a pro-rated basis from profits of the Reorganized Debtor as such profits become

available after (A) payment in full of (i) the BW Consolidated Note (ii) Allowed

Administrative Expenses, and (iii) Priority Claims and (B) retention of amounts deemed

necessary in the business judgment of the Reorganized Debtor to continued business

operations. Until holders of Class U2 claims are paid 20% of their Allowed Unsecured

Claims, the Reorganized Debtor shall not pay any dividends on account of its stock;

provided, however, that the Reorganized Debtor may pay dividends to its shareholders

from time to time in amounts necessary to enable its shareholders to pay income taxes and

12

make estimated tax payments to satisfy their liabilities under federal and state law which arise solely because of their ownership of the Reorganized Debtor's stock.

## ARTICLE 6
## CLASSIFICATION AND TREATMENT OF INTERESTS

6.1    *Class I*—shall consist of all Allowed Interests of the Debtor as set forth in Exhibit H. Class I interests shall be cancelled on the Effective Date.

## ARTICLE 7
## IMPAIRMENT OF CLAIMS

Classes BW1, BW2, BW3, BW4, FMC1, FMC2, U1, U2, and I are impaired under the Plan.

## ARTICLE 8
## PROVISIONS FOR DISPUTED CLAIMS

If, when a distribution is required under the Plan, a Disputed Claim has not been resolved, then the Reorganized Debtor shall set aside and hold that amount that would have been distributed had the Disputed Claim been an Allowed Claim in a segregated account until the Disputed Claim is disallowed or becomes an Allowed Claim. Upon becoming an Allowed Claim, the Reorganized Debtor shall pay the heldback amount to the holder of the Disputed Claim in the same manner as to other holders of the same class. If, disallowed, the heldback amount shall be released to the Reorganized Debtor.

## ARTICLE 9
## MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN

9.1     *Post-Confirmation ownership of the Reorganized Debtor.*

9.1.1.  *If the Plan is accepted by Classes U1 and U2.* If the Plan is accepted by Classes U1 and U2, then, on the Effective Date, RC Montrone shall, for a capital contribution to the Reorganized Debtor of $10,000, become the new 100% stockholder of the Reorganized Debtor.

9.1.2.  *If the Plan is rejected by* Classes *U1 or U2.* If the Plan is rejected by Classes U1 or U2, then, on the Effective Date, the person who is the highest bidder under the auction procedure described below shall become the new 100% stockholder of the Reorganized Debtor upon payment to Reorganized Debtor (prior to the Effective Date) of the amount bid.

9.1.3.  *Auction procedure.* After the filing of this Plan, the Debtor shall provide no less than 20 days notice by first-class mail to all creditors of a telephonic auction of 100% of the stock of the Reorganized Debtor to take place no less than three business days before the Confirmation Hearing. Consummation of the sale shall be contingent upon non-acceptance of the Plan by Classes U1 or U2 and Confirmation of the Plan.

To ensure an exemption from securities registration under § 4(a)(2) of the Securities Act of 1933, which prohibits general solicitation or public advertising, the auction shall be limited to persons who are listed in the Debtor's schedules has

having an Allowed Claim or those who have filed proofs of claim as of the date of this Plan and who are entitled to vote to accept or reject the Plan (*i.e.,* holders of Disputed Claims do not qualify unless their claims are allowed for purposes of voting). Person who may have received an assignment of claims but have not filed a notice of transfer with the Bankruptcy Court in accordance with Bankruptcy Rule 3002(e) as of the date of the filing of the Plan shall not eligible to participate in the auction. Moreover, the successful bidder must qualify as an "accredited investor" (as used in Rule 506(b) of Regulation D) or must meet the legal standard of having sufficient knowledge and experience in financial and business matters to be capable of evaluating the merits and risks of the prospective investment. The sale of the stock shall be approved as part of Confirmation and subject to findings establishing the purchaser's status as an accredited investor or as having sufficient knowledge and experience in financial and business matters to be capable of evaluating the merits and risks of the prospective investment. Any interest obtained by a purchaser of the stock through the auction procedure shall be subject to the terms of the Plan.

9.1.4 *Purchaser's commitments.* Any purchaser of the stock of the Reorganized Debtor shall be required, as a condition to a feasibility finding under the Confirmation Order, to commit to consummation of the Plan as proposed.

9.2   *Continuation of business.* The Reorganized Debtor shall continue its pre-petition/pre-confirmation business operations.

9.3    *Payments due on the Effective Date.* The Reorganized Debtor shall use Estate Cash (including amounts from the sale of its stock) to pay all amounts required under the Plan to be paid as of the Effective Date.

9.4    *Cash collateral and adequate protection payments.* The Debtor shall comply with all agreements and/or orders for the use of the cash collateral and adequate protection payments through the Effective Date.

9.5    *Post-Confirmation Plan Obligations and Operating Expenses*. The Reorganized Debtor shall pay post-confirmation obligations under the Plan and ongoing debts incurred in the ordinary course of the Reorganized Debtor's business from Estate Cash, post-confirmation earnings, and, if necessary, subsequent loans, or capital contributions.

9.6    *Paycheck Protection Program Loan/Grant.* On April 28, 2020, the Debtor obtained a loan/grant in the amount of $367,200 from Zions Bank under the Paycheck Protection Program (the "**PPP**") provided for under the CARES Act. Between April 28, 2020, and June 1, 2020, the Debtor used $161,216 for purposes authorized under the PPP. On June 1, 2020, Zions Bank froze the remaining funds ($205,984) on the basis that the Debtor was ineligible for such loan/grant under and interim final rule promulgated by the Small Business Administration (the "**SBA**") that was published in the Federal Register on April 28, 2020 (the same day the loan was funded), and that prohibited PPP loans/grants to small businesses that were debtors in bankruptcy. Questions regarding the enforceability

of the SBA's eligibility restrictions are the subject of a pending adversary proceeding (Adv. No. 20-2056). To the extent that the Debtor (or Reorganized Debtor) is entitled to use such funds, such funds shall be held in a segregated account at Zions Bank and will be used in a manner to ensure that the loan is forgiven and becomes a grant (*i.e.,* the funds shall be used solely and exclusively for the payment of wages and rent). If the Debtor or Reorganized Debtor are determined (in the adversary proceeding) to be ineligible for the PPP loan and it is further determined that repayment of the loan is necessary (despite the Debtor's compliance with the PPP), the Debtor or Reorganized Debtor shall repay the loan to Zions Bank in accordance with the requirements under the PPP as an unsecured, post-Confirmation obligation. The discharge provisions of this Plan shall <u>not</u> apply to the Debtor's or the Reorganized Debtor's repayment obligation, if any, under the PPP loan; provided, however, that the Reorganized Debtor's payment obligation to Zions Bank shall be subordinate to the Reorganized Debtor's payment obligations to holders of Allowed Administrative Expenses and Priority Claims.

      9.7    *Post-Confirmation Professional Fees and Costs.* The Reorganized Debtor shall pay fees and expenses incurred post-Confirmation by its professionals (including, with limitation, those employed during the pendency of this case) in the ordinary course of the Reorganized Debtor's business. The Reorganized Debtor and its professionals shall not be required to obtain authorization for such payments under applicable provisions of the Bankruptcy Code governing employment and payment of professionals in a case.

## ARTICLE 10
## LEASES

10.1   *Leases assumed or rejected.* Upon the Effective Date, the leases listed on Exhibit I attached hereto shall be assumed or rejected as indicated**.**

10.2   *Cure amounts.* Upon the Effective Date and in conjunction with assumption, the Reorganized Debtor shall cure all pre-confirmation defaults and compensate the parties to such leases for actual pecuniary losses in the amounts set forth in Exhibit I in full satisfaction of the Debtor's obligations under § 365(b)(1)(A) & (B) of the Bankruptcy Code.

10.3   *Adequate Assurance of Future Performance*. Confirmation of the Plan shall constitute adequate assurance of future performance of assumed leases as required under § 365(b)(1)(C) of the Bankruptcy Code.

10.4   *Rejected Leases*. Any lease not identified in Exhibit I as being assumed or rejected under the Plan shall be deemed rejected at Confirmation. A party to a lease that is rejected under this provision must file a proof of Claim arising from such rejection within 28 days after Confirmation. Failure to file a proof of Claim by this deadline will result in disallowance of the Claim.

## ARTICLE 11
## EXECUTORY CONTRACTS

11.1   *Executory Contracts assumed or rejected*. Upon the Effective Date, the pre-petition executory contracts listed in Exhibit I attached hereto shall be assumed or rejected as indicated in the Exhibit.

11.2   *Cure amounts.* Upon the Effective Date and in conjunction with assumption, the Reorganized Debtor shall cure all pre-confirmation defaults and compensate the parties to such contracts for actual pecuniary losses in the amounts set forth in Exhibit I in full satisfaction of the Debtor's obligations under § 365(b)(1)(A) & (B) of the Bankruptcy Code.

11.3   *Adequate Assurance of Future Performance.* Confirmation of the Plan shall constitute adequate assurance of future performance of assumed executory contracts as required under § 365(b)(1)(C) of the Bankruptcy Code.

11.4   *Rejected Executory Contracts.* Any pre-petition executory contract not identified in Exhibit I as being assumed or rejected under the Plan shall be deemed rejected at Confirmation. A party to an executory contract that is rejected under this provision must file a proof of Claim arising from such rejection within 28 days after Confirmation. Failure to file a proof of Claim by this deadline will result in disallowance of the Claim.

## ARTICLE 12
## PAYMENTS

12.1   *Manner of payment.* Unless other mutually-acceptable arrangements are made between the Reorganized Debtor and the holder of an Allowed Administrative Expense or Allowed Claim, the Reorganized Debtor shall make payments required hereunder by check, which will be mailed (first-class, postage prepaid) to the holder of the Allowed Claim or Allowed Administrative Expense. A payment shall be deemed made when mailed.

12.2    *Right to rely on information*. The Reorganized Debtor shall be entitled to rely on the addresses contained the attached exhibits in making payments required hereunder. Every holder of an Allowed Claim has the duty to ensure that its address is listed correctly. The Reorganized Debtor may, but shall have no duty to, search for, obtain, or make corrections to contact and mailing information in the absence of correction by the holder of an Allowed Claim.

12.3    *Forfeiture of payments*. Holders of Allowed Claims or Allowed Administrative Expenses shall be deemed to have forfeited their right to a payment hereunder if (a) a payment check is returned as undeliverable, as having an incorrect address, or the like, and such party does not contact the Reorganized Debtor within 60 days of the check being originally mailed, or (b) a payment check is not paid by the payor bank within 90 days after it is mailed.

## ARTICLE 13
## BAR DATES, DEADLINES, OBJECTION TO CLAIMS

13.1    *Administrative Expense bar date*. Unless an earlier date is ordered by the Court, the bar date for the filing of applications for allowance of any pre-Confirmation administrative expense (except for those of the Debtor's professionals) under § 503(b) of the Bankruptcy Code shall be the Confirmation Hearing. Notwithstanding the foregoing, the Internal Revenue Service and the Utah State Tax Commission shall have 45 days after the relevant return is filed with the insolvency departments of those taxing authorities to file an application for allowance of any pre-Confirmation administrative expenses. For the

Internal Revenue Service, these returns may include quarterly Form 941 returns, Form 940 and a Form 1041.

13.2   *Claims bar date*. The bar date for filing proofs of claim is March 11, 2020 (except for government claims, which is May 6, 2020). Except as otherwise provided herein, any proof of Claim filed after that date shall be deemed disallowed unless the holder of such Claim has obtained an order of the Court allowing the late-filing of the Claim that is entered before, or in conjunction with, the Confirmation Hearing.

13.3   *Amendment of Claims*. Except as otherwise provided herein, no proof of Claim may be amended to increase the amount of any Claim after the Confirmation Hearing.

13.4   *Objections to Claims*. Except as otherwise provided herein, objections to Claims must be filed no later than 60 days after the Effective Date. Any party in interest with a financial stake in the outcome of an objection to a Claim may object to such Claim or join in the prosecution of any pending objection to such Claim.

## ARTICLE 14
## EFFECT OF CONFIRMATION

14.1   *Binding effect*. Upon the Effective Date, the provisions of the Plan shall bind the Debtor, the Reorganized Debtor, creditors, and all parties in interest regardless of whether or not such persons or entities have impaired Claims under the Plan or whether or not such persons or entities have accepted the Plan.

14.2    *Vesting of property*. Property of the Estate shall vest in the Reorganized Debtor upon the Effective Date free and clear of all Claims and Interests except as provided for, or retained, under the Plan.

14.3    *Discharge.* Upon the Effective Date, the Debtor shall receive a discharge of any debt that arose before the Effective Date, and all creditors and parties in interest shall be permanently enjoined from commencing or pursuing any action against the Reorganized Debtor other than to enforce the obligations created or preserved under this Plan.

## ARTICLE 15
## GUARANTOR AND THIRD-PARTY LIABILITY

No provision of this Plan shall be construed to discharge or modify any debt owed to the holder of a Claim by a guarantor or other third party that is, or may be, liable with the Debtor on any debt provided for under the Plan.

## ARTICLE 16
## MODIFICATION OF PLAN

16.1    *Modification prior to Confirmation*. The Debtor may modify the Plan at any time before Confirmation provided that the Plan, as modified, meets the requirements of the Bankruptcy Code. If the Debtor files a modification of the Plan with the Court, the Plan as modified will become the Plan.

16.2    *Modification after Confirmation*. The Debtor may modify the Plan at any time after Confirmation and before substantial consummation provided that the Plan, as modified, meets the requirements of the Bankruptcy Code. The Plan, as modified after Confirmation, will become the Plan only if circumstances warrant such modification and

the Court, after notice and hearing, confirms the Plan as modified. If the Court makes such a determination and approves such modification, it shall be deemed accepted by all holders of claims that have previously accepted the Plan.

### ARTICLE 17
### DEFAULT

17.1   *Rights of secured creditors.* A default shall occur with respect to payment of an Allowed Secured Claim according to the terms of the new notes issued under the Plan. Upon default, the holder shall be entitled to enforce its rights under the new notes including liens rights to the extent preserved or granted under the Plan.

17.2   *Rights of unsecured creditors.* A default shall occur with respect to payment of an Allowed Unsecured Claim or Allowed Administrative Expense if the Reorganized Debtor (1) fails to make any payment or distribution required under the Plan or (2) makes any distribution in violation of the priority provisions required under the Plan (*e.g.,* the Reorganized Debtor makes a distribution on account of stock before payment of Allowed Unsecured Claims). In the event of such a default, the aggrieved party shall be required to provide written notice of such default to the Reorganized Debtor. The Reorganized Debtor shall have 28 days after its actual receipt of such written notice to cure the default. Absent cure, the holder of an Allowed Claim or Allowed Administrative Expense shall be entitled to accelerate all amounts due and enforce its debt as modified under the Plan. For holders of Class U2 Claims, the amount subject to enforcement under this provision shall be limited to 20% of the holder's Allowed Claim less any amounts that have been paid under the Plan.

Any post-Confirmation enforcement of an Allowed Claim shall be subject to the provisions for priority and subordination of Claims as set forth in this Plan and subject to the rights of holders of Allowed Claims or holders of Administrative Expenses who may have priority over such Allowed Claim.

## ARTICLE 18
## RETENTION OF JURISDICTION

The Court shall retain jurisdiction after Confirmation for the purposes of (a) hearing and determining the allowance of  any Administrative Expense; (b) hearing and determining any objection to a Claim; (c) hearing and determining all causes of action, controversies, disputes, or conflicts that were pending before Confirmation or retained under the Plan; (d) correcting any defect, curing any omission, or reconciling any inconsistency in the Plan or order of confirmation as may be necessary to carry out the purpose and intent of the Plan; (e) issuing any order necessary to implement the Plan, including without limitation, such declaratory and injunctive orders as are appropriate to protect the Estate or property of the Reorganized Debtor from actions of creditors or other parties in interest; (f) hearing and determining any dispute relating to the terms or implementation of the Plan or to the rights or obligations of any parties in interest with respect thereto; (g) confirming a Plan after modification pursuant to § 1127(b) of the Bankruptcy Code; and (h) entering orders concluding and terminating this bankruptcy case.

## ARTICLE 19
## FINAL DECREE

The Reorganized Debtor shall seek a Final Decree under § 350 of the Bankruptcy Code and Bankruptcy Rule 3022 as soon as practicable after the estate is fully-administered.

## ARTICLE 20
## CLAIMS RETAINED UNDER THE PLAN

20.1   *Claims retained.* The following claims belonging to the Debtor or the Estate shall be retained by the Reorganized Debtor: (1) any and all claims that existed pre-petition relating to the collection or enforcement of any account receivable; (2) any and all compulsory or permissive counterclaims relating to any Disputed Claim; (3) any claims raised in any adversary proceeding or contested matter that is pending at the time of Confirmation, and (4) any claims against Katy Montrone, Rocky Mountain Advisory, Thermal West Industries, Inc., and Piercey, Bowler, Taylor & Kern including, without limitation, claims to avoid and recover transfers under §§ 544, 547, or 548 of the Bankruptcy Code or state law claims including for breach of fiduciary duty, for breach of contract, for fraud, or for unjust enrichment.

20.2   *Prosecution of retained claims.* The Reorganized Debtor may, but shall not be required to, prosecute any retained claim, and no director, officer, or stockholder of the Reorganized Debtor shall be liable to any party for any decision of the Reorganized Debtor relating to the prosecution of retained claims.

## ARTICLE 21
## MISCELLANEOUS

21.1    *Calculation of Time Periods.* The calculation of time periods herein shall be

governed by Federal Rule of Bankruptcy Procedure 9006.

21.2    *Notices to the Reorganized Debtor.* Notices to the Reorganized Debtor shall

be deemed proper only if delivered or mailed and emailed to

> RC Montrone, general manager
> 2487 South 3270 West
> Salt Lake City, UT 84119

and to

> rcmontrone@sheetmetalworks.biz

21.3    *Reports.* The Reorganized Debtor shall file a post-confirmation summary

report in conformity with Local Rule 2081-1(c) within 90 days of the Effective Date.

Dated this 19th day of July 2020.

**SHEET METAL WORKS, INC**

/s/ RC Montrone
President

**RICHARDS BRANDT MILLER NELSON**

/s/ Adam S. Affleck
Attorneys for Sheet Metal Works, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 19th day of July, 2020, a true and correct copy of the foregoing was served by Electronic service [CM/ECF Service] as follows:

<u>**Electronic Mail Notice List:**</u>

- **Adam S. Affleck**  adam-affleck@rbmn.com; andalin-bachman@rbmn.com; affleckar93359@notify.bestcase.com;
- **Megan K. Baker**  baker.megan@dorsey.com; long.candy@dorsey.com
- **Laurie A. Cayton tr**  laurie.cayton@usdoj.gov; James.Gee@usdoj.gov; Lindsey.Huston@usdoj.gov; Rinehart.Peschell@usdoj.gov
- **P. Matthew Cox**  bankruptcy_pmc@scmlaw.com
- **Robert Crockett**  rcrockett@fabianvancott.com
- **Douglas J. Payne**  dpayne@fabianvancott.com; mdewitt@fabianvancott.com
- **United States Trustee**  USTPRegion19.SK.ECF@usdoj.gov
- **Steven T. Waterman**  waterman.steven@dorsey.com; bingham.karen@dorsey.com; ventrello.ashley@dorsey.com
- **Melinda Willden tr**  melinda.willden@usdoj.gov, Lindsey.Huston@usdoj.gov; James.Gee@usdoj.gov; Rinehart.Peshell@usdog.gov

/s/ Adam S. Affleck

G:\EDSI\DOCS\22212\0003\1AX2188.DOCX

27

<u>EXHIBIT A – Liquidation Analysis</u>

Under 11 U.S.C. § 1129(a)(7), the Debtor must, for each class of claims or interest that does not accept the Plan, demonstrate that the holders of such non-accepting class would receive as much, or more, under the distribution provisions of the Plan than they would receive if the Debtor's assets were liquidated under a hypothetical chapter 7 case on the Effective Date of the Plan. The Debtor's analysis of the liquidation-equivalency test for each of the classes of claims under the Plan follows below.

<u>Classes BW1 through BW4</u>. Bank of the West has four Secured Claims arising from loan agreements and promissory notes totaling approximately $725,299. Bank of the West's payment obligations are cross-collateralized by perfected security interests in essentially all of the Debtor's pre-petition assets. For purposes of asset scheduling, cash collateral matters, and determination of Bank of the West's secured claims, the Debtor has used the "book value" or, alternatively, "going concern" value of its assets. Such valuations have been appropriate under § 506(a) of the Bankruptcy Code because the Debtor intends to use such assets in the context of a post-confirmation going concern. *See, e.g., In re Motors Liquidation Company,* 576 B.R. 325 (Bankr. S.D.N.Y. 2017), *leave to appeal denied,* 2018 WL 4284286 (S.D.N.Y. 2018) (holding that "going concern" value of assets was required under § 506(a) where assets were sold to an entity that was going to continue the use of such assets in an ongoing business). Of course, the value of the Debtor's assets in a hypothetical liquidation is markedly different from the value of such assets as used in a going concern business. Using it most current information, the Debtor anticipates that, in a hypothetical chapter 7 liquidation, Bank of the West's collateral would be worth approximately $560,564. Because the total amount of Bank of the West's Secured Claims is $725,299 (or more), the chapter 7 trustee would likely abandon the collateral to Bank of the West and allow it to foreclose it liens. Since Bank of the West would only realize $560,564 (the liquidation sale value of its collateral) on its Secured Claim in a hypothetical chapter 7 case, and the Debtor proposes payment in full of Bank of the West's Secured Claims, the liquidation-equivalency test is met for Bank of the West.

**Table 1: Bank of the West--Liquidation Analysis**

| Asset Description | Value in Schedules | Going Concern Value | Liquidation Value | Comments |
|---|---|---|---|---|
| Cash Collateral | 73,331 | 33,400 | 33,400 | |
| Accounts Receivable | 878,594 | 337,053 | 123,674 | *See* Note 1 |
| Equipment | | | | |
|    Shop Floor | 303,625 | 304,065 | 95,320 | *See* Note 2 |
|    Outside (Including Untitled Trailers) | 26,445 | 48,755 | 16,800 | *See* Note 2 |
| Inventory | 17,642 | 16,000 | 4,000 | |
| Office Furn. and Equip. | 12,865 | 21,160 | 7,370 | *See* Note 2 |
| Secured Note  (Iron Holdings) | 302,410 | 302,410 | 280,000 | *See* Note 3 |
|    Subtotals: | | | 560,564 | |
|    Less Liens | 1,314,647 | 722,602 | 722,602 | |
| Value over/under liens | | 340,341 | (292,686) | |

Note 1: The $878,594 value of Accounts Receivable in the Schedules was a gross number that did not account for money that was owed on those accounts directly to suppliers and subcontractors pursuant to joint check agreements. The money owed under joint check agreements has been paid in the ordinary course of business. The liquidation value reflects that fact that most of the Debtor's accounts receivable are owed on ongoing executory contracts. If the Debtor ceases operations, the other contracting party will have a large offsetting claims for hiring a new contractor to finish the project. For additional explanation, *see* Disclosure Statement § III (C)(2).

Note 2: The Shop Floor equipment and outside equipment is integrated into the Debtor's rented space. In liquidation, the equipment would need to be disassembled, removed, and sold at auction--most likely in a piecemeal fashion. The liquidation value reflects a significant reduction in value for this reason. The going concern and liquidation value of the equipment is established by the attached appraisal of Loosli Management, Inc., updated as of June 26, 2020.

Note 3: The Iron Holdings Note is earning 4% interest but is not due for 5 years. In liquidation, the Debtor estimates that a purchaser would demand a $20,000 discount for this delayed maturity date.  A copy of the note and trust deed are attached to the Disclosure Statement as Exhibit 3 thereto.

Classes FM1 and FM2. Ford Motor Credit has two Secured Claims: one in the amount of $2,180.33, secured by a 2016 Ford Mustang, and the other in the amount of $18,051.64, secured by a 2017 Ford truck. The vehicles have values in excess of the liens. So in a hypothetical chapter

7 case, the Debtor anticipates that the chapter 7 trustee would sell the vehicles, pay the Secured Claims, and keep the excess proceeds (estimated to be approximately $56,418) for payment of Administrative Expenses and Unsecured Claims. In its Plan, the Debtor proposes payment in full of Ford Motor Credit's Secured

Claims, so the liquidation-equivalency test for Ford Motor Credit is met for these claims.

| Table 2: Ford Motor Credit -Liquidation Analysis | | |
|---|---|---|
| Asset Description | Value in Schedules | Liquidation Value |
| 2017 Ford Truck VIN XXX 5069 | 30,970 | 34,950 |
| 2016 Ford Mustang VIN XXX 0405 | 53,912 | 41,700 |
| Subtotal | | 76,650 |
| Less liens | | (20,232) |
| *Value over/under liens | | 56,418 |

\* The liquidation value of the titled vehicles is established by the attached appraisal of Loosli Management, Inc., updated as of June 26, 2020.

Unencumbered Assets. In addition to the $56,418 in sales proceeds above the amount of liens for the encumbered vehicles discussed above, the Debtor anticipates that its other unencumbered assets (when combined with this $56,418) would have a total liquidation value of $156,993. As shown in the table (below), these assets include avoidance claims. The Debtor has not fully-investigated the value of all avoidance claims in excess of costs of litigation. So several of the entries show an unknown value for such claims.

**Table 3: Unencumbered Assets and Claims--Liquidation Analysis**

| Asset Description | Value in Schedules | Liquidation Value | Comments |
|---|---|---|---|
| **Vehicles \*** | | | |
| Excess proceeds from the sale of encumbered vehicles | n.a. | 56,418 | |
| 2008 Ford Truck VIN XXX 3018 | 7,000 | 7,000 | Shop truck, over 200,000 miles. |
| 2014 Ford Truck VIN XXX 5404 (Ford F350) | 30,970 | 21,200 | The VIN of XXX 2634 in the Schedules for this truck was incorrect. The correct VIN is shown. |
| 2014 Ford Truck VIN XXX 6703 (Ford F150) | 30,970 | 12,375 | The VIN of XXX 0126 in the Schedules for this truck was incorrect. The correct Vin is shown.T |
| 2014 Ford Truck VIN XXX 3167 (Ford F350) | 31,089 | 18,000 | The VIN of VIN XXX 2407 in the Schedules fot this truck was incorrect. The correct VIN is shown. |
| 2008 Ford Truck XXX 1398 | 7,000 | 7,000 | Second shop truck, over 200,000 miles. |
| Subtotal of Vehicle Values | | 121,993 | |
| **Avoidance Claims\*\*** | | | |
| Katy Montrone--fraudulent transfer of undetermined amounts | n.a. | unknown | Value of claim cannot be estimated at this time. |
| Thermal West Industrial Inc.--fraudulent transfer of $60,000 | n.a. | 20,000 | Settlement value. |
| Rocky Mtn. Adv., LLC--preference of $32,000 | n.a. | 15,000 | Settlement value. |
| Piercey, Bowler, Taylor & Kern--fraudulent transfer of undetermined amounts | n.a. | unknown | Value of claim cannot be estimated at this time. |
| Subtotal of Avoidance Claims | | 35,000 | |
| **Total** | | 156,993 | |

\*The liquidation value of the Titled Vehicles is established by the attached appraisal of Loosli Management, Inc, updated as of June 26, 2020

\*\*For a more detailed analysis of the Debtor's analysis of these claims, *see* Disclosure Statement § I.

    <u>Waterfall Distribution Analysis of Proceeds from Unencumbered Assets</u>. In a chapter 7 case, certain unsecured Claims have distribution priority over others. For example, before the anticipated $156,993 (representing the value of unencumbered assets and claims in a hypothetical chapter 7 case) would reach unsecured creditors, all Administrative Expenses and Priority Claims

would need to be paid in full. The Debtor projects these Administrative Expenses and Priority Claims to be approximately $547,400 in this case. Accordingly, in a hypothetical chapter 7 liquidation on the Effective Date, general unsecured creditors would receive no distribution.

| Table 4: Administrative Expenses and Priority Claims--Liquidation Analysis | | |
|---|---|---|
| Chapter 7 Administrative Expenses | Amount | Comments |
| Chapter 7 Trustee Professional Fees | 80,000 | |
| Chapter 7 Trustee Commission on Distribution of $156,993 | 13,312 | 25% of initial $5,000 disbursed to creditors; 10% of next $45,000, and 5% thereafter |
| Chapter 11 Administrative Expenses | | |
| Staples Business Advantage | 733 | § 503(b)(9) for goods delivered just prior to filing |
| Suppliers - post-petition payments to suppliers incurred in the ordinary course of business. | 30,000 | § 503(b)(1) Estimated expense owed to suppliers. |
| Richards Brandt Miller Nelson | 210,924 | Subject to allowance by the Court |
| Zions Bank - post-petition administrative expense for funds expended under the §1102 of the CARES Act Paycheck Protection Program ("PPP") as part of the Small Business Administration's (the "SBA") 7(a) loan program. | 161,216 | Zions Bank will likely assert an administrative expense priority claim under § 503(b)(1) for those funds received and spent by Sheet Metal Works prior to Zion's freezing of the account. |
| Priority Claims | | |
| Utah State Tax Commission | 7,120 | proof of claim no. 12 |
| Internal Revenue Service | 39,261 | proof of claim no. 7 |
| Total Administrative Expense and Priority Claims: | 547,440 | |

# Loosli Management, Inc.

June 26, 2020

Sheet Metal Works, Inc.
RC Montrone
2487 South 3270 West
West Valley City, UT 84119

Reference:  Desktop fair market value – installed and salvage value appraisal report of assets located at Sheet Metal Works, Inc.

Dear Mr. Montrone:

The referenced appraisal report is enclosed. The purpose of this appraisal is to determine the Fair Market Value – Installed and Salvage Value of certain assets of Sheet Metal Works, Inc. as of June 26, 2020 for collateral considerations. Intended users are Sheet Metal Works, Inc. and Bank of the West. It is not intended for any other user or purpose.

This appraisal includes the equipment outlined in Section III as listed in Exhibit A in the report. As a result of my investigation and analysis, I place the requested values as of the effective date of June 26, 2020 as follows:

| | Fair Market Value - Installed | Salvage Value |
|---|---|---|
| Shop Floor Equipment: | $304,065.00 | $ 95,320.00 |
| Equipment Outside the Shop: | $ 48,755.00 | $ 16,800.00 |
| Office Furniture and Equipment: | $ 21,160.00 | $  7,370.00 |
| Vehicles | $143,705.00 | $128,225.00 |
| Grand Totals: | $517,685.00 | $247,715.00 |

### Fair Market Value – Installed
Is an opinion, expressed in terms of money, at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts, considering market conditions for the asset being valued, independent of earnings generated by the business in which the property is or will be installed, as of a specific date.

(Source: Valuing Machinery and Equipment: The fundamentals of Appraising Machinery and Technical Assets – Third Edition – American Society of Appraisers – Copyright 2011)

### Salvage Value (SV)
Is an opinion of the amount, expressed in terms of money, that may be expected for the whole property or a component of the whole property that is retired from service for possible use elsewhere, as of a specific date.

(Source: Valuing Machinery and Equipment: The fundamentals of Appraising Machinery and Technical Assets – Third Edition – American Society of Appraisers – Copyright 2011)

Descriptions of the assets appraised, together with explanations of the appraisal procedures used are presented in the report.  The value opinions expressed in this appraisal are contingent upon the analyses, facts, and conditions presented in the accompanying report.

My analysis, opinions and conclusions were developed, and this report has been prepared in conformity with the Uniform Standards of Professional Appraisal Practice and the Code of Ethics of the American Society of Appraisers.

I would be happy to discuss any of the topics outlined in this Cover Letter or the Appraisal Report at your convenience.

I appreciate the opportunity provided to me with this assignment.

Sincerely,



Mark C. Loosli - ASA
President
Loosli Management, Inc.
3531 East Hidden Springs Drive
Washington, UT  84780

801-450-4411 Cell
435-627-2368 Office

A Desktop Fair Market Value – Installed and Salvage Value Appraisal Report

Of

Various Sheet Metal Fabrication Related Assets,
Office Furniture and Equipment, and Vehicles

Located At:

Sheet Metal Works, Inc.
2487 South 3270 West
West Valley City, UT 84119

Requested By Client

Sheet Metal Works, Inc.
RC Montrone

(Reference USPAP 8.2 (a) (i))

\*    The majority of the assets were inspected by the appraiser on August 6, 2018 as part of an appraisal dated August 10, 2018, with an effective date of April 25, 2018. No additional inspection was performed for this new appraisal.
\*    The effective date of this report is June 26, 2020.  (Reference USPAP 8.2 (a) (vii))
\*    The date of this report is June 26, 2020. (Reference USPAP 8.2 (a) (vii))

A copy of this report and the workfile associated with it will be retained by Loosli Management, Inc. for a period of at least five (5) years after preparation, or at lease two (2) years after final disposition of any judicial proceeding in which testimony will have been given, whichever period expires last.

Appraiser:

Mark C. Loosli
American Society of Appraisers Accredited Senior Appraiser Member: Machinery and
Technical Specialties – Machinery and Equipment
President
Loosli Management, Inc.
3531 East Hidden Springs Drive
Washington, UT  84780
435-627-2368

_Mark C. Loosli_

Signature

June 26, 2020
Date

Note:  Reference to USPAP, (Uniform Standards of Professional Appraisal Practice, effective January 1, 2020) throughout this report indicates by paragraph number the specific USPAP standards associated with the various sections contained in this report.

## <u>TABLE OF CONTENTS</u>

I.      CERTIFICATE

II.     ASSUMPTIONS AND LIMITING CONDITIONS

III.    TERMS AND DEFINITIONS

IV.     PURPOSE AND INTENDED USE OF THE APPRAISAL

V.      METHODOLOGY

VI.     RECAPITULATION

VII.    APPRAISAL

VIII.   APPRAISER QUALIFICATIONS

IX.     PHOTOGRAPHS OR OTHER DOCUMENTATION

## I.  CERTIFICATE (Reference USPAP 8.3)

I certify that, to the best of my knowledge and belief:

The statements of fact contained in this report are true and correct.

The reported analyses, opinions and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal impartial unbiased professional analyses, opinions and conclusions.

I have no present or prospective interest in the property that is the subject of this report, and I have no personal interest with respect to the parties involved

I have performed an appraisal assignment for this client relating to the same assets on August 10, 2018 with an effective date of April 25, 2018.

I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

My engagement in this assignment was not contingent upon developing or reporting predetermined results.

My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

My analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the *Uniform Standards of Professional Appraisal Practice.*

I made a personal inspection of the majority of the property that is the subject of this report on August 6, 2018.

No one provided significant personal property appraisal assistance to the person signing this certification.

The person signing this report is a Senior Accredited Appraiser Member of the American Society of Appraisers in the discipline of Machinery and Technical Specialties – Machinery and Equipment.

**Appraiser:**

Mark C. Loosli
American Society of Appraisers Accredited Senior Appraiser Member: Machinery and
Technical Specialties – Machinery and Equipment
President
Loosli Management, Inc.
3531 East Hidden Springs Drive
Washington, UT  84780
435-627-2368

_____
Signature

June 26, 2020
Date

## II. ASSUMPTIONS AND LIMITING CONDITIONS

This appraisal has been made with the following general assumptions and limiting conditions:

1. No investigation has been made of, and no responsibility is assumed for legal descriptions or other legal matters, including title or encumbrances. Title to the property is assumed to be good and marketable unless otherwise stated. The property is further assumed to be free and clear of all liens, easements or encumbrances unless otherwise stated.

2. Information supplied by others that was considered in this valuation is from sources believed to be reliable, and no further responsibility is assumed for its accuracy. We reserve the right to make such adjustments to the valuation herein reported as may be required by consideration of additional or more reliable data that may become available.

3. No responsibility is taken for changes in market conditions and no obligation is assumed to revise this report to reflect events or conditions that occur subsequent to the date hereof.

4. Responsible ownership and competent management are assumed.

5. Full compliance with all applicable local, state and federal use, environmental, and similar laws and regulations is assumed, unless otherwise stated.

6. It is assumed that all required licenses, certificates, consents, or other legislative or administrative authority from local, state or federal government or private entity or organization can be obtained or renewed for any use on which the values contained in this report are based.

7. The opinions of value contained in this report are only for the stated valuation date and only for the stated purpose. This report has been made solely for the use by Loosli Management, Inc.'s named client. Client's unnamed advisors and Bank of the West are additional intended users. It is not intended for any other user or purpose.

8. Neither Loosli Management, Inc. nor any individual signing or associated with this report shall be required by reason of this report to give testimony or appear in court or other legal proceedings unless arrangements have been made.

9. No tests were performed on mechanical parts of any assets. All values presented are the appraiser's considered opinion based on information obtained during the investigation.

10. Assets that were not inspected are so noted in the appraisal section of this report. When we were unable to inspect assets, we have relied on information provided by our client, the client's advisors, or the user of the assets.

11. This report is the property of Loosli Management, Inc. and its client. All parties understand that Loosli Management, Inc. reserves the right to retain and reuse the information in this report at its sole discretion.

12. Valuations contained herein are predicated on the ability to resell, convey or transfer asset(s) clear of any toxic contaminants to the buyer without subsequent liabilities to the seller or liquidator.

13. All opinions of value are presented as our considered opinion based on the facts and data appearing in the report. We assume no responsibility for changes in value and market condition or for the inability of the owner to locate a purchaser at the appraised value.

14. No consideration has been given for business goodwill, royalties, licensing or any other type of intangible asset associated with the business wherein the respective tangible assets are located.

15. It is assumed that the entity in possession of the subject assets holds a fee simple interest thereto. **(Reference USPAP 8.2 (a) (v))**

16. This report and supporting notes are confidential. The contents of this appraisal may be disclosed by Loosli Management, Inc.'s client to parties whom may require such by their direct involvement with the stated intended use and purpose of this appraisal, otherwise, neither all, or any part of the contents of this appraisal shall be copied or disclosed to any party, or conveyed to the public orally or in writing through advertising, public relations, news, sales, or in any other manner without the prior written consent and approval of both the appraiser and client.

17. The appraiser was provided pictures by the client and his advisors. The appraiser also took pictures of a number of assets while onsite August 6, 2018.

18. The majority of the assets were manufactured by well-known companies, many with an international reputation and presence

19. The "estimated manufacture or installation dates" shown on Exhibit A enclosed were based on manufacturer placed identification plates when available. Many assets didn't reflect such dates and the appraiser relied on client's staff of long standing, company reports, or the general condition of the asset to best ascertain the estimated dates.

20. Due to the age of many of the assets, comparable market information was not available. As a result, the cost basis approach to value was used or given more weight when applicable.

21. There were a number of "vehicles" that the appraiser was asked to value by the client. The appraiser included various vehicle assets in the Exhibit A where dealer provided Blue Book values were listed. These vehicles were not inspected by the appraiser since most were on job sites or elsewhere when the appraiser visited the facility.

22. No new assets were added to this report, but a number were removed from the asset listing that supported the appraisal assignment in 2018 referenced in the Certificate above.

23. The appraiser was notified that the building and surrounding property being leased by the client would more than likely not be made available by the landlord to store the assets or stage the assets for sale if the client loses control of the assets for any reason.

24. The appraisal assignment was conducted during the Covid-19 pandemic. Due to various restrictions to travel and some limitations in economic activity requiring the listed assets, the opportunity to remarket the assets may be limited in scope.

## III. TERMS AND DEFINITIONS

### VALUE CONCEPTS (Reference USPAP 8.2 (a) (vi))

#### Fair Market Value – Installed
Is an opinion, expressed in terms of money, at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts, considering market conditions for the asset being valued, independent of earnings generated by the business in which the property is or will be installed, as of a specific date.

(Source: Valuing Machinery and Equipment: The fundamentals of Appraising Machinery and Technical Assets – Third Edition – American Society of Appraisers – Copyright 2011)

#### Salvage Value (SV)
Is an opinion of the amount, expressed in terms of money, that may be expected for the whole property or a component of the whole property that is retired from service for possible use elsewhere, as of a specific date.

(Source: Valuing Machinery and Equipment: The fundamentals of Appraising Machinery and Technical Assets – Third Edition – American Society of Appraisers – Copyright 2011)

### PERSONAL PROPERTY CONDITION

#### Good, ("G")
This term describes items of equipment which are in good operating condition. They may or may not have been modified or repaired and are capable of being used at or near their full specified utilization.

### APPRAISAL REPORT (Reference USPAP 8.2)

This is an "Appraisal Report." As outlined in USPAP 8.2 and it contains information significant to the solution of the appraisal problem.

### PHOTOGRAPHS

There are various photographs included with this appraisal report. Some were taken by the appraiser as part of a site visit on August 6, 2018. Others were furnished by the client or their representatives. Refer to the photograph reference numbers shown in Exhibit A attached which is an integral part of this report:

### DESCRIPTION OF THE ASSETS (Reference USPAP 8.2 (a) (iv))

The subject assets are listed in Exhibit A attached.

I estimate the useful life of the subject assets when originally purchased to be at least five (5) years for office and furniture assets and (10 - 20) years for shop and other sheet metal fabrication related assets, assuming the assets are maintained in accordance with the manufacturers' specifications.
Useful Life: The period of time over which property may reasonably be expected to perform the function for which it was designed. (Source: "Valuing Machinery and Equipment: The Fundamentals of Appraising Machinery and Technical Assets" - Third Edition - American Society of Appraisers, Washington, D.C. 2011)

### APPROPRIATE MARKET OR MARKET LEVEL (Reference USPAP 8.2 (aa) (xii))

In the process of developing our opinion of value of the subject assets we have considered an analysis of the current use and alternative uses to encompass what is profitable, legal and physically possible. This analysis, with regard to the assets appraised herein, simply requires the appraiser to determine if the assets could be used for their intended purpose. We are unaware of any physical or legal restrictions limiting the use of the Subject Assets. Also, it is beyond the scope of this assignment to determine or measure specific income associated with the Subject Assets. Therefore, we have assumed the Subject Assets would be used at their best use and we have valued them at their highest value in the appropriate marketplace.

The assets described in this report have been appraised for their value as an integral part of a business enterprise. In this instance the proper market for the used assets is the market in which purchasers typically buy used assets. This would typically be the retail, wholesale, and auction markets. Comparable sales found in these markets have been adjusted to reflect the types(s) of sale(s) and relevant marketing periods consistent with the purpose and intended use of this appraisal. The utilization of comparable sales data from these markets, along with adjustments is consistent with the concept of best use, as previously discussed.

## IV. PURPOSE AND INTENDED USE OF THE APPRAISAL (Reference USPAP 8.2 (a) (iii))

The purpose of this appraisal is to determine the respective values of certain assets of the client as of June 26, 2020 for collateral considerations.

## V. METHODOLOGY (Reference USPAP 8.2 (a) (x) (1), 8.2 (a) (x) (5), and 8.2 (a) (x) (2))

The methodologies employed in this appraisal are the sales comparison approach to valuation and the cost approach to valuation. The income approach to valuation was considered but not used to create this report.

The income approach to valuation is based upon the present worth of the future benefits (income) of ownership. The income approach is usually not applied to appraise individual assets since it is difficult, if not impossible, to identify individual income streams. As such, the income approach to valuation was deemed inappropriate for use in this analysis. **(Reference 8.2 (a) (x) (2))**

The cost approach to valuation is that approach which measures value by determining the current cost of an asset and deducting for the various elements of depreciation: physical deterioration and functional and economic obsolescence. Physical deterioration represents the loss in value due to wear and tear and age. Functional obsolescence is a loss in value due to factors inherent in the asset itself, such as changes in design or technology. Economic obsolescence is a loss in value due to factors external to the asset, such as government regulations, utilization, or profitability of the asset, or reduced demand for the products produced by the asset. Assets with very little used market data were valued giving more weight to the cost approach. **(Reference USPAP 8.2 (a) (x) (2))**

The sales comparison approach to valuation involves an analysis of recent sales and offering prices for assets that are of the same-kind or like-kind compared to the subject property to arrive at an indication of the most probable selling price for the subject property. The procedure includes gathering data, establishing the appropriate units of comparison and applying the results to obtain the subject property valuation. An example of possible adjustments would be for age, condition, and capacity of the assets, location, date, and type of sale: retail sale, auction sale, asking prices, etc. Assets with an active used market were valued giving more weight to the sales comparison approach. **(Reference USPAP 8.2 (a) (x) (5))**

After careful analyses, the resultant values obtained by the cost approach and sales comparison approach were reconciled to form our conclusion of value. Information considered in this appraisal report relative to the subject property included:

- the age of the subject assets,
- the condition of the subject assets, including usage and suggested maintenance of the assets, and
- new and used asking and selling prices for assets of the same or similar kind as the subject assets.
- Some of the sources used to provide appropriate trade data are:

| | | |
|---|---|---|
| CPMFAB.com | eBay | Sterling Machinery |
| Richie Bros. Auctioneers | shoprpmachine.com | kempler.com |
| Rams Equipment | Mestek Machinery | Hyster |
| Machinery Trader | Blue Book Vehicle Value Guides | |

The American Society of Appraisers Normal Useful Life Study (Copyright 2010)

## VI. RECAPITULATION (Reference USPAP 8.2 (a) (x) (4)

This appraisal includes the equipment outlined in Section III as listed on Exhibit A. As a result of my investigation and analysis, I place the requested values as of the effective date of June 26, 2020 as follows:

|  | Fair Market Value-Installed | Salvage Value |
|---|---|---|
| Shop Floor Equipment: | $304,065.00 | $ 95,320.00 |
| Equipment Outside the Shop: | $ 48,755.00 | $ 16,800.00 |
| Office Furniture and Equipment: | $ 21,160.00 | $ 7,370.00 |
| Vehicles | $143,705.00 | $128,225.00 |
| Grand Totals: | $517,685.00 | $247,715.00 |

## VII. APPRAISAL

The subject assets are listed in Exhibit A attached.

## VIII. APPRAISER QUALIFICATIONS

MARK C. LOOSLI
President
Loosli Management, Inc.
3531 East Hidden Springs Drive
Washington, UT 84780

### ASSET MANAGEMENT AND LEASING INDUSTRY

| 2006-Present | Owner, President, Loosli Management, Inc. - Utah (Asset Management, Appraisals, Inspections, Used Equipment / Personal Property Sales – Member American Society of Appraisers since February 2009) – Accredited Senior Appraiser designation awarded February 2011 and Reaccredited in February 2016 |
|---|---|
| 1989-2009 | Senior Vice President, Asset Management and Remarketing, Tetra Corporate Services, Inc. – Utah (Equipment Leasing) |
| 1998-2011 | Member / Owner, CapitalPlus Equity, LLC - Nevada (Accounts Receivable Financing / Factoring and Equipment Lease Originations) |
| 2001-2010 | Member / Owner, HealthCare Solutions, LLC - Utah (Dental Practice Funding) |

### FINANCIAL SERVICES INDUSTRY

| 1997-2010 | Member / Owner, Secretary, Priority Mortgage, LLC - Utah (Mortgage Company) |
|---|---|
| 1988-1989 | Vice President of Operations and Branch Administration, United Savings Bank – Utah |
| 1985-1988 | Senior Marketing Support Specialist, Unisys Corporation - Utah |
| 1980-1984 | Vice President and Cashier, Utah Firstbank - Utah<br>Vice President of Operations, First Bancorporation - Utah<br>Cashier, Foothill Thrift - Utah |
| 1967-1980 | Assistant Vice President and Branch Coordinator, Walker Bank & Trust - Utah |

### PROFESSIONAL DESIGNATIONS AND EDUCATION

| 2009 – Present | American Society of Appraisers – Accredited Senior Appraiser (ASA) Member – Machinery and Technical Specialties – Machinery and Equipment |
|---|---|
| 1971 | B.S. Finance - University of Utah |
| 1986 – 1987 | MBA Studies – University of Phoenix (not completed) |

## IX.  PHOTOGRAPHS OR OTHER DOCUMENTATION

There are various photographs included with this appraisal report. Some were taken by the appraiser as part of a site visit on August 6, 2018. Others were furnished by the client or their representatives. Refer to the photograph reference numbers shown in Exhibit A attached which is an integral part of this report:

EXHIBIT A
SMW, INC.
EFFECTIVE APPRAISAL DATE 6/26/20

| PICTURE ON FRONT | EST. MANUFACTURE OR INSTALL DATE | MODEL NUMBER | SERIAL NUMBER | DESCRIPTION | MANUFACTURER | PHOTO NUMBER BACK OF PICTURE | TOTAL SYSTEM VALUE | COMMENTS | FMV INSTALLED | SALVAGE |
|---|---|---|---|---|---|---|---|---|---|---|
| 1, 2 | 1990 | NONE | NONE | COIL CRADLE | ENGEL INDUSTRIES, INC | 81, 82 | $ | | $ 3,220.00 | $ 800.00 |
| 3, 4 | 1990 | M-516-UC-H | 390172 | COMPACT COIL LINE | ENGEL INDUSTRIES, INC | 83, 84 | | | 6,400.00 | 1,920.00 |
| 5 thru 13 | Shop Floor Equip. | M-10-ST-R | 207-62 | TRANSFER SYSTEM | ENGEL INDUSTRIES, INC | 85,86,87,88,89,90,91 | | & Pics 3045, 3046 | 180,100.00 | 57,600.00 |
| 14 | 1990 | DH-4800-EF | 2026-92 | CLEAT EDGE | ENGEL INDUSTRIES, INC | 92 | | | | |
| 15, 16 | 1990 | M-461-6-DH | S1295-95 | ROLL FORMING MACHINE | ENGEL INDUSTRIES, INC | 93, 94 | | | | |
| 17, 18 | 1990 | M-LM-60-DD | 182-95 | LIN-O-MATIC | ENGEL INDUSTRIES, INC | 95, 96 | | | | |
| 19, 20 | 1990 | FGMH-50 | 420-574 | MULTIHEAD PINSPOTTER | DURO-DYNE | 97, 98 | | | | |
| 21, 22 | 1990 | M-516-H-B | 3131-A-95 | HYDRAULIC BRAKE | ENGEL INDUSTRIES, INC | 99, 100 | | | | |
| 23 | | NONE | NONE | CONTROL PANEL FOR COIL LINE | ENGEL INDUSTRIES, INC | 101 | | | | |
| 24, 25 | 2002 | 1000B | NONE | PLASMA TABLE (BROKEN) | LOCKFORMER | 102, 103 | | | | |
| 26, 27 | 2002 | 1000B | VOL 3654 | PLASMA TABLE | LOCKFORMER | 104, 105 | | | 3,220.00 | 800.00 |
| 28 | 2002 | 1000B | NONE | PLASMA CUTTER POWER PAC. | HYPERTHERM | 3,065 | | INCLUDED IN CUTTER | 6,400.00 | 1,920.00 |
| 29, 30 | 1985 | 0-8366-2 | 590-01838 | SHEAR | CINCINATTI | 106, 107 | | | 6,975.00 | 1,750.00 |
| 31, 32 | 1985 | 2ZCC2 | | BEND | KRRAS | 108, 109 | | | 6,800.00 | 2,040.00 |
| 33 | 2006 | BEND 160 37 | 8170 | WELDER | MILLER | 110 | | | 1,450.00 | 510.00 |
| 34 | 2017 | | NONE | WELDER | MILLER | 111 | | | 2,500.00 | 875.00 |
| 35 | 2007 | SPECTRUM 625 | NONE | PORTABLE PLASMA CUTTER | MILLER | 112 | | | 1,425.00 | 505.00 |
| 36 | 2012 | D-74 Mpa PLUS | NONE | WELDER | MILLER | 113 | | | 1,760.00 | 500.00 |
| 37 | 2014 | XMT 350 Mpa | NONE | WELDER | MILLER | 114 | | | 2,100.00 | 635.00 |
| 38 | 2012 | NONE | NONE | WELDER | MILLER | 115 | | | 2,350.00 | 750.00 |
| 39, 40 | 2015 | COOLMATE 1.3 | NONE | WELDER | WEBB | 116, 117 | | | 350.00 | 120.00 |
| 41, 42 | 2014 | 897 | NONE | IRON WORKER | WEBB | 118, 119 | | | 45.00 | 15.00 |
| 43, 44 | 2014 | 7005RF | 9927430 | POWER PINNER | WEBB | 120, 121 | | | 2,350.00 | 750.00 |
| 45, 46 | 2015 | 2DP-2DV0S-1 | NONE | DRILL | WEBB | 122, 123 | | | 2,150.00 | 750.00 |
| 47, 48, 49 | 1995 | 4T-87 | 2015-695 | 15" DRILL | UPTON BRADEN & JAMES | 124, 125, 126 | | | 390.00 | 115.00 |
| 50, 51 | 2014 | RD-2D0 | 2015-695 | DUCT ROLLER | GRIPNAIL CORP | 127, 128 | | | 230.00 | 70.00 |
| 52, 53 | 2006 | TR-2D00 | MDD9039 | DUCT ROLLER | JET EQUIPMENT & TOOLS | 129, 130 | | | 350.00 | 90.00 |
| 54, 55 | 2000 | DYNASTY 700 | NONE | WELDER | WEBB | 131, 132 | | | 70.00 | 20.00 |
| 56, 57 | 2015 | COOLMATE 1 | 833-696 | WELDER | WEBB | 133, 134 | | | 90.00 | 30.00 |
| 58, 59 | 2015 | 3617 | FJ 749 | ROLL FORMER | MILLER | 135, 136 | | | 800.00 | 200.00 |
| 60, 61 | 2006 | 30KVA | 2015.46 | PAN BRAKE | MILLER | 137, 138 | | | 340.00 | 90.00 |
| 62, 63 | 1995 | EMT 7R | 2C775 | SPOT WELDER | MILLER | 139, 140 | | | 350.00 | 70.00 |
| 64, 65 | 2002 | 8SP226RFFA1600 | 729 | SPOT WELDER | ROPER, WHITNEY CO. PEXTO | 141, 142 | | | 665.00 | 200.00 |
| 66, 67 | 2016 | RANVS2019 | 907422 | ROLL FORMER | WESTERN ARCTRONICS | 143, 144 | | | 1,900.00 | 540.00 |
| 68, 69 | 2015 | MILLERMATIC 211 | TDC.2016 | SPOT WELDER | EMPIRE MACHINERY & TOOLS | 145, 146 | | | 1,140.00 | 340.00 |
| 70, 71 | 2016 | MILLERMATIC 212 | 7065 | 14 GA POWER ROTARY ROLL FORMER | PEI POINT | 147, 148 | | | 1,900.00 | 665.00 |
| 72, 73 | 2016 | PRMD11199 | 4153-12-05 | WELDER | RAMS SHEETMETAL EQUIP | 149 | | | 1,450.00 | 510.00 |
| 74, 75 | 2016 | CATA0LBE880 | 3191160 | WELDER | MILLER | 150, 150b6 | | | 5,700.00 | 1,995.00 |
| 76, 77 | 1996 | 1016 | 76016 | ROLL FORMER | LOCKFORMER | 151, 152 | | | 380.00 | 45.00 |
| 78, 79 | 2016 | TR050/5 | 4599-11-00 | LEAF BRAKE | NIAGRA SHEETMETAL WORKING MACHINERY | 153, 154 | | | 1,230.00 | 430.00 |
| 80, 81 | 2012 | 104 | 6/53 | ROLLS | ROPER WHITNEY CO | 155, 156 | | | 300.00 | 69.00 |
| 82, 83 | 2016 | U416 | NONE | ROLL FORMER | LENAS | 157, 158 | | | 2,720.00 | 945.00 |
| 84, 85 | 1970 | 381-D | NONE | PAN BRAKE | NIAGRA SHEETMETAL WORKING MACHINERY | 159, 160 | | | 11,000.00 | 3,850.00 |
| 86, 87 | 2003 | 3A | NONE | ROLLS | ROPER WHITNEY CO | 161, 162 | | | 220.00 | 65.00 |
| 88, 89 | 1953 | NONE | 729 | BAR FOLDER | PECK STOW & WILCOX CO | 163, 164 | | | 740.00 | 200.00 |
| 90, 91 | | NONE | 1622 | DRIVE TURNER | NIAGRA SHEETMETAL WORKING MACHINERY | 165, 166 | | | 210.00 | 40.00 |
| 92 | | POWERED ROLL SIZER | 138463.407 | LINE SIZER | LOCKFORMER | 167, 168 | | | 200.00 | 60.00 |
| 93, 94 | 2008 | NONE | TR-4747 | | DURO-DYNE | 169 | | | 200.00 | 45.00 |
| 95, 96 | 1994 | 18200 | 722 | LOCKFORMER | LOCKFORMER | 170, 171 | | | 40.00 | 25.00 |
| 97, 98 | 2007 | NONE | NONE | | FLAGLER CO | 172, 173 | | | 45.00 | 75.00 |
| 99, 100 | 1995 | NONE | NONE | LOCKFORMER | LOCKFORMER | 174, 175 | | | 75.00 | 1,150.00 |
| 101, 102 | 2016 | NONE | NONE | LOCKFORMER | LOCKFORMER | 176, 177 | | | 1,995.00 | 50.00 |
| 103, 104 | 1996 | BR5-059 | 029715S7 | POWER ROLLS | BUILT-RITE MFG. | 178, 179 | | | 1,870.00 | 650.00 |
| 105, 106 | 1975 | D-4560-1 | NONE | COIL CRADLE | IOWA PRECISION | 180, 181 | | OLD PARTIAL SYS. | 950.00 | 240.00 |
| | | | | | | 182, 183 | | | 423.00 | 85.00 |

| Item | Year | Model | Serial | Description | Manufacturer | Section | | |
|---|---|---|---|---|---|---|---|---|
| 107, 108 | 1975 | ES96878 | 108G05 | FRONT END COIL LINE | IOWA PRECISION | 184, 185 | PARTIAL LINE | $ 1,900.00 | $ 420.00 |
| 109, 110 | 2016 | NONE | F5-AG8161216? | EZ-EDGER | LOCKFORMER | 186, 187 | | $ 420.00 | $ 150.00 |
| 111, 112 | 1994 | HSCL | HSCL433 | SNAP LOCK THAT ONLY DOES Ss | FLAGLER CO | 188, 189 | | $ 2,125.00 | $ 530.00 |
| 113, 114 | 1996 | NONE | 14TDC-3161 | 18 GAUGE TDC MACHINE | LOCKFORMER | 190, 191 | | $ 4,700.00 | $ 1,175.00 |
| 115 | 1965 | POWER MIG 225 | NONE | MIG WELDER | LINCOLN ELECTRIC | 192 | | $ 760.00 | $ 150.00 |
| 116, 117 | 1995 | 10 | 82720 | HYDRAULIC BENDER | ROTO DIE/FECO | 193, 194 | | $ 5,390.00 | $ 1,350.00 |
| 118, 119 | 2027 | M-1836-3-A | 1198 | CLEAT FOLDER | LDN MACHINERY | 195, 196 | | $ 4,000.00 | $ 1,220.00 |
| 120, 121 | | 05S | 1.67 | BAR FOLDER | ROPER WHITNEY CO. /PEXTO | 197, 198 | | $ 675.00 | $ 200.00 |
| 122, 123 | 2016 | CV-400 | U1950.123359 | WELDER | LINCOLN ELECTRIC | 199, 200 | | $ 2,475.00 | $ 220.00 |
| 124, 125 | 2029 | ORI3N | R1002411 | ANGLE TABLE SAW / GRINDER | FAB'R, FABRICA MACHINE (BERGAMO) | 201, 202 | | $ 4,400.00 | $ 1,320.00 |
| 126, 127 | 1998 | S320XL | D004D5169Y | FORKLIFT / 8,831 hours | HYSTER | 203, 204 | | $ 2,850.00 | $ 720.00 |
| 128, 129, 130 | 2001 | S120XL2 | D004D10496Y | FORKLIFT / 5,912 hours | HYSTER | 205, 206, 207 | | $ 4,350.00 | $ 1,355.00 |
| 131, 132, 133 | 1995 | ASPRM0-AACAHA | W7E016 | COMPRESSOR | GARDNER-DENVER | 208, 209, 210 | | $ 400.00 | $ 100.00 |
| 134, 135 | | 05S1 | 47 | BAR FOLDER | PEXTO | 211, 212 | | $ 600.00 | $ 150.00 |
| 136, 137 | 1995 | ES0220S118 | 7719931 | COMPRESSOR | SULLAIR | 213, 214 | | $ 135.00 | $ 35.00 |
| 138, 139 | 1995 | 12087 | 7719931 | MOTOR FOR COMPRESSOR | TOSHIBA | 215, 216 | | $ 770.00 | $ 200.00 |
| 138, 140 | 1990 | 35D | 6409477 | COMPRESSOR | QUINCY COMPRESSOR | 215, 217 | | $ 420.00 | $ 100.00 |
| 141, 142 | 1990 | BP7540LF2UC | 7771451 | QUINCY COMPRESSOR | QUINCY COMPRESSOR | 218, 219 | | $ 780.00 | $ 200.00 |
| 141, 143 | | POWERMAX 600 | PAN6690-065721 | PLASMA CUTTER | HYPERTHERM | 220 | | | |
| 144, 145 | 1990 | MILLERMATIC 140 | M008080ZN | PLASMA CUTTER | MILLER | 221, 222 | | $ 780.00 | $ 235.00 |
| 146, 147 | | 2511 | 376487 | CORING MACHINE (?) | TARGET/DIAMANT BOART INC | 223, 224 | | $ 100.00 | $ 35.00 |
| 148, 149 | | MILLERMATIC 252 | KK250022 | WELDER | MILLER | 225, 226 | | $ 350.00 | $ 105.00 |
| 150, 151 | 2005 | NONE | 21-11466 | PITTSBURGH MACHINE | LOCKFORMER | 227, 228 | | $ 100.00 | $ 25.00 |
| 152, 153 | 1990 | OBSCURED | OBSCURED | WELDER | LINCOLN ELECTRIC | 229, 230 | | $ 100.00 | $ 25.00 |
| 154 | | 113-24Ε321 | 93833PO708 | 12' BANDSAW | SEARS | 231 | | $ 75.00 | $ 20.00 |
| 155, 156 | | NONE | 27773 | PEXTO 14 GAUGE SHEAR | LOCKFORMER | 232, 233 | | $ 100.00 | $ 25.00 |
| 157, 158 | | 132X | 6469494 | 24 GAUGE PITTSBURGH MACHINE | ROPER WHITNEY CO. | 234, 235 | | $ 100.00 | $ 25.00 |
| 159, 160 | 1994 | NONE | 2189 | 16 GAUGE PITTSBURGH / NIAGARA EDGER | LOCKFORMER | 236, 237 | | $ 870.00 | $ 250.00 |
| 161, 162 | 1990 | NONE | | Air Dryer | Lifter-Framar /2,000 LBS | 238, 240 | | $ 100.00 | $ 25.00 |
| 163 | | | | WELDER | Ingersoll Rand | 238, 239 | | | $ 25.00 |
| 164 | 1990 | DBU180 | | | MILLER | 3044 | | $ 150.00 | $ 50.00 |
| 165 | | MANSTAR 150 | OBM-023955 | | | 3047 | | $ 290.00 | $ 90.00 |
| | | | | | | 3049 | | $ 40.00 | |

**Outside Equip.**

| Item | Year | Model | Serial | Description | Manufacturer | Section | | |
|---|---|---|---|---|---|---|---|---|
| 166 | | SLC-18 | SLC 07-41562 | CONTRACTOR DUCT JACK | GENE | 3050 | | $ 1,200.00 | $ 360.00 |
| 167 | 2001 | SLC-18 | SLC 08-46590 | CONTRACTOR DUCT JACK | GENE | 3051 | | $ 1,200.00 | $ 360.00 |
| 168 | 2002 | SLC-18 | SLC 06-37438 | CONTRACTOR DUCT JACK | GENE | 3052 | | $ 1,200.00 | $ 360.00 |
| 169 | | SLC-12 | | CONTRACTOR DUCT JACK | GENE | 3053 | | $ 980.00 | $ 295.00 |
| 169 | 2005 | CAT ® DTP3304 | WZ64998680202 | THREE PHASE INDUCTION MOTOR | TECO - WESTINGHOUSE | 3053 | | NOT IN USE | $ 100.00 | $ 25.00 |
| 170 | | CAT ® DTP3304 | WZ64998680205 | THREE PHASE INDUCTION MOTOR | TECO - WESTINGHOUSE | 3054 | | NOT IN USE | $ 100.00 | $ 35.00 |
| 170 | 2027 | 24,000 GVWR - 31' | 5F7GF3IQ247L011557 | GOOSENECK FLATBED TRAILER | BIG BABBA'S | 3054 | | $ 2,860.00 | $ 1,145.00 |
| 171 | | MAX106221SS-3 | MAX106221SS-3 | STORAGE CONTAINER | | 3055 | | $ 1,870.00 | $ 650.00 |
| 171 | | 40' X 8' GREEN | C.I=U.841309-9 | STORAGE CONTAINER | | 3055 | | $ 1,870.00 | $ 650.00 |
| 171 | | 40' X 8' BLUE | GESU.487742D | STORAGE CONTAINER | | 3056 | | $ 1,870.00 | $ 650.00 |
| 172 | 2004 | 20' X 8' RED | FCIU.240411-0 | STORAGE CONTAINER | | 3068 | | $ 1,870.00 | $ 650.00 |
| 172 | 2004 | 20' X 8' RED | FSCU 768041-3 | STORAGE CONTAINER | | 3069 | | $ 1,790.00 | $ 620.00 |
| 173 | 2000 | 40' X 8' WHITE | WCIU.814689-3 | STORAGE CONTAINER | | 3067 | | $ 1,790.00 | $ 620.00 |
| 174 | 1999 | 40' X 8' WHITE | WCIU.805139-2 | ROPER WHITNEY CO. | | 3057 | | $ 1,320.00 | |
| 174-A | | 24' X 8' | | ON SITE OFFICE TRAILER | | 3057 | | $ 145.00 | $ 50.00 |
| 175 | | (3) 14' | | METAL LADDER | | 3057 | | $ 35.00 | $ 15.00 |
| 175 | | (3) 12' | | METAL LADDER | | 3057 | | $ 150.00 | $ 60.00 |
| 175 | | (6) 10' | | METAL LADDER | | 3057 | | $ 275.00 | $ 180.00 |
| 175 | | (10) 8' | | METAL LADDER | | 3058 | | $ 72.00 | $ 30.00 |
| 175 | | (3) 6' | | METAL LADDER | | 3059 | | | |
| 176 | | 25 T | | AIR COMPRESSOR | INGERSOLL RAND | 24, 29 | | $ 2,320.00 | $ 660.00 |
| 231, 233 | 2008 | 8061721 | | FLATBED TRAILER | BIG BABBA'S | 3057 | | $ 150.00 | $ 50.00 |
| 234 | 2016 | (3) 16' | 8061721 | (3) ENCLOSED TRAILERS - 16 ft. | BIG BABBA'S | 6305 | | $ 18,575.00 | $ 6,500.00 |
| | 2014 | 20' X 5' | PPT7U4D72 | | | | | $ 3,000.00 | $ 1,050.00 |

| | | | | | | **SECTION TOTAL** | $ 304,065.00 | $ 95,320.00 |
| | | | | | | **PART OF CUTTER SYS** | $ 48,755.00 | $ 16,800.00 |
| | | | | | | **NOT INSPECTED** | | |

## Office Furniture & Equipment

| # | Location | Item | Model / Spec | Serial | Brand | Code | Amount | Amount |
|---|----------|------|--------------|--------|-------|------|--------|--------|
| 177 | Phone Electrical Room | MODEM | R15 873 SERIES DUAL BAND MODEM | 737102SB | TRIMBLE MEP DIGITAL WIFI SETTINGS | 3001 | $ 14,250.00 | $ 5,000.00 |
| 178 | | SMART UPS | TM 824 | | ARRIS | 3002 | $ 40.00 | $ 15.00 |
| 178 | | APC | 1500 | | APC | 3002 | $ 30.00 | $ 5.00 |
| 178 | | SMART UPS | 2200XL | | APC | 3002 | $ 30.00 | $ 40.00 |
| 178 | | POWER PROTECTION | | | APC | 3003 | $ 250.00 | $ 80.00 |
| 179 | | SMART PDE SWITCH | TL600 G-28FS | | TRIPP-LITE | 3003 | $ 150.00 | $ 5.00 |
| 179 | | UNIPRISE CAT5E PATCH PANEL | C5E | | TP-LINK | 3003 | $ 150.00 | $ 40.00 |
| 179 | | PC | VERIZON | | COMMSCAPE | 3004 | $ 30.00 | $ 5.00 |
| 180 | | SHREDDER | 1620 MX | | ACER | 3004 | $ 30.00 | $ 35.00 |
| 180 | | PC MONITOR | 16" | | ROYAL | 3005 | $ 100.00 | $ 85.00 |
| 181 | | | | | DELL | 3005 | $ 75.00 | $ 20.00 |
| 182 | RC'S OFFICE | VALOR COUCH | 8" | | | 3006 | $ 20.00 | $ 10.00 |
| 183 | | METAL DESK | 4" | | | 3007 | | |
| 183 | | VISITOR CHAIR | | | | 3007 | | |
| 183 | | EXECUTIVE CHAIR | | | | 3007 | | |
| 184 | | METAL TABLE WITH TOP | 6" | | | 3008 | | |
| 184 | | FILE CABINET | 4 DRAWER | | FLEX | 3008 | $ 750.00 | $ 250.00 |
| 185 | | FAN | | | | 3009 | | |
| 185 | | BOOK SHELF | 7 | | | 3009 | | |
| 186 | | METAL SHELF | | | | 3010 | | |
| 186 | | PHONE | SYN 248 | | AT&T | 3010 | | |
| 187 | | SMALL FRIDGE | | | | 3011 | | |
| 187 | | BOOK SHELF | | | | 3011 | | |
| 188 | | PC | 24" | | | 3012 | | |
| 188 | | MONITOR | | | VIEWSONIC | 3012 | | |
| | | UPS | | | | 3012 | | |
| 189 | CHRISTINA'S AREA | DESK | 5" | | | 3013 | $ 525.00 | $ 185.00 |
| 190 | | (2) SIDE CHAIRS | | | | 3013 | | |
| 189 | | HUTCH | | | | 3013 | | |
| 189 | | CREDENZA | | | | 3013 | | |
| 190 | | LAZER JET PRO PRINTER | M402N | | HP | 3014 | | |
| | | SECRETARY CHAIR | 5" | | | 3014 | | |
| 189 | | PHONE | SYN 248 | | AT&T | 3013 | | |
| 189 | | PC MONITOR | 22" | | LG | 3013 | | |
| 189 | | PC | | | DELL | 3013 | | |
| 190 | | TWO DRAWER LATERAL FILE | 36" | | | 3014 | | |
| 190 | | (2) TWO DRAWER FILES | 15" | | | 3014 | | |
| 191 | PATRICIA'S AREA | DESK | 5" | | | 3015 | $ 730.00 | $ 250.00 |
| 191 | | HUTCH | 3" | | | 3015 | | |
| 192 | | L SHAPED WORK SPACE / DESK | 20" | | AOC | 3016 | | |
| 192 | | PC MONITOR | | | AT&T | 3016 | | |
| 192 | | PHONE | SYN 248 | | VIVO | 3016 | | |
| 192 | | PC | | | APC | 3016 | | |
| 192 | | UPS | 4' X 5' | | | 3016 | | |
| 192 | | CUBICLE PARTITION | | | | 3016 | | |
| | | SECRETARY CHAIR | | | | 3016 | | |

| Item | Location | Dim | Description | Brand | Asset # | | Value |
|---|---|---|---|---|---|---|---|
| 193 | ANDREA'S AREA | 5' | METAL DESK W/COMPOSITE TOP | | 3017 | $ | 220.00 |
| 193 | | | PHONE | AT&T | 3017 | | |
| 193 | | | BOOK SHELF | | 3017 | | |
| 193 | | | PC MONITOR | SAMSUNG | 3017 | | |
| 193 | | | PC | DELL | 3017 | | |
| 193 | | | SECRETARY CHAIR | | 3017 | | |
| 194 | | SYN.248 | (2) FOUR DRAWER FILE | HON | 3018 | $ | 625.00 |
| 194 | | | TWO DRAWER FILE | HON | 3018 | | |
| 195 | | 36" | FOUR DRAWER FILE | HON | 3020 | | |
| 195 | | | (2) FOUR DRAWER FILE W/LOCK | HON | 3020 | | |
| 196 | | 27" | (2) FOUR DRAWER FILE W/LOCK | HON | 3021 | | 215.00 |
| 196 | | | | | 3021 | | |
| 197 | COPY ROOM AREA | 4020 | METAL DESK | | 3022 | $ | 605.00 |
| 197 | | 3650 | LASER JET PRINTER | HP | 3022 | | |
| 198 | | 720 | PLANS COPIER | XEROX | 3023 | | NOT USED |
| 199 | | MF 8560 | DESK JET PRINTER | HP | 3024 | | NOT USED |
| 200 | | AR 207 | MULTI FUNCTION PRINTER | CANON | 3025 | | NOT USED |
| 200 | | SYN.248 | COPIER | CANON | 3025 | | |
| 200 | | | PHONE | SHARP | 3025 | | |
| 200 | | | WOOD SHELF | AT&T | 3025 | | |
| 201 | BREAK ROOM AREA | 1030 | ENGINEERING COPIER | KIP | 3026 | $ | 210.00 |
| 202 | | | SMALL FRIDGE | MAGIC CHEF | 3027 | | 75.00 |
| 202 | | | SMALL MICROWAVE OVEN | GENERAL ELECTRIC | 3027 | | |
| 202 | | | (2) SMALL COFFEE MAKERS | BLACK & DECKER | 3027 | | |
| 203 | JEFF'S OFFICE | | METAL BOOK SHELF | | 3028 | $ | 480.00 |
| 203 | | | SINGLE DRAWER FILE W/LOCK | | 3028 | | 170.00 |
| 204 | | 5' | TWO DRAWER FILE | HON | 3029 | | |
| 204 | | S835020 | WOOD DESK | HON | 3029 | | |
| 204 | | | PHONE | AT&T | 3029 | | |
| 205 | | 80" | SHORT STOOL | | 3030 | | |
| 205 | | | DRAFTING BENCH | | 3030 | | |
| 205 | | 32" | PC | SAMSUNG | 3030 | | |
| 205 | | | PC MONITOR | JVC | 3030 | | |
| 206 | | | LEATHER EXEC CHAIR | | 3031 | | |
| 207 | SPARE OFFICE | 4' | WOOD CABINET | | 3032 | $ | 200.00 |
| 208 | | | GUEST CHAIR | HON | 3033 | | 75.00 |
| 208 | | | TWO DRAWER FILE | | 3033 | | |
| 208 | | 78" | METAL DESK | NITSUKO | 3033 | | |
| 208 | | 92753 | PHONE | | 3034 | | |
| 209 | | 66132038 | FOLDING TABLE | | 3034 | | |
| 210 | PLOTTER ROOM | 5' | METAL DESK | | 3035 | $ | 835.00 |
| 210 | | | SECRETARY CHAIR | HON | 3035 | | |
| 211 | | | TWO DRAWER FILE | | 3036 | | |
| 211 | | | GUEST CHAIR | | 3036 | | |
| 212 | | 6' | WOOD CREDENZA | | 3037 | | |
| 212 | | 3' | WOOD HUTCH | | 3037 | | |
| 213 | | IPF 765 | PLOTTER / SCANNER | CANON IMAGE PRO GMF | 3038 | | 100.00 |

## ESTIMATING ROOM

| # | VIN/SERIAL # | DESCRIPTION | | ID | RETAIL | WHOLESALE |
|---|---|---|---|---|---|---|
| 214 | | METAL SHELVING | | 3039 | | |
| 214 | 8702 | OFFICE JET MF PRINTER | HP | 3039 | | |
| 215 | | DRAFTING TABLE | | 3040 | | |
| 215 | 5" | TELEVISION | VISIO | 3040 | | |
| 215 | | PC | | 3040 | | |
| 215 | 48" | SECRETARY CHAIR | | 3041 | | |
| 216 | 48" | TELEVISION | VISIO | 3041 | | |
| 216 | | PC | | 3041 | | |
| 217 | | TWO DRAWER FILE | | 3042 | | |
| 217 | | METAL DESK | | 3042 | | |
| 217 | 5" | TWO DRAWER FILE | HON | 3042 | | |
| 218 | 5" | METAL DRAFTING TABLE | | 3043 | | |
| 218 | | STOOL | | 3043 | | |
| 217 | 5835020 | PHONE | AT&T | 3043 | | |
| | | | | **SECTION TOTAL** | $ 1,075.00 | $ 375.00 |

## VEHICLES / BLUE BOOK LISTINGS

| # | VIN/SERIAL # | MODEL | DESCRIPTION | MILEAGE/HOUR READING | | RETAIL | WHOLESALE |
|---|---|---|---|---|---|---|---|
| 235, 236 | 1FA6P8JZXG5520425 | 2016 MUSTANG | FORD 2D SHELBY GT350 V8 COUPE | 6,200 | NOT INSPECTED | $ 44,460.00 | $ 41,700.00 |
| | 1FTFW1ET4EFB76703 | 2014 F150 PICKUP | FORD SUPERCREW PLATINUM 4WD | 160,000 | NOT INSPECTED | $ 16,430.00 | $ 12,375.00 |
| | 1FT8W3BT5EEB25404 | 2014 F350 PICKUP | FORD SUPER DUTY V8 CREW CAB PLATINUM 4WD | 131,700 | NOT INSPECTED | $ 23,715.00 | $ 21,200.00 |
| | 1FT8W3BT9EEB63167 | 2014 F350 PICKUP | FORD SUPER DUTY V8 CREW CAB LARIAT 4WD | 165,940 | NOT INSPECTED | $ 20,600.00 | $ 18,000.00 |
| 237, 238 | 1FDUF5GY4HEE75059 | 2017 F559 TRUCK | FORD 4 X 2 CHASSIS CAB DRW/205 | 15,000 | NOT INSPECTED | $ 38,500.00 | $ 34,450.00 |
| | | | Section Totals | 2422, 2424 | | | |
| | | | | 4585, 63167 | NOT INSPECTED | $ 143,705.00 | $ 128,225.00 |

| | RETAIL | WHOLESALE |
|---|---|---|
| SECTION TOTALS | $ 21,160.00 | $ 7,370.00 |
| EQUIPMENT TOTALS | $ 373,980.00 | $ 119,690.00 |
| **GRAND TOTALS WITH VEHICLES** | $ 517,685.00 | $ 247,715.00 |

### A Desktop Fair Market Value – Installed and Salvage Value Appraisal Report

#### Of

**Various Sheet Metal Fabrication Related Assets,**
**Office Furniture and Equipment, and Vehicles**

**Located At:**

**Sheet Metal Works, Inc.**
**2487 South 3270 West**
**West Valley City, UT 84119**

**Requested By Client**

**Sheet Metal Works, Inc.**
**RC Montrone**

**(Reference USPAP 8.2 (a) (i))**

\*       The majority of the assets were inspected by the appraiser on August 6, 2018 as part of an appraisal dated August 10, 2018, with an effective date of April 25, 2018. No additional inspection was performed for this new appraisal.

\*       The effective date of this report is June 26, 2020.  **(Reference USPAP 8.2 (a) (vii))**

\*       The date of this report is June 26, 2020. **(Reference USPAP 8.2 (a) (vii))**

A copy of this report and the workfile associated with it will be retained by Loosli Management, Inc. for a period of at least five (5) years after preparation, or at lease two (2) years after final disposition of any judicial proceeding in which testimony will have been given, whichever period expires last.

**Appraiser:**

Mark C. Loosli
American Society of Appraisers Accredited Senior Appraiser Member: Machinery and
Technical Specialties – Machinery and Equipment
President
Loosli Management, Inc.
3531 East Hidden Springs Drive
Washington, UT  84780
435-627-2368

_____

Signature

**June 26, 2020**
Date

**Note:**  Reference to USPAP, (Uniform Standards of Professional Appraisal Practice, effective January 1, 2020) throughout this report indicates by paragraph number the specific USPAP standards associated with the various sections contained in this report.

## <u>TABLE OF CONTENTS</u>

I.       **CERTIFICATE**

II.      **ASSUMPTIONS AND LIMITING CONDITIONS**

III.     **TERMS AND DEFINITIONS**

IV.      **PURPOSE AND INTENDED USE OF THE APPRAISAL**

V.       **METHODOLOGY**

VI.      **RECAPITULATION**

VII.     **APPRAISAL**

VIII.    **APPRAISER QUALIFICATIONS**

IX.      **PHOTOGRAPHS OR OTHER DOCUMENTATION**

**I.    CERTIFICATE (Reference USPAP 8.3)**

I certify that, to the best of my knowledge and belief:

The statements of fact contained in this report are true and correct.

The reported analyses, opinions and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal impartial unbiased professional analyses, opinions and conclusions.

I have no present or prospective interest in the property that is the subject of this report, and I have no personal interest with respect to the parties involved

I have performed an appraisal assignment for this client relating to the same assets on August 10, 2018 with an effective date of April 25, 2018.

I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

My engagement in this assignment was not contingent upon developing or reporting predetermined results.

My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

My analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the *Uniform Standards of Professional Appraisal Practice.*

I made a personal inspection of the majority of the property that is the subject of this report on August 6, 2018.

No one provided significant personal property appraisal assistance to the person signing this certification.

The person signing this report is a Senior Accredited Appraiser Member of the American Society of Appraisers in the discipline of Machinery and Technical Specialties – Machinery and Equipment.

**Appraiser:**

Mark C. Loosli
American Society of Appraisers Accredited Senior Appraiser Member: Machinery and
Technical Specialties – Machinery and Equipment
President
Loosli Management, Inc.
3531 East Hidden Springs Drive
Washington, UT  84780
435-627-2368

---

Signature

June 26, 2020
Date

## II. ASSUMPTIONS AND LIMITING CONDITIONS

This appraisal has been made with the following general assumptions and limiting conditions:

1. No investigation has been made of, and no responsibility is assumed for legal descriptions or other legal matters, including title or encumbrances. Title to the property is assumed to be good and marketable unless otherwise stated. The property is further assumed to be free and clear of all liens, easements or encumbrances unless otherwise stated.

2. Information supplied by others that was considered in this valuation is from sources believed to be reliable, and no further responsibility is assumed for its accuracy. We reserve the right to make such adjustments to the valuation herein reported as may be required by consideration of additional or more reliable data that may become available.

3. No responsibility is taken for changes in market conditions and no obligation is assumed to revise this report to reflect events or conditions that occur subsequent to the date hereof.

4. Responsible ownership and competent management are assumed.

5. Full compliance with all applicable local, state and federal use, environmental, and similar laws and regulations is assumed, unless otherwise stated.

6. It is assumed that all required licenses, certificates, consents, or other legislative or administrative authority from local, state or federal government or private entity or organization can be obtained or renewed for any use on which the values contained in this report are based.

7. The opinions of value contained in this report are only for the stated valuation date and only for the stated purpose. This report has been made solely for the use by Loosli Management, Inc.'s named client. Client's unnamed advisors and Bank of the West are additional intended users. It is not intended for any other user or purpose.

8. Neither Loosli Management, Inc. nor any individual signing or associated with this report shall be required by reason of this report to give testimony or appear in court or other legal proceedings unless arrangements have been made.

9. No tests were performed on mechanical parts of any assets. All values presented are the appraiser's considered opinion based on information obtained during the investigation.

10. Assets that were not inspected are so noted in the appraisal section of this report. When we were unable to inspect assets, we have relied on information provided by our client, the client's advisors, or the user of the assets.

11. This report is the property of Loosli Management, Inc. and its client. All parties understand that Loosli Management, Inc. reserves the right to retain and reuse the information in this report at its sole discretion.

12. Valuations contained herein are predicated on the ability to resell, convey or transfer asset(s) clear of any toxic contaminants to the buyer without subsequent liabilities to the seller or liquidator.

13. All opinions of value are presented as our considered opinion based on the facts and data appearing in the report. We assume no responsibility for changes in value and market condition or for the inability of the owner to locate a purchaser at the appraised value.

14. No consideration has been given for business goodwill, royalties, licensing or any other type of intangible asset associated with the business wherein the respective tangible assets are located.

15. It is assumed that the entity in possession of the subject assets holds a fee simple interest thereto. **(Reference USPAP 8.2 (a) (v))**

16. This report and supporting notes are confidential. The contents of this appraisal may be disclosed by Loosli Management, Inc.'s client to parties whom may require such by their direct involvement with the stated intended use and purpose of this appraisal, otherwise, neither all, or any part of the contents of this appraisal shall be copied or disclosed to any party, or conveyed to the public orally or in writing through advertising, public relations, news, sales, or in any other manner without the prior written consent and approval of both the appraiser and client.

17. The appraiser was provided pictures by the client and his advisors. The appraiser also took pictures of a number of assets while onsite August 6, 2018.

18. The majority of the assets were manufactured by well-known companies, many with an international reputation and presence

19. The "estimated manufacture or installation dates" shown on Exhibit A enclosed were based on manufacturer placed identification plates when available. Many assets didn't reflect such dates and the appraiser relied on client's staff of long standing, company reports, or the general condition of the asset to best ascertain the estimated dates.

20. Due to the age of many of the assets, comparable market information was not available. As a result, the cost basis approach to value was used or given more weight when applicable.

21. There were a number of "vehicles" that the appraiser was asked to value by the client. The appraiser included various vehicle assets in the Exhibit A where dealer provided Blue Book values were listed. These vehicles were not inspected by the appraiser since most were on job sites or elsewhere when the appraiser visited the facility.

22. No new assets were added to this report, but a number were removed from the asset listing that supported the appraisal assignment in 2018 referenced in the Certificate above.

23. The appraiser was notified that the building and surrounding property being leased by the client would more than likely not be made available by the landlord to store the assets or stage the assets for sale if the client loses control of the assets for any reason.

24.  The appraisal assignment was conducted during the Covid-19 pandemic. Due to various restrictions to travel and some limitations in economic activity requiring the listed assets, the opportunity to remarket the assets may be limited in scope.

## III.  TERMS AND DEFINITIONS

### VALUE CONCEPTS (Reference USPAP 8.2 (a) (vi))

#### Fair Market Value – Installed
Is an opinion, expressed in terms of money, at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts, considering market conditions for the asset being valued, independent of earnings generated by the business in which the property is or will be installed, as of a specific date.

(Source: Valuing Machinery and Equipment: The fundamentals of Appraising Machinery and Technical Assets – Third Edition – American Society of Appraisers – Copyright 2011)

#### Salvage Value (SV)
Is an opinion of the amount, expressed in terms of money, that may be expected for the whole property or a component of the whole property that is retired from service for possible use elsewhere, as of a specific date.

(Source: Valuing Machinery and Equipment: The fundamentals of Appraising Machinery and Technical Assets – Third Edition – American Society of Appraisers – Copyright 2011)

### PERSONAL PROPERTY CONDITION

#### Good, ("G")
This term describes items of equipment which are in good operating condition.  They may or may not have been modified or repaired and are capable of being used at or near their full specified utilization.

### APPRAISAL REPORT (Reference USPAP 8.2)

This is an "Appraisal Report."  As outlined in USPAP 8.2 and it contains information significant to the solution of the appraisal problem.

### PHOTOGRAPHS

There are various photographs included with this appraisal report. Some were taken by the appraiser as part of a site visit on August 6, 2018. Others were furnished by the client or their representatives. Refer to the photograph reference numbers shown in Exhibit A attached which is an integral part of this report:

### DESCRIPTION OF THE ASSETS (Reference USPAP 8.2 (a) (iv))

 The subject assets are listed in Exhibit A attached.

   I estimate the useful life of the subject assets when originally purchased to be at least five (5) years for office and furniture assets and (10 - 20) years for shop and other sheet metal fabrication related assets, assuming the assets are maintained in accordance with the manufacturers' specifications.
   Useful Life:  The period of time over which property may reasonably be expected to perform the function for which it was designed.  (Source: "Valuing Machinery and Equipment: The Fundamentals of Appraising Machinery and Technical Assets" - Third Edition - American Society of Appraisers, Washington, D.C. 2011)

### APPROPRIATE MARKET OR MARKET LEVEL (Reference USPAP 8.2 (aa) (xii))

In the process of developing our opinion of value of the subject assets we have considered an analysis of the current use and alternative uses to encompass what is profitable, legal and physically possible.  This analysis, with regard to the assets appraised herein, simply requires the appraiser to determine if the assets could be used for their intended purpose.  We are unaware of any physical or legal restrictions limiting the use of the Subject Assets.  Also, it is beyond the scope of this assignment to determine or measure specific income associated with the Subject Assets.  Therefore, we have assumed the Subject Assets would be used at their best use and we have valued them at their highest value in the appropriate marketplace.

The assets described in this report have been appraised for their value as an integral part of a business enterprise.  In this instance the proper market for the used assets is the market in which purchasers typically buy used assets.  This would typically be the retail, wholesale, and auction markets.  Comparable sales found in these markets have been adjusted to reflect the types(s) of sale(s) and relevant marketing periods consistent with the purpose and intended use of this appraisal.  The utilization of comparable sales data from these markets, along with adjustments is consistent with the concept of best use, as previously discussed.

## IV.  PURPOSE AND INTENDED USE OF THE APPRAISAL (Reference USPAP 8.2 (a) (iii))

The purpose of this appraisal is to determine the respective values of certain assets of the client as of June 26, 2020 for collateral considerations.

## V.   METHODOLOGY (Reference USPAP 8.2 (a) (x) (1), 8.2 (a) (x) (5), and 8.2 (a) (x) (2))

The methodologies employed in this appraisal are the sales comparison approach to valuation and the cost approach to valuation.  The income approach to valuation was considered but not used to create this report.

The income approach to valuation is based upon the present worth of the future benefits (income) of ownership.  The income approach is usually not applied to appraise individual assets since it is difficult, if not impossible, to identify individual income streams.  As such, the income approach to valuation was deemed inappropriate for use in this analysis.  **(Reference 8.2 (a) (x) (2))**

The cost approach to valuation is that approach which measures value by determining the current cost of an asset and deducting for the various elements of depreciation: physical deterioration and functional and economic obsolescence.  Physical deterioration represents the loss in value due to wear and tear and age.  Functional obsolescence is a loss in value due to factors inherent in the asset itself, such as changes in design or technology.  Economic obsolescence is a loss in value due to factors external to the asset, such as government regulations, utilization, or profitability of the asset, or reduced demand for the products produced by the asset.  Assets with very little used market data were valued giving more weight to the cost approach.  **(Reference USPAP 8.2 (a) (x) (2))**

The sales comparison approach to valuation involves an analysis of recent sales and offering prices for assets that are of the same-kind or like-kind compared to the subject property to arrive at an indication of the most probable selling price for the subject property.  The procedure includes gathering data, establishing the appropriate units of comparison and applying the results to obtain the subject property valuation.  An example of possible adjustments would be for age, condition, and capacity of the assets, location, date, and type of sale: retail sale, auction sale, asking prices, etc.  Assets with an active used market were valued giving more weight to the sales comparison approach.  **(Reference USPAP 8.2 (a) (x) (5))**

After careful analyses, the resultant values obtained by the cost approach and sales comparison approach were reconciled to form our conclusion of value.  Information considered in this appraisal report relative to the subject property included:

- the age of the subject assets,
- the condition of the subject assets, including usage and suggested maintenance of the assets, and
- new and used asking and selling prices for assets of the same or similar kind as the subject assets.
- Some of the sources used to provide appropriate trade data are:

| | | |
|---|---|---|
| CPMFAB.com | eBay | Sterling Machinery |
| Richie Bros. Auctioneers | shoprpmachine.com | kempler.com |
| Rams Equipment | Mestek Machinery | Hyster |
| Machinery Trader | Blue Book Vehicle Value Guides | |

The American Society of Appraisers Normal Useful Life Study (Copyright 2010)

## VI.  RECAPITULATION (Reference USPAP 8.2 (a) (x) (4)

This appraisal includes the equipment outlined in Section III as listed on Exhibit A. As a result of my investigation and analysis, I place the requested values as of the effective date of June 26, 2020 as follows:

|  | Fair Market Value-Installed | Salvage Value |
|---|---|---|
| Shop Floor Equipment: | $304,065.00 | $ 95,320.00 |
| Equipment Outside the Shop: | $ 48,755.00 | $ 16,800.00 |
| Office Furniture and Equipment: | $ 21,160.00 | $  7,370.00 |
| Vehicles | $143,705.00 | $128,225.00 |
| Grand Totals: | $517,685.00 | $247,715.00 |

## VII.  APPRAISAL

The subject assets are listed in Exhibit A attached.

## VIII.   APPRAISER QUALIFICATIONS

MARK C. LOOSLI
President
Loosli Management, Inc.
3531 East Hidden Springs Drive
Washington, UT  84780

### ASSET MANAGEMENT AND LEASING INDUSTRY

| 2006-Present | Owner, President, Loosli Management, Inc. - Utah (Asset Management, Appraisals, Inspections, Used Equipment / Personal Property Sales – Member American Society of Appraisers since February 2009) – Accredited Senior Appraiser designation awarded February 2011 and Reaccredited in February 2016 |
|---|---|
| 1989-2009 | Senior Vice President, Asset Management and Remarketing, Tetra Corporate Services, Inc. – Utah (Equipment Leasing) |
| 1998-2011 | Member / Owner, CapitalPlus Equity, LLC - Nevada (Accounts Receivable Financing / Factoring and Equipment Lease Originations) |
| 2001-2010 | Member / Owner,  HealthCare Solutions, LLC - Utah (Dental Practice Funding) |

### FINANCIAL SERVICES INDUSTRY

| 1997-2010 | Member / Owner, Secretary, Priority Mortgage, LLC - Utah (Mortgage Company) |
|---|---|
| 1988-1989 | Vice President of Operations and Branch Administration, United Savings Bank – Utah |
| 1985-1988 | Senior Marketing Support Specialist, Unisys Corporation - Utah |
| 1980-1984 | Vice President and Cashier, Utah Firstbank - Utah<br>Vice President of Operations, First Bancorporation - Utah<br>Cashier, Foothill Thrift - Utah |
| 1967-1980 | Assistant Vice President and Branch Coordinator, Walker Bank & Trust - Utah |

### PROFESSIONAL DESIGNATIONS AND EDUCATION

| 2009 – Present | American Society of Appraisers – Accredited Senior Appraiser (ASA) Member – Machinery and Technical Specialties – Machinery and Equipment |
|---|---|
| 1971 | B.S. Finance - University of Utah |
| 1986 – 1987 | MBA Studies – University of Phoenix (not completed) |

## IX.  <u>**PHOTOGRAPHS OR OTHER DOCUMENTATION**</u>

There are various photographs included with this appraisal report. Some were taken by the appraiser as part of a site visit on August 6, 2018. Others were furnished by the client or their representatives. Refer to the photograph reference numbers shown in Exhibit A attached which is an integral part of this report:

EXHIBIT A
SMW, INC.     APPRAISAL
EFFECTIVE     DATE 6/26/20

| PICTURE #<br>ON FRONT | EST. MANUFACTURE<br>OR INSTALL DATE | MODEL NUMBER | SERIAL NUMBER | DESCRIPTION | MANUFACTURER | PHOTO NUMBER<br>BACK OF PICTURE | COMMENTS | FMV - INSTALLED | SALVAGE |
|---|---|---|---|---|---|---|---|---|---|
| | | **Shop Floor Equip.** | | | | | | | |
| 1, 2 | 1990 | NONE | NONE | COIL CRADLE | ENGEL INDUSTRIES, INC | 81,82 | TOTAL SYSTEM VALUE | $ 180,100.00 | $ 57,600.00 |
| 3, 4 | 1990 | M-516UC-II | 300172 | COMPACT COIL LINE | ENGEL INDUSTRIES, INC | 83,84 | | | |
| 5 thru 13 | 1990 | M-10-5TR | 207-92 | TRANSFER SYSTEM | ENGEL INDUSTRIES, INC | 85,86,87,88,89,90,91 | & Pics 3045, 3046 | | |
| 14 | 1990 | DH-800CEF | 2026-92 | CLEAT EDGE | ENGEL INDUSTRIES, INC | 92 | | | |
| 15, 16 | 1990 | M-4616-DH | 51295-95 | ROLL FORMING MACHINE | ENGEL INDUSTRIES, INC | 93,94 | | | |
| 17, 18 | 1990 | M-LM-60-DD | 182-95 | LIN-O-MATIC | ENGEL INDUSTRIES, INC | 95,96 | | | |
| 19, 20 | 1990 | FGMH-50 | 400-574 | MULTIHEAD PINSPOTTER | DURO-DYNE | 97,98 | | | |
| 21, 22 | 1990 | M-516-HLB | 3131-A-95 | HYDRAULIC BRAKE | ENGEL INDUSTRIES, INC | 99,100 | | | |
| 23 | | NONE | NONE | CONTROL PANEL FOR COIL LINE | ENGEL INDUSTRIES, INC | 101 | | | |
| 24, 25 | 2002 | 1000B | VUL 3654 | PLASMA TABLE (BROKEN) | LOCKFORMER | 102,103 | MISSING CONTROL | $ 3,200.00 | $ 800.00 |
| 26, 27 | 2002 | 1000B | NONE | PLASMA TABLE | LOCKFORMER | 104,105 | | $ 6,400.00 | $ 1,920.00 |
| 28 | 2002 | 083063 | 900-018838 | PLASMA CUTTER POWER PAC | HYPERTHERM | 3,065 | INCLUDED IN CUTTER | | |
| 29, 30 | 1985 | 2CC12 | NONE | SHEAR | CINCINATTI | 106,107 | | $ 6,975.00 | $ 1,750.00 |
| 31, 32 | 2006 | BEND 160.37 | 8170 | BEND | KRRAS | 108,109 | | $ 6,800.00 | $ 2,040.00 |
| 33 | 2012 | MILLERMATIC 252 | NONE | WELDER | MILLER | 110 | | $ 1,450.00 | $ 510.00 |
| 34 | 2012 | MILLERMATIC 350P | NONE | WELDER | MILLER | 111 | | $ 2,500.00 | $ 875.00 |
| 35 | 2007 | SPECTRUM 625 | NONE | PORTABLE PLASMA CUTTER | MILLER | 112 | | $ 350.00 | $ 105.00 |
| 36 | 2012 | D-74 Mpa PLUS | NONE | WELDER | MILLER | 113 | | $ 1,425.00 | $ 500.00 |
| 37 | 2014 | XMT 350 Mpa | NONE | WELDER | MILLER | 114 | | $ 1,760.00 | $ 615.00 |
| 38 | 2012 | COOLMATE 1.3 | NONE | WELDER | MILLER | 115 | | $ 350.00 | $ 120.00 |
| 39, 40 | 2015 | TRI-2000 | 2015-091 | DUCT ROLLER | WEBB | 116, 117 | | $ 2,150.00 | $ 750.00 |
| 41, 42 | 2014 | TRD-2000 | 2014-342 | DUCT ROLLER | WEBB | 118,119 | | $ 1,900.00 | $ 665.00 |
| 43, 44 | 2014 | TRI-2000 | 2014-345 | DUCT ROLLER | WEBB | 120,121 | | $ 1,900.00 | $ 665.00 |
| 45, 46 | 2015 | TRD-2000 | 2015-091 | DUCT ROLLER | WEBB | 122,123 | | $ 2,150.00 | $ 750.00 |
| 47, 48, 49 | 1995 | 897 | NONE | IRON WORKER | UPTON BRADEEN & JAMES | 124,125,126 | | $ 800.00 | $ 200.00 |
| 50, 51 | 2014 | 7005RF | 1 2080488 | POWER PINNER | GRIPNAIL CORP. | 127,128 | | $ 2,100.00 | $ 735.00 |
| 52, 53 | 2006 | JDP-20VS-1 | 9021430 | DRILL | JET EQUIPMENT & TOOLS | 129,130 | | $ 350.00 | $ 120.00 |
| 54, 55 | 2000 | 4TJ87 | NONE | 10" DRILL | DAYTON | 131,132 | | $ 45.00 | $ 15.00 |
| 56, 57 | 2015 | RD-200 | 2015-095 | DUCT ROLLER | WEBB | 133,134 | | $ 2,150.00 | $ 750.00 |
| 58, 59 | 2015 | TRI-2000 | 2015-095 | DUCT ROLLER | WEBB | 135,136 | | $ 2,150.00 | $ 750.00 |
| 60, 61 | 2006 | DYNASTY 200 | MD09039 | WELDER | MILLER | 137,138 | | $ 380.00 | $ 115.00 |
| 62, 63 | 2006 | COOLMATE 1 | NONE | WELDER | MILLER | 139,140 | | $ 230.00 | $ 70.00 |
| 64, 65 | 1995 | 3617 | 833-696 | ROLL FORMER | ROPE, WHITNEY CO. PEXTO | 141,142 | | $ 350.00 | $ 90.00 |
| 66, 67 | 2002 | 30KVA | FJ 749 | SPOT WELDER | WESTERN ARCTRONICS | 143,144 | | $ 1,140.00 | $ 340.00 |
| 68, 69 | 2016 | EMT 7R | 2015 46 | ROLL FORMER | EMPIRE MACHINERY & TOOLS | 145,146 | | $ 1,900.00 | $ 665.00 |
| 70, 71 | 2015 | BSP226RFPX1600 | ZC775 | SPOT WELDER | PEI POINT | 147,148 | | $ 1,450.00 | $ 510.00 |
| 72, 73 | 2016 | RAMS2019 | PRM01199 | 14 GA POWER ROTARY ROLL FORMER | RAMS SHEETMETAL EQUIP. | 150, 3066 | | $ 5,700.00 | $ 1,995.00 |
| 74, 75 | 2016 | MILLERMATIC 211 | 907422 | WELDER | MILLER | 151,152 | | $ 1,230.00 | $ 430.00 |
| 76, 77 | 1996 | NONE | TDC 2016 | TDC NOTCHER | LOCKFORMER | 153,154 | | $ 180.00 | $ 45.00 |
| 78, 79 | 1956 | CATALOG #180 | 70641 | ROLL FORMER | NIAGRA SHEETMETAL WORKING MACHINERY | 155,156 | | $ 300.00 | $ 60.00 |
| 80, 81 | 2012 | 1016 | 4153-12-06 | LEAF BRAKE | ROPER WHITNEY CO. | 157,158 | | $ 2,700.00 | $ 945.00 |
| 82, 83 | 2016 | TR100/5 | 3191160 | ROLLS | LEMAS | 159,160 | | $ 11,000.00 | $ 3,850.00 |
| 84, 85 | 1970 | 104 | 76016 | ROLL FORMER | NIAGRA SHEETMETAL WORKING MACHINERY | 161,162 | | $ 220.00 | $ 65.00 |
| 86, 87 | 2000 | U416 | 4599-11-00 | PAN BRAKE | ROPER WHITNEY CO. | 163,164 | | $ 740.00 | $ 200.00 |
| 88, 89 | 1953 | 381-D | 6/53 | ROLLS | PECK STOW & WILCOX CO | 165,166 | | $ 210.00 | $ 40.00 |
| 90, 91 | | 3A | NONE | BAR FOLDER | NIAGRA SHEETMETAL WORKING MACHINERY | 167,168 | | $ 200.00 | $ 45.00 |
| 92 | | NONE | NONE | DRIVE TURNER | LOCKFORMER | 169 | | $ 300.00 | $ 75.00 |
| 93, 94 | 2008 | POWERED LINE SIZER | 729 | LINE SIZER | DURO-DYNE | 170,171 | | $ 3,800.00 | $ 1,150.00 |
| 95, 96 | 1994 | NONE | 1620 | 18 GAUGE PITTSBURGH MACHINE | LOCKFORMER | 172,173 | | $ 210.00 | $ 50.00 |
| 97, 98 | 2007 | 18000 | 1 18463 407 | PITTSBURGH MACHINE | FLAGLER CO | 174,175 | | $ 1,900.00 | $ 570.00 |
| 99, 100 | 1995 | NONE | TRI-4747 | 22 GAUGE CLEATFORMER | LOCKFORMER | 176,177 | | $ 320.00 | $ 80.00 |
| 101, 102 | 2016 | NONE | 722 | BUTTON PUNCH/CHEEK BENDER | LOCKFORMER | 178,179 | | $ 1,870.00 | $ 650.00 |
| 103, 104 | 1996 | BR5.059 | 02971567 | POWER ROLLS | BUILT-RITE MFG. | 180,181 | | $ 950.00 | $ 240.00 |
| 105, 106 | 1975 | D4560-1 | NONE | COIL CRADLE | IOWA PRECISION | 182,183 | OLD PARTIAL SYS. | $ 420.00 | $ 85.00 |

| Item | Year | Model | Serial | Description | Manufacturer | Ref | Notes | Value 1 | Value 2 |
|---|---|---|---|---|---|---|---|---|---|
| 107, 108 | 1975 | ESB6018 | 108605 | FRONT END COIL LINE | IOWA PRECISION | 184,185 | PARTIAL LINE | $ 1,900.00 | $ 400.00 |
| 109, 110 | 2016 | NONE | FB-AGF1612167 | EZ-EDGER | LOCKFORMER | 186,187 | | $ 420.00 | $ 150.00 |
| 111,112 | 1994 | HSCL | HSCL433 | SNAP LOCK THAT ONLY DOES Ss | FLAGLER CO | 188,189 | | $ 2,125.00 | $ 530.00 |
| 113, 114 | 1996 | NONE | 14TDC-3161 | 18 GAUGE TDC MACHINE | LOCKFORMER | 190,191 | | $ 4,700.00 | $ 1,175.00 |
| 115 | 1965 | POWER MIG 225 | NONE | MIG WELDER | LINCOLN ELECTRIC | 192 | | $ 760.00 | $ 150.00 |
| 116, 117 | 1995 | 10 | 82720 | HYDRAULIC BENDER | ROTO-DIE/FECO | 193,194 | | $ 5,390.00 | $ 1,350.00 |
| 118, 119 | 2007 | M-1836-3-A | 1198 | CLEAT FOLDER | LION MACHINERY | 195,196 | | $ 4,000.00 | $ 1,200.00 |
| 120, 121 | | 055 | 1-07 | BAR FOLDER | ROPER WHITNEY CO. /PEXTO | 197,198 | | $ 675.00 | $ 200.00 |
| 122, 123 | 2016 | CV-400 | U1950 123359 | WELDER | LINCOLN ELECTRIC | 199,200 | | $ 1,430.00 | $ 500.00 |
| 124, 125 | 2009 | ORION | NI 00241 | ANGLE TABLE SAW / GRINDER | FMB, FABBRICA MACCHINE BERGAMO | 201,202 | | $ 4,400.00 | $ 1,320.00 |
| 126, 127 | 1998 | S100XL | D004D05169V | FORKLIFT / 8,831 hours | HYSTER | 203,204 | | $ 2,850.00 | $ 720.00 |
| 128, 129, 130 | 2001 | S120XL2 | D004D10936Y | FORKLIFT / 5,812 hours | HYSTER | 205,206,207 | | $ 4,350.00 | $ 1,305.00 |
| 131, 132, 133 | 1995 | ASDRMD-AACAHA | W7E016 | COMPRESSOR | GARDNER-DENVER | 208,209,210 | | $ 400.00 | $ 100.00 |
| 134, 135 | | 0551 | 47 | BAR FOLDER | PEXTO | 211,212 | | $ 420.00 | $ 125.00 |
| 136, 137 | 1995 | ES6-10H/AC/SUL | E602005118 | COMPRESSOR | SULLAIR | 213,214 | | $ 600.00 | $ 150.00 |
| 138, 139 | 1995 | BY754DLF2UC | 12087 | MOTOR FOR COMPRESSOR | TOSHIBA | 215,216 | | $ 135.00 | $ 35.00 |
| 138, 140 | 1990 | 350 | 7719031 | COMPRESSOR | QUINCEY COMPRESSOR | 215, 217 | | $ 770.00 | $ 200.00 |
| 141, 142 | 1990 | BY754DLF2UD | 6400477 | MOTOR FOR COMPRESSOR | TOSHIBA | 218,219 | | $ 140.00 | $ 35.00 |
| 141, 143 | 1990 | 350 | 7721451 | COMPRESSOR | QUINCEY COMPRESSOR | 218,220 | | $ 780.00 | $ 200.00 |
| 144, 145 | | POWERMAX 600 | PMX600-065721 | PLASMA CUTTER | HYPERTHERM | 221,222 | PART OF CUTTER SYS | | |
| 146, 147 | | MILLERMATIC 140 | MD080802N | PLASMA CUTTER | MILLER | 223,224 | | $ 780.00 | $ 235.00 |
| 148, 149 | | 2511 | 376487 | CORING MACHINE (?) | TARGET/DIAMANT BOART INC | 225,226 | NOT IN USE | $ 100.00 | $ 35.00 |
| 150, 151 | 2005 | MILLERMATIC 252 | KK206022 | WELDER | MILLER | 227,228 | NOT IN USE | $ 350.00 | $ 105.00 |
| 152, 153 | 1990 | NONE | 21-1466 | PITTSBURGH MACHINE | LOCKFORMER | 229,230 | NOT IN USE | $ 100.00 | $ 25.00 |
| 154 | | OBSCURED | OBSCURED | WELDER | LINCOLN ELECTRIC | 231 | NOT IN USE | $ 100.00 | $ 25.00 |
| 155, 156 | | 113.248321 | 93335PO708 | 12" BANDSAW | SEARS | 232,233 | NOT IN USE | $ 75.00 | $ 20.00 |
| 157, 158 | 1990 | NONE | 27773 | 24 GAUGE PITTSBURGH MACHINE | LOCKFORMER | 234,235 | NOT IN USE | $ 100.00 | $ 25.00 |
| 159, 160 | 1994 | 152K | 6469-4-94 | PEXTO -16 GAUGE SHEAR | ROPER WHITNEY CO. | 236,237 | NOT IN USE | $ 100.00 | $ 25.00 |
| 161, 162 | 1990 | NONE | 2169 | 18 GAUGE POWER FLANGER/EZ EDGER | LOCKFORMER | 238,240 | NOT IN USE | $ 100.00 | $ 25.00 |
| 163 | | | | (3) Pallet Jacks | Lifter-Pramac 2,000 LBS | 3044 | | $ 870.00 | $ 225.00 |
| 164 | | 08U180 | 08M-023955 | Air Dryer | Ingersol Rand | 3047 | | $ 150.00 | $ 40.00 |
| 165 | | MAXSTAR 150 | | WELDER | MILLER | 3049 | | $ 290.00 | $ 90.00 |
| | | | | | | | SECTION TOTAL | $ 304,065.00 | $ 95,320.00 |
| | **Outside Equip.** | | | | | | | | |
| 166 | | SLC-18 | SLC 07-41652 | CONTRACTOR DUCT JACK | GENIE | 3050 | | $ 1,200.00 | $ 360.00 |
| 167 | | SLC-18 | SLC 08-46190 | CONTRACTOR DUCT JACK | GENIE | 3051 | | $ 1,200.00 | $ 360.00 |
| 168 | | SLC-18 | SLC 06-37436 | CONTRACTOR DUCT JACK | GENIE | 3052 | | $ 1,200.00 | $ 360.00 |
| 168 | | SLC-12 | | CONTRACTOR DUCT JACK | GENIE | 3052 | | $ 980.00 | $ 300.00 |
| 169 | | CAT # DTP0304 | WZ6149868002 | THREE PHASE INDUCTION MOTOR | TECO - WESTINGHOUSE | 3053 | NOT IN USE | $ 100.00 | $ 25.00 |
| 169 | | CAT # DTP0304 | WZ6149868005 | THREE PHASE INDUCTION MOTOR | TECO - WESTINGHOUSE | 3053 | NOT IN USE | $ 100.00 | $ 35.00 |
| 170 | 2007 | 24,000 GVWR - 31' | 5F7GF30247U011557 | GOOSENECK FLATBED TRAILER | BIG BABBA'S | 3054 | | $ 2,860.00 | $ 1,145.00 |
| 171 | 2001 | 40' X 8' RED | MAX U622155-3 | STORAGE CONTAINER | | 3055 | | $ 1,870.00 | $ 650.00 |
| 171 | 2002 | 40' X 8' GREEN | CLHU 841809-9 | STORAGE CONTAINER | | 3055 | | $ 1,870.00 | $ 650.00 |
| 171 | 2004 | 40' X 8' BLUE | GESU 4877420 | STORAGE CONTAINER | | 3055 | | $ 1,870.00 | $ 650.00 |
| 172 | 2005 | 20' X 8' RED | FCIU 240411-0 | STORAGE CONTAINER | | 3056 | | $ 1,870.00 | $ 650.00 |
| 172 | 2004 | 20' X 8' RED | FSCU 768041-8 | STORAGE CONTAINER | | 3056 | | $ 1,870.00 | $ 650.00 |
| 173 | 2000 | 40' X 8' WHITE | YMLU 810669-3 | STORAGE CONTAINER | | 3068 | | $ 1,790.00 | $ 600.00 |
| 174 | 1999 | 40' X 8' WHITE | WCIU 805193-2 | STORAGE CONTAINER | | 3069 | | $ 1,790.00 | $ 600.00 |
| 174-A | | 24' X 8' | | ON SITE OFFICE TRAILER | | 3067 | | $ 3,725.00 | $ 1,300.00 |
| 175 | | (3) 14' | | METAL LADDER | | 3057 | | $ 145.00 | $ 50.00 |
| 175 | | (1) 12' | | METAL LADDER | | 3057 | | $ 35.00 | $ 15.00 |
| 175 | | (6) 10' | | METAL LADDER | | 3057 | | $ 160.00 | $ 60.00 |
| 175 | | (10) 8' | | METAL LADDER | | 3057 | | $ 275.00 | $ 100.00 |
| 175 | | (3) 6' | | METAL LADDER | | 3057 | | $ 70.00 | $ 30.00 |
| 176 | 2008 | 15 T | 8061721 | AIR COMPRESSOR | INGERSOL RAND | 3058 | NOT IN USE | $ 2,200.00 | $ 660.00 |
| 231, 233 | 2016 | (3) 16' | PPT7X14DT2 | (3) ENCLOSED TRAILERS - 16 ft. | BIG BABBA'S | 24, 29 | NOT INSPECTED | $ 18,575.00 | $ 6,500.00 |
| 234 | 2014 | 20' x 5' | | FLATBED TRAILER | BIG BABBA'S | 6305 | NOT INSPECTED | $ 3,000.00 | $ 1,050.00 |
| | | | | | | | SECTION TOTAL | $ 48,755.00 | $ 16,800.00 |

**Office Furniture**
**& Equipment**

**Phone Electical Room**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 177 | RTS 873 SERIES | 73710258 | LAYOUT UNIT | TRIMBLE MEP | 3001 | $ | 14,250.00 | $ 5,000.00 |
| 178 | DUAL BAND MODEM | | DIGITAL WIFI SETTINGS | | 3002 | $ | 40.00 | $ 15.00 |
| 178 | TM 804 | | MODEM | ARRIS | 3002 | $ | 30.00 | $ 5.00 |
| 178 | 1500 | | SMART UPS | APC | 3002 | $ | 150.00 | $ 40.00 |
| 178 | 2200XL | | SMART UPS | APC | 3002 | $ | 250.00 | $ 80.00 |
| 178 | | | POWER PROTECTION | TRIPP-LITE | 3002 | $ | 30.00 | $ 5.00 |
| 179 | T1600 G-28PS | | SMART POE SWITCH | TP-LINK | 3003 | $ | 150.00 | $ 40.00 |
| 179 | C5E | | UNIPRISE CAT5E PATCH PANEL | COMMSCAPE | 3003 | $ | 30.00 | $ 5.00 |
| 180 | VERITON | | PC | ACER | 3004 | $ | 100.00 | $ 35.00 |
| 180 | 1620 MX | | SHREDDER | ROYAL | 3004 | $ | 75.00 | $ 20.00 |
| 181 | 16" | | PC MONITOR | DELL | 3005 | $ | 20.00 | $ 10.00 |
| | | | | | | | | |
| | **RC'S OFFICE** | | | | 3006 | $ | 750.00 | $ 250.00 |
| 182 | 8' | | VALOR COUCH | | 3006 | | | |
| 183 | 4' | | METAL DESK | | 3007 | | | |
| 183 | | | VISITOR CHAIR | | 3007 | | | |
| 183 | | | EXECUTIVE CHAIR | | 3007 | | | |
| 184 | 6' | | METAL TABLE WITH TOP | | 3008 | | | |
| 184 | 4 DRAWER | | FILE CABINET | FLEX | 3008 | | | |
| 184 | | | FAN | | 3008 | | | |
| 185 | 7' | | BOOK SHELF | | 3009 | | | |
| 186 | | | METAL SHELF | | 3010 | | | |
| 186 | SYN 248 | | PHONE | AT&T | 3010 | | | |
| 187 | | | SMALL FRIDGE | | 3011 | | | |
| 187 | | | BOOK SHELF | | 3011 | | | |
| 188 | | | PC | | 3012 | | | |
| 188 | 24" | | MONITOR | VIEWSONIC | 3012 | | | |
| 188 | | | UPS | | 3012 | | | |
| | | | | | | | | |
| | **CHRISTINA'S AREA** | | | | 3013 | $ | 525.00 | $ 185.00 |
| 189 | 5' | | DESK | | 3013 | | | |
| 190 | | | (2) SIDE CHAIRS | | 3014 | | | |
| 189 | | | HUTCH | | 3013 | | | |
| 189 | 5' | | CREDENZA | | 3013 | | | |
| 190 | M402N | | LAZER JET PRO PRINTER | HP | 3014 | | | |
| | | | SECRETARY CHAIR | | | | | |
| 189 | SYN 248 | | PHONE | AT&T | 3013 | | | |
| 189 | 22" | | PC MONITOR | LG | 3013 | | | |
| 189 | | | PC | DELL | 3013 | | | |
| 190 | 36" | | TWO DRAWER LATERAL FILE | | 3014 | | | |
| 190 | 15" | | (2) TWO DRAWER FILES | | 3014 | | | |
| | | | | | | | | |
| | **PATRICIA'S AREA** | | | | 3015 | $ | 730.00 | $ 250.00 |
| 191 | 5' | | DESK | | 3015 | | | |
| 191 | 3' | | HUTCH | | 3015 | | | |
| 192 | | | L SHAPED WORK SPACE / DESK | | 3016 | | | |
| 192 | 20" | | PC MONITOR | AOC | 3016 | | | |
| 192 | SYN 248 | | PHONE | AT&T | 3016 | | | |
| 192 | | | PC | VIVO | 3016 | | | |
| 192 | | | UPS | APC | 3016 | | | |
| 192 | 4' X 5' | | CUBICLE PARTITION | | 3016 | | | |
| 192 | | | SECRETARY CHAIR | | 3016 | | | |

| # | Model/Size | Serial | Description | Brand | Room | $ | $ |
|---|---|---|---|---|---|---|---|
| | **ANDREA'S AREA** | | | | | $ 625.00 | $ 220.00 |
| 193 | 5' | | METAL DESK W/COMPOSITE TOP | | 3017 | | |
| 193 | SYN 248 | | PHONE | AT&T | 3017 | | |
| 193 | 36" | | BOOK SHELF | | 3017 | | |
| 193 | 27" | | PC MONITOR | SAMSUNG | 3017 | | |
| 193 | | | PC | DELL | 3017 | | |
| 193 | | | SECRETARY CHAIR | | 3017 | | |
| 194 | | | (2) FOUR DRAWER FILE | HON | 3018 | | |
| 194 | | | TWO DRAWER FILE | HON | 3018 | | |
| 195 | | | FOUR DRAWER FILE | HON | 3020 | | |
| 196 | | | (2) FOUR DRAWER FILE | HON | 3021 | | |
| 196 | | | (2) FOUR DRAWER FILE W/LOCK | HON | 3021 | | |
| | **COPY ROOM AREA** | | | | | $ 605.00 | $ 215.00 |
| 197 | | | METAL DESK | | 3022 | | |
| 197 | 4000 | | LASER JET PRINTER | HP | 3022 | NOT USED | |
| 198 | 3050 | | PLANS COPIER | XEROX | 3023 | NOT USED | |
| 199 | 700 | | DESK JET PRINTER | HP | 3024 | NOT USED | |
| 200 | MF 8580 | | MULTI FUNCTION PRINTER | CANON | 3025 | | |
| 200 | AR 207 | | COPIER | SHARP | 3025 | | |
| 200 | SYN 248 | | PHONE | AT&T | 3025 | | |
| 200 | | | WOOD SHELF | | 3025 | | |
| | **BREAK ROOM AREA** | | | | | $ 210.00 | $ 75.00 |
| 201 | 1030 | | ENGINEERING COPIER | KIP | 3026 | | |
| 202 | | | SMALL FRIDGE | MAGIC CHEF | 3027 | | |
| 202 | | | SMALL MICROWAVE OVEN | GENERAL ELECTRIC | 3027 | | |
| 202 | | | (2) SMALL COFFEE MAKERS | BLACK & DECKER | 3027 | | |
| | **JEFF'S OFFICE** | | | | | $ 480.00 | $ 170.00 |
| 203 | | | METAL BOOK SHELF | | 3028 | | |
| 203 | | | SINGLE DRAWER FILE W/LOCK | HON | 3028 | | |
| 204 | | | TWO DRAWER FILE | HON | 3029 | | |
| 204 | 5' | | WOOD DESK | | 3029 | | |
| 204 | SB35020 | | PHONE | AT&T | 3029 | | |
| 205 | | | SHORT STOOL | POWER BUILT | 3030 | | |
| 205 | 80" | | DRAFTING BENCH | | 3030 | | |
| 205 | | | PC | SAMSUNG | 3030 | | |
| 205 | 32" | | PC MONITOR | JVC | 3030 | | |
| 206 | | | LEATHER EXEC CHAIR | | 3031 | | |
| | **SPARE OFFICE** | | | | | $ 200.00 | $ 75.00 |
| 207 | 4' | | WOOD CABINET | | 3032 | | |
| 208 | | | GUEST CHAIR | | 3033 | | |
| 208 | | | TWO DRAWER FILE | HON | 3033 | | |
| 208 | 78" | | METAL DESK | | 3033 | | |
| 208 | 92753 | 66113038 | PHONE | NITSUKO | 3033 | | |
| 209 | | | FOLDING TABLE | | 3034 | | |
| | **PLOTTER ROOM** | | | | | $ 835.00 | $ 300.00 |
| 210 | 5' | | METAL DESK | | 3035 | | |
| 210 | | | SECRETARY CHAIR | | 3035 | | |
| 211 | | | TWO DRAWER FILE | HON | 3036 | | |
| 211 | | | GUEST CHAIR | | 3036 | | |
| 212 | 6' | | WOOD CREDENZA | | 3037 | | |
| 212 | 3' | | WOOD HUTCH | | 3037 | | |
| 213 | IPF 765 | | PLOTTER / SCANNER | CANON IMAGE PRO GMF | 3038 | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **ESTIMATING ROOM** | | | | | | $ 1,075.00 | $ 375.00 |
| 214 | | METAL SHELVING | | | 3039 | | |
| 214 | 8702 | OFFICE JET MF PRINTER | HP | | 3039 | | |
| 215 | 5' | DRAFTING TABLE | | | 3040 | | |
| 215 | 48" | TELEVISION | VISIO | | 3040 | | |
| 215 | | PC | | | 3040 | | |
| 215 | | SECRETARY CHAIR | | | 3040 | | |
| 216 | 48" | TELEVISION | VISIO | | 3041 | | |
| 216 | | PC | | | 3041 | | |
| 217 | | TWO DRAWER FILE | | | 3042 | | |
| 217 | 5' | METAL DESK | | | 3042 | | |
| 217 | | TWO DRAWER FILE | HON | | 3042 | | |
| 218 | 5' | METAL DRAFTING TABLE | | | 3043 | | |
| 218 | | STOOL | | | 3043 | | |
| 217 | SB35020 | PHONE | AT&T | | | | |

| | | |
|---|---|---|
| **SECTION TOTAL** | $ 21,160.00 | $ 7,370.00 |
| **EQUIPMENT TOTALS** | $ 373,980.00 | $ 119,490.00 |

| | VIN / SERIAL # | MODEL | DESCRIPTION | MILEAGE / HOUR READING | | | RETAIL | WHOLESALE |
|---|---|---|---|---|---|---|---|---|
| **VEHICLES** | | | | | | | | |
| **BLUE BOOK LISTINGS** | | | | | | | | |
| | 1FA6P8JZXG5520405 | 2016 MUSTANG | FORD 2D SHELBY GT350 V8 COUPE | 6,000 | | NOT INSPECTED | $ 44,460.00 | $ 41,700.00 |
| | 1TFW1ET4EFB76703 | 2014 F150 PICKUP | FORD SUPERCREW PLATINUM 4WD | 160,000 | | NOT INSPECTED | $ 16,430.00 | $ 12,375.00 |
| 235, 236 | 1FT8W3BT5EEB25404 | 2014 F350 PICKUP | FORD SUPER DUTY-V8 CREW CAB PLATINUM 4WD | 131,700 | 2422, 2424 | NOT INSPECTED | $ 23,715.00 | $ 21,200.00 |
| 237, 238 | 1FT8W3BT9EEB63167 | 2014 F350 PICKUP | FORD SUPER DUTY-V8 CREW CAB LARIAT 4WD | 165,940 | 4589, 63167 | NOT INSPECTED | $ 20,600.00 | $ 18,000.00 |
| | 1FDUF5GY4HEE75069 | 2017 F559 TRUCK | FORD 4 X 2 CHASSIS CAB DRW/205 | 15,000 | | NOT INSPECTED | $ 38,500.00 | $ 34,950.00 |
| | | | | **Section Totals** | | | $ 143,705.00 | $ 128,225.00 |

| | | | |
|---|---|---|---|
| **GRAND TOTALS** | **WITH VEHICLES** | $ 517,685.00 | $ 247,715.00 |

**EXHIBIT B - Post Confirmation Cash Projections (through February, 2021)**

|                          | September  | October    | November   | December   | January    | February   |
|--------------------------|-----------:|-----------:|-----------:|-----------:|-----------:|-----------:|
| **Income**               | 302,466.00 | 300,000.00 | 300,000.00 | 300,000.00 | 300,000.00 | 300,000.00 |
| **Monthly Operating Expense** | 200,000.00 | 200,000.00 | 200,000.00 | 200,000.00 | 200,000.00 | 200,000.00 |
| **Subs & Suppliers**     | 80,000.00  | 80,000.00  | 80,000.00  | 80,000.00  | 80,000.00  | 80,000.00  |
|                          | 22,466.00  | 20,000.00  | 20,000.00  | 20,000.00  | 20,000.00  | 20,000.00  |

**Monthly Operating**

| | |
|---|---:|
| Payroll | 88,000.00 |
| Union | 48,000.00 |
| Fed Payroll Tax | 28,000.00 |
| State Payroll Tax | 5,500.00 |
| Unemployment | 2,200.00 |
| Work Comp G.L. | 3,622.00 |
| Office Services supplies | 300.00 |
| Gas/Fuel | 2,000.00 |
| Vehicle Maintenance | 400.00 |
| Phone | 750.00 |
| State and Federal PrePetition Payment | 833.00 |
| BRPI | 1,666.00 |
| Rent | 5,210.00 |
| Utilities | 2,100.00 |
| Legal | 5,000.00 |
| Accounting | 2,400.00 |
| Ford Credit | 650.00 |
| Bank of West | 5,000.00 |
| | $ 201,631.00 |

**EXHIBIT C -  Administrative Expenses under 11 U.S.C. § 503(b) and 28 U.S.C § 1930**

| Creditor | Consideration | Claim No. | Amount |
|---|---|---|---|
| **Staples Business Advantage** | 503(b)(9) Administrative Expense | | |
| Tom Riggleman | Claim - for Supplies | | |
| 7 Technology Circle | | 1 | $732.54 |
| Columbia, SC 29203 | | | |

(Note: Attorneys fees voluntarily capped at $5,000 per week for November - January, 2020)

| Attorneys | | Actual Fees Incurred | Time Period | Attorney Fees that will be  Sought |
|---|---|---|---|---|
| **Richards Brandt Miller Nelson** | 503(b)(2) Attorney Fees (Fee | | | |
| 111 East Broadway, Suite 400 | Application to be Filed) | 32,347.00 | Nov/8-30/ 2019 | 15000.00 |
| Salt Lake City, UT 84111 | | | | |
| | | 28,481.00 | Dec/1-31/2020 | 20000.00 |
| | | 21,286.00 | Jan/1-31/2020 | 20000.00 |
| | | 28,452.00 | Feb/1-29/2020 | 28,452.00 |
| | | 15,814.00 | Mar/1-31/2020 | 15,814.00 |
| | | 21,658.00 | Apr/1-30/2020 | 21,658.00 |
| | | 35,798.00 | May/1-31/2020 | 30,000.00 |
| | | 40,596.00 | June/1-30/2020 | 30,000.00 |
| | | 30,000.00 (est) | July/1-31-2020 through Confirmation | 30,000.00 |
| **Total Attorney Fees:** | | **224,432.00** | | **210,924.00** |
| **United States Trustee** | Quarterly Fees assessed under 28 | | | |
| U.S. Trustee Payment Center | U.S. Code § 1930 | | | |
| P.O. Box 6200-19 | | 4875.00 | | 4875.00 |
| Portland, OR 97228-6200 | | | | |

**Exhibit D--Secured Claims and Payment Terms**

**Bank of the West**
Payments to:
Attn: Terry D. Larson
120 North Mill Street
Fergus Falls, MN 56537-2135

| Class/Loan No. | POC | POC Amount | Interest Rate | Post-Petition Interest | Attorney Fees | Adequate Protection Payments | Pre-Petition Payments Not Credited |
|---|---|---|---|---|---|---|---|
| BW1-Loan No. 3501 | 10 | 14,187.59 | 4.00% | 483.54 | 25,000.00 | (24,000.00) | (30,000.00) |
| BW2-Loan No. 6529 | 10 | 24,032.73 | 4.00% | 819.09 | | | |
| BW3-Loan No. 0018 | 10 | 81,739.11 | 4.14% | 2,883.35 | | | |
| BW4-Loan No. 0026 | 10 | 609,384.40 | 4.00% | 20,769.16 | | | |
| Subtotals | | 729,343.83 | | 24,955.14 | 25,000.00 | (24,000.00) | (30,000.00) |

Consolidated Note Terms
| | |
|---|---|
| Principal | 725,298.97 |
| Interest Rate | 4.00% |
| Regular Payments | 5,000 mo. 1st year,  6,000 mo. 2nd year, 7,000 mo. 3rd year, 8,000 month 4th year. |
| Extra Payments | 25,000 on 9/1/21, 3/1/21 & 9/1/22; 50,000 on 3/1/22, 9/1/22, 3/1/23 & 9/1/23; 100,000 on 3/1/24, 9/1/24 & 3/1/25. |
| Balloon Payment | Balance owed  to be paid as balloon payment in 48th month. |
| Term | 4 years |

**Ford Motor Credit Company**
Payments to:
Drawer 55-953
Detriot, MI 48255-0953

| Class/Loan No. | POC | POC or Scheduled Amount | Interest Rate | Post-Petition Interest | Petition Attorney Fees |
|---|---|---|---|---|---|
| FMC1--Loan No. 2405 | none | 2,128.68 | 3.69% | 66.93 | 0.00 |
| FMC2--Loan No. 9010 | 13 | 17,528.38 | 4.54% | 678.06 | 0.00 |

FMC1 Note Terms
| | |
|---|---|
| Principal | 2,195.61 |
| Interest Rate | 3.69% |
| Regular Payments | 64.53/mo. |
| Term | 3 years |

FMC2 Note Terms
| | |
|---|---|
| Principal | 18,206.44 |
| Interest Rate | 4.54% |
| Regular Payments | 541.90/mo. |
| Term | 3 years |

Exhibit E-1 (BW Consolidated Note)

# PROMISSORY NOTE

*Sheet Metal Works, Inc.*

Principal Amount                                                    Salt Lake City, Utah
$725,299                                                             September ***, 2020

1.    <u>Consolidation and Replacement of Prior Notes and Loan Agreements</u>. This promissory note (this "*Note*") is given pursuant to the terms of **SHEET METAL WORKS, INC.'s** ("*Maker*") confirmed chapter 11 plan in Case No. 19-2830 (D. Utah). This Note supplants, supersedes, and consolidates all prior notes and loan agreements between Maker and **BANK OF THE WEST** ("*Holder*"); provided, however, that Holder's rights against third-party guarantors and sureties under the prior notes and loan agreements are expressly preserved.

2.    <u>Promise to Pay</u>. For value received Maker promises to pay to the order of Holder the principal sum of Seven Hundred Twenty Five Thousand Eight Two Hundred and Ninety-Nine dollars ($725,299), together with interest and other amounts provided for under this Note. Payments shall be made to Holder at Bank of the West, Attn: Terry D. Larsen, 120 North Mill Street, Fergus Falls, MN 56537-2135, unless a different address is provided in writing by Holder to Maker.

3.    <u>Interest Rate</u>. The principal sum outstanding from time to time under this Note shall bear simple interest at a per annum interest of four percent (4%) (the "*Interest Rate*").

4.    <u>Required Payments; Maturity Date</u>.

(a)    <u>Payments of Principal and Interest</u>. Beginning on the first business day of the calendar month after the execution of this Note, and continuing on or before the first business day of each calendar month, thereafter through the Maturity Date (defined below), Maker shall pay Holder according to the loan amortization schedule attached hereto as Exhibit 1, which includes regular monthly payments of $5,000 for the first year, $6,000 for the second year, $7,000 for the third year, and $8,000 for the fourth year, with extra payments on six month intervals ranging between $25,000 and 100,000, and a final balloon payment in the 48th month.

(b)    <u>Maturity Date</u>. If not earlier due and payable, all unpaid principal, accrued but unpaid interest and other amounts payable under the provisions of this Note shall become due and payable in full on August 15, 2024.

5.    <u>Application of Payments</u>. All payments and other credits shall be applied (a) first, to reimbursable fees, costs and expenses payable by Maker under this Note, (b) second, to accrued and unpaid interest, and (c) third, to principal. Any payments made by Maker must be received by Holder no later than 1:00 p.m. Salt Lake City, Utah time in order for same-day credit.

6.    <u>Late Charges</u>. If Maker fails to make payment when due, Holder may charge, and Maker shall pay upon demand, a late charge equal to three percent (3.00%) of the dollar amount of such payment.

7.    <u>Collection Costs</u>. If suit, arbitration or other legal proceeding or any nonjudicial foreclosure proceeding is instituted or any other action is taken by Holder to collect all or any part of the indebtedness evidenced hereby or to proceed against any collateral for any portion of such indebtedness, Maker promises to pay Holder's reasonable attorneys' fees and other costs (to be determined by the court or arbitrator and not by

jury in the case of litigation or arbitration) incurred thereby.  Such fees and costs shall be included in any judgment or arbitration award obtained by Holder, shall be secured by any document securing any portion of the indebtedness evidenced by this Note, shall bear interest at the Default Rate (defined below).

8.    Optional Prepayments.  Maker shall have the option to prepay this Note, in full or in part, at any time, without penalty.

9.    Waivers and Acknowledgments.    Except as is expressly provided herein, Maker and endorsers waive: (a) demand, notice, diligence, protest, presentment for payment, and notice of extension, dishonor, protest, demand and nonpayment of this Note; and (b) any release or discharge by reason of (i) any release or substitution of, or other change in (A) the Security Agreements (defined below) or any other security given for the indebtedness evidenced by this Note or (B) the obligation of any other person or entity who or which is now or may become directly or indirectly liable for all or any portion of the indebtedness evidenced by this Note, or (ii) any extension or other modification of the time or terms of payment of all or any portion of the indebtedness evidenced by this Note.  Maker and endorsers agree that their liability for the indebtedness evidenced hereby shall be joint and several.

10.    Collateral. Maker's obligations under this Note are secured by a security interest in collateral (the "*Collateral*") described in the security agreements (the "*Security Agreements*") attached hereto as Exhibit 2.

11.    Default. An event of default ("*Event of Default*") shall occur as follows:

(a)    Payment Default. If Maker fails to make any payment required under this Note, Holder shall give written notice to Maker of such failure and the amount due. If Maker fails to pay the required payment within fifteen (15) days of receipt of such notice, such failure shall be an Event of Default.

(b)    Minimum Collateral Value. If the value of those items of the Collateral described in Exhibit 3 (according to the valuation guidelines set forth in such Exhibit) falls below 110% of the outstanding balance owed under this Note, Holder shall give written notice to Maker of such occurrence. If, within sixty (60) days after receipt of such notice, Maker cannot demonstrate that the value of all of the Collateral is 110% or more of the outstanding balance of the Note, such failure shall be an Event of Default.

(c)    Violation of Security Agreements. If Maker fails to comply with its obligations under the Security Agreements, Holder shall give written notice to Maker of such failure. If Maker fails to cure the failure within fifteen (15) days of receipt of such notice, such failure shall be an Event of Default. (This provision supplants and supersedes any inconsistent provisions of the Security Agreements regarding default, notice, cure, etc.)

12.    Reporting. Maker shall, within fifteen (15) days after the end of each quarter of the calendar year, provide reports to Holder regarding the status and value of Maker's (i) cash on hand, (ii) accounts receivable, and (iii) work-in-process. Maker's failure to timely provide such reports shall not, in itself, constitute an Event of Default but, until such reports are provided, Maker shall not be entitled to rely on the value of such property to meet the minimum Collateral value requirements of the preceding section.

13.    Acceleration.  Upon the occurrence of any Event of Default, then, at the option of Holder, Holder may declare the total then unpaid indebtedness evidenced by this Note to be immediately due and payable.

14.    <u>Default Interest</u>.  After maturity, including maturity upon acceleration following any Event of Default, then all amounts outstanding hereunder, including any late charges that are then due and payable shall thereafter bear interest at the Interest Rate plus four percent (4%) per annum (the "*Default Interest Rate*").

15.    <u>Remedies/Right of Setoff</u>.  Upon the occurrence of any Event of Default, Holder may proceed against the Collateral or Maker in such order and manner as Holder in its sole discretion may determine, unless otherwise required by applicable Utah law.

16.    <u>No Waiver by Holder</u>.  Failure of Holder to exercise any option hereunder shall not constitute a waiver of the right to exercise the same in the event of any subsequent default or in the event of continuance of any existing default after demand for strict performance hereof.

17.    <u>Time of Essence</u>.  Time is of the essence of this Note.

18.    <u>Notices</u>.  Except as otherwise designative in writing by Maker or Holder, all notices required or permitted in connection with this Note shall be given as follows:

| | | |
|---|---|---|
| If to Maker: | by mail to: | Sheet Metal Works, Inc. |
| | | Attn: RC Montrone, general manager |
| | | 2487 South 3270 West, Salt Lake City, UT 84119 |
| | and by email to: | rcmontrone@sheetmetalworks.biz; jlyoung@yahlaw.com |
| If to Holder: | by mail to: | Terry D. Larsen |
| | | 120 North Mill Street |
| | | Fergus Falls, MN 56537-2135 |
| | and by email to: | terry.larson@bankofthewest.com |

19.    <u>Governing Law</u>.  The validity of this Note and the construction, interpretation, and enforcement hereof, and the rights of the parties hereto with respect to all matters arising hereunder or related hereto, shall be determined under, governed by, and construed in accordance with the laws of the State of Utah without giving effect to conflict of laws principles (regardless of the location, residence, domicile or place of business of Maker or any constituent principal thereof or the location of any of the Collateral securing that Note).

IN WITNESS WHEREOF, this Note has been executed as of the date first written above.


**SHEET METAL WORKS, INC.,**
a Utah corporation


By:_____
Name: _____
Title: _____


Exhibit 1—Amortization and Payment Schedule
Exhibit 2—Security Agreements
Exhibit 3—Collateral Valuation Guideline

## EXHIBIT 1 - LOAN AMORTIZATION SCHEDULE

| ENTER VALUES | |
|---|---|
| Loan amount | $725,299.00 |
| Annual interest rate | 4.00% |
| Loan period in years | 4 |
| Number of payments per year | 12 |
| Start date of loan | 9/15/2020 |
| | |
| Optional extra payments | $0.00 |

| LOAN SUMMARY | |
|---|---|
| Initial scheduled payment | $5,000.00 |
| Scheduled number of payments | 48 |
| Actual number of payments | 48 |
| Total early payments | $425,000.00 |
| Total interest | $87,512.84 |
| | |
| LENDER NAME | Bank of the West |

| PMT NO | PAYMENT DATE | BEGINNING BALANCE | SCHEDULED PAYMENT | EXTRA PAYMENT | TOTAL PAYMENT | PRINCIPAL | INTEREST | ENDING BALANCE | CUM. INTEREST |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 9/15/2020 | $725,299.00 | $5,000.00 | $0.00 | $5,000.00 | $2,582.34 | $2,417.66 | $722,716.66 | $2,417.66 |
| 2 | 10/15/2020 | $722,716.66 | $5,000.00 | $0.00 | $5,000.00 | $2,590.94 | $2,409.06 | $720,125.72 | $4,826.72 |
| 3 | 11/15/2020 | $720,125.72 | $5,000.00 | $0.00 | $5,000.00 | $2,599.58 | $2,400.42 | $717,526.14 | $7,227.14 |
| 4 | 12/15/2020 | $717,526.14 | $5,000.00 | $0.00 | $5,000.00 | $2,608.25 | $2,391.75 | $714,917.89 | $9,618.89 |
| 5 | 1/15/2021 | $714,917.89 | $5,000.00 | $0.00 | $5,000.00 | $2,616.94 | $2,383.06 | $712,300.95 | $12,001.95 |
| 6 | 2/15/2021 | $712,300.95 | $5,000.00 | $0.00 | $5,000.00 | $2,625.66 | $2,374.34 | $709,675.29 | $14,376.29 |
| 7 | 3/15/2021 | $709,675.29 | $5,000.00 | $0.00 | $5,000.00 | $2,634.42 | $2,365.58 | $707,040.87 | $16,741.87 |
| 8 | 4/15/2021 | $707,040.87 | $5,000.00 | $0.00 | $5,000.00 | $2,643.20 | $2,356.80 | $704,397.68 | $19,098.68 |
| 9 | 5/15/2021 | $704,397.68 | $5,000.00 | $0.00 | $5,000.00 | $2,652.01 | $2,347.99 | $701,745.67 | $21,446.67 |
| 10 | 6/15/2021 | $701,745.67 | $5,000.00 | $0.00 | $5,000.00 | $2,660.85 | $2,339.15 | $699,084.82 | $23,785.82 |
| 11 | 7/15/2021 | $699,084.82 | $5,000.00 | $0.00 | $5,000.00 | $2,669.72 | $2,330.28 | $696,415.10 | $26,116.10 |
| 12 | 8/15/2021 | $696,415.10 | $5,000.00 | $25,000.00 | $30,000.00 | $27,678.62 | $2,321.38 | $668,736.49 | $28,437.49 |
| 13 | 9/15/2021 | $668,736.49 | $6,000.00 | $0.00 | $6,000.00 | $3,770.88 | $2,229.12 | $664,965.61 | $30,666.61 |
| 14 | 10/15/2021 | $664,965.61 | $6,000.00 | $0.00 | $6,000.00 | $3,783.45 | $2,216.55 | $661,182.16 | $32,883.16 |
| 15 | 11/15/2021 | $661,182.16 | $6,000.00 | $0.00 | $6,000.00 | $3,796.06 | $2,203.94 | $657,386.10 | $35,087.10 |
| 16 | 12/15/2021 | $657,386.10 | $6,000.00 | $0.00 | $6,000.00 | $3,808.71 | $2,191.29 | $653,577.39 | $37,278.39 |
| 17 | 1/15/2022 | $653,577.39 | $6,000.00 | $0.00 | $6,000.00 | $3,821.41 | $2,178.59 | $649,755.98 | $39,456.98 |
| 18 | 2/15/2022 | $649,755.98 | $6,000.00 | $25,000.00 | $31,000.00 | $28,834.15 | $2,165.85 | $620,921.83 | $41,622.83 |
| 19 | 3/15/2022 | $620,921.83 | $6,000.00 | $0.00 | $6,000.00 | $3,930.26 | $2,069.74 | $616,991.57 | $43,692.57 |
| 20 | 4/15/2022 | $616,991.57 | $6,000.00 | $0.00 | $6,000.00 | $3,943.36 | $2,056.64 | $613,048.21 | $45,749.21 |
| 21 | 5/15/2022 | $613,048.21 | $6,000.00 | $0.00 | $6,000.00 | $3,956.51 | $2,043.49 | $609,091.70 | $47,792.70 |
| 22 | 6/15/2022 | $609,091.70 | $6,000.00 | $0.00 | $6,000.00 | $3,969.69 | $2,030.31 | $605,122.01 | $49,823.01 |
| 23 | 7/15/2022 | $605,122.01 | $6,000.00 | $0.00 | $6,000.00 | $3,982.93 | $2,017.07 | $601,139.08 | $51,840.08 |
| 24 | 8/15/2022 | $601,139.08 | $6,000.00 | $25,000.00 | $31,000.00 | $28,996.20 | $2,003.80 | $572,142.88 | $53,843.88 |
| 25 | 9/15/2022 | $572,142.88 | $7,000.00 | $0.00 | $7,000.00 | $5,092.86 | $1,907.14 | $567,050.02 | $55,751.02 |
| 26 | 10/15/2022 | $567,050.02 | $7,000.00 | $0.00 | $7,000.00 | $5,109.83 | $1,890.17 | $561,940.19 | $57,641.19 |
| 27 | 11/15/2022 | $561,940.19 | $7,000.00 | $0.00 | $7,000.00 | $5,126.87 | $1,873.13 | $556,813.32 | $59,514.32 |
| 28 | 12/15/2022 | $556,813.32 | $7,000.00 | $0.00 | $7,000.00 | $5,143.96 | $1,856.04 | $551,669.37 | $61,370.37 |
| 29 | 1/15/2023 | $551,669.37 | $7,000.00 | $0.00 | $7,000.00 | $5,161.10 | $1,838.90 | $546,508.27 | $63,209.27 |
| 30 | 2/15/2023 | $546,508.27 | $7,000.00 | $50,000.00 | $57,000.00 | $55,178.31 | $1,821.69 | $491,329.96 | $65,030.96 |
| 31 | 3/15/2023 | $491,329.96 | $7,000.00 | $0.00 | $7,000.00 | $5,362.23 | $1,637.77 | $485,967.73 | $66,668.73 |
| 32 | 4/15/2023 | $485,967.73 | $7,000.00 | $0.00 | $7,000.00 | $5,380.11 | $1,619.89 | $480,587.62 | $68,288.62 |
| 33 | 5/15/2023 | $480,587.62 | $7,000.00 | $0.00 | $7,000.00 | $5,398.04 | $1,601.96 | $475,189.58 | $69,890.58 |

| PMT NO | PAYMENT DATE | BEGINNING BALANCE | SCHEDULED PAYMENT | EXTRA PAYMENT | TOTAL PAYMENT | PRINCIPAL | INTEREST | ENDING BALANCE | CUM. INTEREST |
|--------|--------------|-------------------|-------------------|---------------|---------------|-----------|----------|----------------|---------------|
| 34 | 6/15/2023 | $475,189.58 | $7,000.00 | $0.00 | $7,000.00 | $5,416.03 | $1,583.97 | $469,773.54 | $71,474.54 |
| 35 | 7/15/2023 | $469,773.54 | $7,000.00 | $0.00 | $7,000.00 | $5,434.09 | $1,565.91 | $464,339.45 | $73,040.45 |
| 36 | 8/15/2023 | $464,339.45 | $7,000.00 | $50,000.00 | $57,000.00 | $55,452.20 | $1,547.80 | $408,887.25 | $74,588.25 |
| 37 | 9/15/2023 | $408,887.25 | $8,000.00 | $0.00 | $8,000.00 | $6,637.04 | $1,362.96 | $402,250.21 | $75,951.21 |
| 38 | 10/15/2023 | $402,250.21 | $8,000.00 | $0.00 | $8,000.00 | $6,659.17 | $1,340.83 | $395,591.04 | $77,292.04 |
| 39 | 11/15/2023 | $395,591.04 | $8,000.00 | $0.00 | $8,000.00 | $6,681.36 | $1,318.64 | $388,909.68 | $78,610.68 |
| 40 | 12/15/2023 | $388,909.68 | $8,000.00 | $0.00 | $8,000.00 | $6,703.63 | $1,296.37 | $382,206.05 | $79,907.05 |
| 41 | 1/15/2024 | $382,206.05 | $8,000.00 | $0.00 | $8,000.00 | $6,725.98 | $1,274.02 | $375,480.07 | $81,181.07 |
| 42 | 2/15/2024 | $375,480.07 | $8,000.00 | $50,000.00 | $58,000.00 | $56,748.40 | $1,251.60 | $318,731.67 | $82,432.67 |
| 43 | 3/15/2024 | $318,731.67 | $8,000.00 | $0.00 | $8,000.00 | $6,937.56 | $1,062.44 | $311,794.11 | $83,495.11 |
| 44 | 4/15/2024 | $311,794.11 | $8,000.00 | $0.00 | $8,000.00 | $6,960.69 | $1,039.31 | $304,833.42 | $84,534.42 |
| 45 | 5/15/2024 | $304,833.42 | $8,000.00 | $0.00 | $8,000.00 | $6,983.89 | $1,016.11 | $297,849.53 | $85,550.53 |
| 46 | 6/15/2024 | $297,849.53 | $8,000.00 | $0.00 | $8,000.00 | $7,007.17 | $992.83 | $290,842.36 | $86,543.36 |
| 47 | 7/15/2024 | $290,842.36 | $8,000.00 | $0.00 | $8,000.00 | $7,030.53 | $969.47 | $283,811.84 | $87,512.84 |
| 48 | 8/15/2024 | $283,811.84 | $283,811.84 | $0.00 | $283,811.84 | . | . | | $87,512.84 |

# COMMERCIAL SECURITY AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $750,000.00 | 06-09-2016 | | 0000000026 | | 1060811268 | *** | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Grantor:**  SHEET METAL WORKS, INC.
2487 SOUTH 3270 WEST
WEST VALLEY CITY, UT 84119

**Lender:**  BANK OF THE WEST
South Valley #764
12572 South Creek Meadow Road
Salt Lake City, UT 94065

THIS COMMERCIAL SECURITY AGREEMENT dated June 9, 2016, is made and executed between SHEET METAL WORKS, INC. ("Grantor") and BANK OF THE WEST ("Lender").

**GRANT OF SECURITY INTEREST.** For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

**COLLATERAL DESCRIPTION.** The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

All inventory, equipment, accounts (including but not limited to all health-care-insurance receivables), chattel paper, instruments (including but not limited to all promissory notes), letter-of-credit rights, letters of credit, documents, deposit accounts, investment property, money, other rights to payment and performance, and general intangibles (including but not limited to all software and all payment intangibles); all oil, gas and other minerals before extraction; all oil, gas, other minerals and accounts constituting as-extracted collateral; all fixtures; all timber to be cut; all attachments, accessions, accessories, fittings, increases, tools, parts, repairs, supplies, and commingled goods relating to the foregoing property, and all additions, replacements of and substitutions for all or any part of the foregoing property; all insurance refunds relating to the foregoing property; all good will relating to the foregoing property; all records and data and embedded software relating to the foregoing property, and all equipment, inventory and software to utilize, create, maintain and process any such records and data on electronic media; and all supporting obligations relating to the foregoing property; all whether now existing or hereafter arising, whether now owned or hereafter acquired or whether now or hereafter subject to any rights in the foregoing property; and all products and proceeds (including but not limited to all insurance payments) of or relating to the foregoing property.

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(A) All accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the collateral described herein, whether added now or later.

(B) All products and produce of any of the property described in this Collateral section.

(C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

(D) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(E) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.** With respect to the Collateral, Grantor represents and promises to Lender that:

**Perfection of Security Interest.** Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Grantor may not be indebted to Lender.

**Notices to Lender.** Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the management of the Corporation Grantor; (4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in Grantor's state of organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name or state of organization will take effect until after Lender has received notice.

**No Violation.** The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its certificate or articles of incorporation and bylaws do not prohibit any term or condition of this Agreement.

**Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. At the time any account becomes subject to a security interest in favor of Lender, the account shall be a good and valid account representing an undisputed, bona

# COMMERCIAL SECURITY AGREEMENT
**(Continued)**

fide indebtedness incurred by the account debtor, for merchandise held subject to delivery instructions or previously shipped or delivered pursuant to a contract of sale, or for services previously performed by Grantor with or for the account debtor. So long as this Agreement remains in effect, Grantor shall not, without Lender's prior written consent, compromise, settle, adjust, or extend payment under or with regard to any such Accounts. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

**Location of the Collateral.** Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral (or to the extent the Collateral consists of intangible property such as accounts or general intangibles, the records concerning the Collateral) at Grantor's address shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or leasing; (3) all storage facilities Grantor owns, rents, leases, or uses; and (4) all other properties where Collateral is or may be located.

**Removal of the Collateral.** Except in the ordinary course of Grantor's business, including the sales of inventory, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. To the extent that the Collateral consists of vehicles, or other titled property, Grantor shall not take or permit any action which would require application for certificates of title for the vehicles outside the State of Utah, without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

**Transactions Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. While Grantor is not in default under this Agreement, Grantor may sell inventory, but only in the ordinary course of its business and only to buyers who qualify as a buyer in the ordinary course of business. A sale in the ordinary course of Grantor's business does not include a transfer in partial or total satisfaction of a debt or any bulk sale. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

**Title.** Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

**Repairs and Maintenance.** Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, reasonable attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

**Compliance with Governmental Requirements.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify and defend shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

**Application of Insurance Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Collateral, whether or not such

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

casualty or loss is covered by insurance. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

**Insurance Reserves.** Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due. Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

**Insurance Reports.** Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

**Financing Statements.** Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property. Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Grantor irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. Lender may file a copy of this Agreement as a financing statement.

**GRANTOR'S RIGHT TO POSSESSION AND TO COLLECT ACCOUNTS.** Until default and except as otherwise provided below with respect to accounts, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. Until otherwise notified by Lender, Grantor may collect any of the Collateral consisting of accounts. At any time and even though no Default exists, Lender may exercise its rights to collect the accounts and to notify account debtors to make payments directly to Lender for application to the Indebtedness. If Lender at any time has possession of any Collateral, whether before or after Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**DEFAULT.** Default will occur if payment of the Indebtedness in full is not made immediately when due.

**RIGHTS AND REMEDIES ON DEFAULT.** If Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the Utah Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Grantor would be required to pay, immediately due and payable, without notice of any kind to Grantor.

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. Grantor hereby waives any requirement that the receiver be impartial and disinterested as to all of the parties and agrees that employment by Lender shall not

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

disqualify a person from serving as a receiver.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Grantor for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Grantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not Lender's salaried employee and whether or not there is a lawsuit, including reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law. This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Utah without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Utah.**

**Choice of Venue.** If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the courts of Salt Lake County, State of Utah.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Unless otherwise provided by applicable law, any notice required to be given under this Agreement or required by law shall be given in writing, and shall be effective when actually delivered in accordance with the law or with this Agreement, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided by applicable law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

Indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**Waive Jury.** All parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Agreement.** The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

**Borrower.** The word "Borrower" means SHEET METAL WORKS, INC. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

**Default.** The word "Default" means the Default set forth in this Agreement in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Grantor.** The word "Grantor" means SHEET METAL WORKS, INC..

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means BANK OF THE WEST, its successors and assigns.

**Note.** The word "Note" means the Note dated June 9, 2016 and executed by SHEET METAL WORKS, INC. in the principal amount of $750,000.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**GRANTOR HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED JUNE 9, 2016.**

GRANTOR:

SHEET METAL WORKS, INC.

By: _____
RALPH C MONTRONE, President of SHEET METAL
WORKS, INC.

By: _____
KATHARINA A MONTRONE, Vice President of
SHEET METAL WORKS, INC.

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

Loan No: 0000000026                                                                 Page 6

LENDER:

BANK OF THE WEST

X _____
   Authorized Officer

LaserPro, Ver. 16.1.10.003 Copr. D+H USA Corporation 1997, 2016.  All Rights Reserved.  - UT  P:\CFI\LPL\E40.FC  TR-163970  PR-COMBB2VS

# COMMERCIAL SECURITY AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $225,000.00 | 06-09-2016 | 06-09-2021 | 0000000018 | | 1060811318 | *** | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Grantor:**  EXPLORE MANAGEMENT, L.L.C.
2487 SOUTH 3270 WEST
WEST VALLEY CITY, UT 84119

**Lender:**  BANK OF THE WEST
South Valley #764
12572 South Creek Meadow Road
Salt Lake City, UT 94065

---

THIS COMMERCIAL SECURITY AGREEMENT dated June 9, 2016, is made and executed between EXPLORE MANAGEMENT, L.L.C. ("Grantor") and BANK OF THE WEST ("Lender").

**GRANT OF SECURITY INTEREST.** For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

**COLLATERAL DESCRIPTION.** The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

2005 Explore Coil Line (SN: 300172); 2005 Explore Clear Edge Former (SN: 2026-92); 2005 Explore Roll Forming (SN: 51295-95); 2005 Hydraulic Brake (SN: 3131-A-95); 2005 Multi Head Pin Spotter (SN: 400-574); 2005 Lin O Matic (SN: 182-95)

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(A) All accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the collateral described herein, whether added now or later.

(B) All products and produce of any of the property described in this Collateral section.

(C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

(D) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(E) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.** With respect to the Collateral, Grantor represents and promises to Lender that:

**Perfection of Security Interest.** Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender.

**Notices to Lender.** Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the management or in the members or managers of the limited liability company Grantor; (4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in Grantor's state of organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name or state of organization will take effect until after Lender has received notice.

**No Violation.** The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its membership agreement does not prohibit any term or condition of this Agreement.

**Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

**Location of the Collateral.** Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral at Grantor's address shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or leasing; (3) all storage facilities Grantor owns, rents, leases, or uses; and (4) all other properties where Collateral is or may be located.

**Removal of the Collateral.** Except in the ordinary course of Grantor's business, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. To the extent that the Collateral consists of vehicles, or other titled property, Grantor shall not take or permit any action which would require application for certificates of title for the vehicles outside the State of Utah, without

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

**Transactions Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

**Title.** Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

**Repairs and Maintenance.** Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, reasonable attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

**Compliance with Governmental Requirements.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify and defend shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

**Application of Insurance Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Collateral, whether or not such casualty or loss is covered by insurance. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

**Insurance Reserves.** Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due. Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

**Insurance Reports.** Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

of the policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

**Financing Statements.** Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property. Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Grantor irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. Lender may file a copy of this Agreement as a financing statement.

**GRANTOR'S RIGHT TO POSSESSION.** Until default, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**Default in Favor of Third Parties.** Any guarantor or Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of any guarantor's or Grantor's property or ability to perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Insolvency.** The dissolution of Grantor (regardless of whether election to continue is made), any member withdraws from the limited liability company, or any other termination of Grantor's existence as a going business or the death of any member, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or Guarantor dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the Utah Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Grantor would be required to pay, immediately due and payable, without notice of any kind to Grantor.

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

Loan No: 0000000018                                                                                                Page 4

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. Grantor hereby waives any requirement that the receiver be impartial and disinterested as to all of the parties and agrees that employment by Lender shall not disqualify a person from serving as a receiver.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Grantor for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Grantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not Lender's salaried employee and whether or not there is a lawsuit, including reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law. This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Utah without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Utah.**

**Choice of Venue.** If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the courts of Salt Lake County, State of Utah.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Unless otherwise provided by applicable law, any notice required to be given under this Agreement or required by law shall be given in writing, and shall be effective when actually delivered in accordance with the law or with this Agreement, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided by applicable law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documents

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

Loan No: 0000000018                                                                                                      Page 5

=====================================================================================================

necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**Waive Jury.** All parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Agreement.** The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

**Borrower.** The word "Borrower" means EXPLORE MANAGEMENT, L.L.C. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

**Default.** The word "Default" means the Default set forth in this Agreement in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Grantor.** The word "Grantor" means EXPLORE MANAGEMENT, L.L.C..

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means BANK OF THE WEST, its successors and assigns.

**Note.** The word "Note" means the Note dated June 9, 2016 and executed by EXPLORE MANAGEMENT, L.L.C. in the principal amount of $225,000.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

GRANTOR HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED JUNE 9, 2016.

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

**Loan No: 0000000018**                                                                 **Page 6**

GRANTOR:

EXPLORE MANAGEMENT, L.L.C.

By: _____          By: _____
RALPH C MONTRONE, Managing Member of          KATHARINA A MONTRONE, Managing Member of
EXPLORE MANAGEMENT, L.L.C.                     EXPLORE MANAGEMENT, L.L.C.

LENDER:

BANK OF THE WEST

X _____
Authorized Officer

LaserPro, Ver. 16.1.10.003  Copr. D+H USA Corporation 1997, 2016.  All Rights Reserved.  - UT  P:\CFI\LPL\E40.FC  TR-163991  PR-COMBB3CF

**Addendum to Exhibit 2**

**Amendment to Commerical Security Agreement**

      Sheet Metal Work, Inc, ("**SMW**") hereby agrees to amendment of that certain Commercial Security Agreement (for Loan No. 0000000026, Account no. 1060811268), dated 6/9/2016 (the "**2016 Security Agreement**") in favor of Bank of the West to include additional security for the purpose of securing SMW's obligations to Bank of the West under that certain Consolidated Note, dated September ***, 2010.

      Wherefore, SMW hereby grants an additional security interest to Bank of the West in the following described vehicles:

| | | |
|---|---|---|
| 1FA6P8JZXG5520405 | 2016 MUSTANG | FORD 2D SHELBY GT350 V8 COUPE |
| 1FDUF5GY4HEE75069 | 2017 F550 TRUCK | FORD 4 X 2 CHASSIS CAB DRW/205 |
| | | |
| 1FTFW1ET4EFB7673 | 2014 F150 PICKUP | FORD SUPERCREW PLATINUM 4WD |
| 1FT8W3BT5EEB2544 | 2014 F350 PICKUP | FORD SUPER DUTY-V8 CREW CAB PLATINUM 4WD |
| 1FT8W3BT9EEB6317 | 2014 F350 PICKUP | FORD SUPER DUTY-V8 CREW CAB LARIAT 4WD |

2008 Ford Shop Truck with over 200,000 miles, VIN XXXX 3018
2008 Ford Shop Truck with over 200,000 miles, VIN XXXX 1398

      As modified by the terms of the Chapter 11 Plan of SMX, dated July 19, 2020, all provisions of the 2016 Security Agreement shall apply to the security interest granted herein including, without limitation, provisions as to maintenance of collateral, insurance, rights and remedies upon default, perfection, etc.

      Dated this ___ of September, 2020.

                      **SHEET METAL WORKS, INC.**

                      **By**_____

                      **Its**_____

**EXHIBIT 3**

**COLLATERAL VALUATION GUIDELINES**

For purposes of determining minimum collateral value, the following guidelines shall apply:

1.      The shop equipment shall be valued at $304,065 subject to a 5% reduction applied annually on every September 1st after the Effective Date of the Plan.

2.      The vehicles shall be valued at $100,000, subject to an 8% reduction applied annually on every September 1st after the Effective Date of the Plan.

3.      The note receivable owed by Iron Holdings, LLC and secured by a trust deed on land and improvements located at 2487 South 3270 West, West Valley, Utah shall be valued at $300,000 subject to a 4% increase applied annually on every September 1st after the Effective Date of the Plan.

4.      Accounts receivable for invoiced work shall be valued according to aging as follows:

| | |
|---|---|
| 0-90 days | 100% |
| 90-120 days | 95% |
| 120-180 days | 90% |
| 365 days or more | 70% |

Exhibit E-2 (FMC1 Note)

# PROMISSORY NOTE

*Sheet Metal Works, Inc.*

Principal Amount                                                                      Salt Lake City, Utah
$2,195.00                                                                           September ***, 2020

1.      <u>Replacement of Prior Note and Loan Agreement</u>. This promissory note (this "*Note*") is given pursuant to the terms of **SHEET METAL WORKS, INC.'s** ("*Maker*") confirmed chapter 11 plan in Case No. 19-2830 (D. Utah). This Note supplants and supersedes a prior note and loan agreement between Maker and **FORD MOTOR CREDIT COMPANY** ("*Holder*"); provided, however, that Holder's rights against co-makers, third-party guarantors, and sureties under the prior note and loan agreement are expressly preserved.

2.      <u>Promise to Pay</u>. For value received, Maker promises to pay to the order of Holder the principal sum of $2,195.00, together with interest and other amounts provided for under this Note. Payments shall be made to Holder at Ford Motor Credit Company LLC, Drawer 55-953, PO Box 55000, Detroit, MI 48255-095, unless a different address is provided in writing by Holder to Maker.

3.      <u>Interest Rate</u>. The principal sum outstanding from time to time under this Note shall bear simple interest at a per annum interest of 3.69% (the "*Interest Rate*").

4.      <u>Required Payments; Maturity Date</u>.

(a)      <u>Payments of Principal and Interest</u>. Beginning on the first business day of the calendar month after the execution of this Note, and continuing on or before the first business day of each calendar month thereafter through the Maturity Date (defined below), Maker shall pay Holder monthly payments of $64.53 per month.

(b)      <u>Maturity Date</u>. If not earlier due and payable, all unpaid principal, accrued but unpaid interest and other amounts payable under the provisions of this Note shall become due and payable in full on September 1, 2023.

5.      <u>Application of Payments</u>. All payments and other credits shall be applied (a) first, to reimbursable fees, costs and expenses payable by Maker under this Note, (b) second, to accrued and unpaid interest, and (c) third, to principal. Any payments made by Maker must be received by Holder no later than 1:00 p.m. Salt Lake City, Utah time in order for same-day credit.

6.      <u>Late Charges</u>. If Maker fails to make payment within 10 days of the due date, Holder may charge, and Maker shall pay upon demand, a late charge equal to 5.00% of the dollar amount of such payment or $30, whichever is greater.

7.      <u>Collection Costs</u>. If suit, arbitration or other legal proceeding or any nonjudicial foreclosure proceeding is instituted or any other action is taken by Holder to collect all or any part of the indebtedness evidenced hereby or to proceed against any collateral for any portion of such indebtedness, Maker promises to pay Holder's reasonable attorneys' fees and other costs (to be determined by the court or arbitrator and not by jury in the case of litigation or arbitration) incurred thereby. Such fees and costs shall be included in any judgment or arbitration award obtained by Holder, shall be secured by any document securing any portion of the indebtedness evidenced by this Note, shall bear interest at the Default Rate (defined below).

8.     Optional Prepayments.  Maker shall have the option to prepay this Note, in full or in part, at any time, without penalty.

9.     Waivers and Acknowledgments.  Except as is expressly provided herein, Maker and endorsers waive: (a) demand, notice, diligence, protest, presentment for payment, and notice of extension, dishonor, protest, demand and nonpayment of this Note; and (b) any release or discharge by reason of (i) any release or substitution of, or other change in (A) the Security Agreements (defined below) or any other security given for the indebtedness evidenced by this Note or (B) the obligation of any other person or entity who or which is now or may become directly or indirectly liable for all or any portion of the indebtedness evidenced by this Note, or (ii) any extension or other modification of the time or terms of payment of all or any portion of the indebtedness evidenced by this Note. Maker or endorsers agree that their liability for the indebtedness evidenced hereby shall be joint and several.

10.     Collateral. Under the terms of a pre-existing security agreement between Maker and Holder (the "*Security Agreement*"), Maker's obligations under this Note are secured by a security interest in a 2015 Ford Mustang Coupe, VIN XXX 0405 (the "*Collateral*").

11.     Default. An event of default ("*Event of Default*") shall occur as follows:

(a)     Payment Default. If Maker fails to make any payment required under this Note, Holder shall give written notice to Maker of such failure and the amount due. If Maker fails to pay the required payment within 15 days of receipt of such notice, such failure shall be an Event of Default.

(b)     Violation of Security Agreements. If Maker fails to comply with its obligations under the Security Agreement, Holder shall give written notice to Maker of such failure. If Maker fails to cure the failure within 15 days of receipt of such notice, such failure shall be an Event of Default. (This provision supplants and supersedes any inconsistent provisions of the Security Agreement regarding default, notice, cure, etc.).

12.     Acceleration.  Upon the occurrence of any Event of Default, then, at the option of Holder, Holder may declare the total then unpaid indebtedness evidenced by this Note to be immediately due and payable.

13.     Remedies/Right of Setoff.  Upon the occurrence of any Event of Default, Holder may proceed against the Collateral or Maker in such order and manner as Holder in its sole discretion may determine, unless otherwise required by applicable Utah law.

14.     No Waiver by Holder.  Failure of Holder to exercise any option hereunder shall not constitute a waiver of the right to exercise the same in the event of any subsequent default or in the event of continuance of any existing default after demand for strict performance hereof.

15.     Time of Essence.  Time is of the essence of this Note.

16.     Notices.  Except as otherwise designative in writing by Maker or Holder, all notices required or permitted in connection with this Note shall be given as follows:

| If to Maker: | by mail to: | Sheet Metal Works, Inc.<br>Attn: RC Montrone, general manager<br>2487 South 3270 West, Salt Lake City, UT 84119 |
| | and by email to: | rcmontrone@sheetmetalworks.biz; jlyoung@yahlaw.com |
| If to Holder: | by mail to: | Ford Motor Credit Company |

2

c/o P. Matthew Cox
10 Exchange Place, 11th Floor
Salt Lake City, UT  84145-5000

and by email to:          pmc@scmlaw.co

17.    <u>Governing Law</u>.  The validity of this Note and the construction, interpretation, and enforcement hereof, and the rights of the parties hereto with respect to all matters arising hereunder or related hereto, shall be determined under, governed by, and construed in accordance with the laws of the State of Utah without giving effect to conflict of laws principles (regardless of the location, residence, domicile or place of business of Maker or any constituent principal thereof or the location of any of the Collateral securing that Note).

IN WITNESS WHEREOF, this Note has been executed as of the date first written above.

**SHEET METAL WORKS, INC.,**
a Utah corporation

By:_____
Name: _____
Title: _____

Exhibit E-3 (FMC2 Note)

# PROMISSORY NOTE

*Sheet Metal Works, Inc.*

Principal Amount                                                                          Salt Lake City, Utah
$18,206.44                                                                                    September ***, 2020

      1.    <u>Replacement of Prior Note and Loan Agreement</u>. This promissory note (this "*Note*") is given pursuant to the terms of **SHEET METAL WORKS, INC.'s** ("*Maker*") confirmed chapter 11 plan in Case No. 19-2830 (D. Utah). This Note supplants and supersedes a prior note and loan agreement between Maker and **FORD MOTOR CREDIT COMPANY** ("*Holder*"); provided, however, that Holder's rights against co-makers, third-party guarantors, and sureties under the prior note and loan agreement are expressly preserved.

      2.    <u>Promise to Pay</u>. For value received, Maker promises to pay to the order of Holder the principal sum of $18,051.00, together with interest and other amounts provided for under this Note. Payments shall be made to Holder at: Ford Motor Credit Company LLC, Drawer 55-953, PO Box 55000, Detroit, MI 48255-095, unless a different address is provided in writing by Holder to Maker.

      3.    <u>Interest Rate</u>. The principal sum outstanding from time to time under this Note shall bear simple interest at a per annum interest of 4.54% (the "*Interest Rate*").

      4.    <u>Required Payments; Maturity Date</u>.

          (a)    <u>Payments of Principal and Interest</u>. Beginning on the first business day of the calendar month after the execution of this Note, and continuing on or before the first business day of each calendar month thereafter through the Maturity Date (defined below), Maker shall pay Holder monthly payments of $541.90 per month.

          (b)    <u>Maturity Date</u>. If not earlier due and payable, all unpaid principal, accrued but unpaid interest and other amounts payable under the provisions of this Note shall become due and payable in full on September 1, 2023.

      5.    <u>Application of Payments</u>. All payments and other credits shall be applied (a) first, to reimbursable fees, costs and expenses payable by Maker under this Note, (b) second, to accrued and unpaid interest, and (c) third, to principal. Any payments made by Maker must be received by Holder no later than 1:00 p.m. Salt Lake City, Utah time in order for same-day credit.

      6.    <u>Late Charges</u>. If Maker fails to make payment within 10 days of the due date, Holder may charge, and Maker shall pay upon demand, a late charge equal to 5.00% of the dollar amount of such payment or $30, whichever is greater.

      7.    <u>Collection Costs</u>. If suit, arbitration or other legal proceeding or any nonjudicial foreclosure proceeding is instituted or any other action is taken by Holder to collect all or any part of the indebtedness evidenced hereby or to proceed against any collateral for any portion of such indebtedness, Maker promises to pay Holder's reasonable attorneys' fees and other costs (to be determined by the court or arbitrator and not by jury in the case of litigation or arbitration) incurred thereby. Such fees and costs shall be included in any judgment or arbitration award obtained by Holder, shall be secured by any document securing any portion of the indebtedness evidenced by this Note, shall bear interest at the Default Rate (defined below).

8.    Optional Prepayments.  Maker shall have the option to prepay this Note, in full or in part, at any time, without penalty.

9.    Waivers and Acknowledgments.  Except as is expressly provided herein, Maker and endorsers waive: (a) demand, notice, diligence, protest, presentment for payment, and notice of extension, dishonor, protest, demand and nonpayment of this Note; and (b) any release or discharge by reason of (i) any release or substitution of, or other change in (A) the Security Agreements (defined below) or any other security given for the indebtedness evidenced by this Note or (B) the obligation of any other person or entity who or which is now or may become directly or indirectly liable for all or any portion of the indebtedness evidenced by this Note, or (ii) any extension or other modification of the time or terms of payment of all or any portion of the indebtedness evidenced by this Note. Maker and endorsers agree that their liability for the indebtedness evidenced hereby shall be joint and several.

10.    Collateral. Under the terms of a pre-existing security agreement between Maker and Holder (the "*Security Agreement*"), Maker's obligations under this Note are secured by a security interest in a 2017 Ford Pickup Truck, VIN XXX 5069 (the "*Collateral*").

11.    Default. An event of default ("*Event of Default*") shall occur as follows:

(a)    Payment Default. If Maker fails to make any payment required under this Note, Holder shall give written notice to Maker of such failure and the amount due. If Maker fails to pay the required payment within 15 days of receipt of such notice, such failure shall be an Event of Default.

(b)    Violation of Security Agreements. If Maker fails to comply with its obligations under the Security Agreement, Holder shall give written notice to Maker of such failure. If Maker fails to cure the failure within 15 days of receipt of such notice, such failure shall be an Event of Default. (This provision supplants and supersedes any inconsistent provisions of the Security Agreement regarding default, notice, cure, etc.).

12.    Acceleration.  Upon the occurrence of any Event of Default, then, at the option of Holder, Holder may declare the total then unpaid indebtedness evidenced by this Note to be immediately due and payable.

13.    Remedies/Right of Setoff.  Upon the occurrence of any Event of Default, Holder may proceed against the Collateral or Maker in such order and manner as Holder in its sole discretion may determine, unless otherwise required by applicable Utah law.

14.    No Waiver by Holder.  Failure of Holder to exercise any option hereunder shall not constitute a waiver of the right to exercise the same in the event of any subsequent default or in the event of continuance of any existing default after demand for strict performance hereof.

15.    Time of Essence.  Time is of the essence of this Note.

16.    Notices.  Except as otherwise designative in writing by Maker or Holder, all notices required or permitted in connection with this Note shall be given as follows:

| If to Maker: | by mail to: | Sheet Metal Works, Inc. |
|---|---|---|
| | | Attn: RC Montrone, general manager |
| | | 2487 South 3270 West, Salt Lake City, UT 84119 |
| | | |
| | and by email to: | rcmontrone@sheetmetalworks.biz; jlyoung@yahlaw.com |
| | | |
| If to Holder: | by mail to: | Ford Motor Credit Company |

2

Drawer 55-953
PO Box 55000, Detroit, MI 48255-095

17.    <u>Governing Law</u>.  The validity of this Note and the construction, interpretation, and enforcement hereof, and the rights of the parties hereto with respect to all matters arising hereunder or related hereto, shall be determined under, governed by, and construed in accordance with the laws of the State of Utah without giving effect to conflict of laws principles (regardless of the location, residence, domicile or place of business of Maker or any constituent principal thereof or the location of any of the Collateral securing that Note).

IN WITNESS WHEREOF, this Note has been executed as of the date first written above.

**SHEET METAL WORKS, INC.,**
a Utah corporation

By:_____
Name: _____
Title: _____

3

**EXHIBIT F - Priority Claims**

**Class P1 Claims (Allowed Unsecured Claims under 11 USC § 507(a)(4) and (a)(5))**

There are no P1 claims since creditors in this class have been paid pursuant to the *Order Authorizing Payment of Prepetition Claims,* entered December 11, 2019, Docket No. 36.

**Class P2 Claims (Allowed Unsecured Claims under 11 USC § 507(a)(8))**

| Creditor | Claim No. | Amount of Claim | Monthly Payment to be paid in 48 equal installments as follows: |
|---|---|---|---|
| Utah State Tax Commission Attention Bankruptcy Unit 210 N 1950 W Salt Lake City, UT 84134-9000 | 12 | $7,119.53 | $148.32 |
| Internal Revenue Service Attention Insolvency Unit 178 S Rio Grande St M/S 5021 Salt Lake City, Ut 84101 | 7 | $39,261.23 | $817.94 |
| **Total Unsecured Priority Claims** | | **$46,380.76** | **$966.26** |

**EXHIBIT G - Unsecured Claims**

**Class U-1  Allowed Unsecured Claims with Preserved Lien Rights without Joint Check Agreemengs. (To be paid 100%)**

| Creditor | Scheduled Amount | POC Amount | Claim No. | Allowed Amount | Pre-construction Lien Filed | Job | Comments |
|---|---|---|---|---|---|---|---|
| BRPI Mechanical<br>3560 South 2200 West<br>Salt Lake City, UT 84119 | 108,183.52 | 79,404.77 | 8.00 | 79,404.77 | Yes | | Disputed |
| **Total Unsecured Creditors with Preserved Lien Rights:** | | | | 79,404.77 | | | |

**Class U-2 Non-priority unsecured claims allowed under § 502**

| Creditor | Scheduled Amount | POC Amount | Claim No. | Allowed Amount | Disputed | Comments |
|---|---|---|---|---|---|---|
| A-1 Casters & Equipment<br>710 W 1700 S<br>Salt Lake City, UT 84104 | 305.50 | None Filed | | 305.50 | No | |
| Ahern Rentals, Inc.<br>P.O. Box 271390<br>Las Vegas, NV 89127-1390 | 10,309.08 | 12,167.49 | 3 | 12,167.49 | No | |
| Apache Industrial Services<br>3070 West California Ave<br>Salt Lake City, UT 84104 | 43,432.46 | None Filed | | 0.00 | Yes | No Proof of Claim Filed, Listed as Disputed, So Disallowed. |
| BDO<br>299 South Main Street, 10th Floor<br>Salt Lake City, UT 84111 | 5,090.00 | 4,840.00 | 6 | 4,840.00 | Yes | Amount changed to match Proof of Claim |
| Bonneville Test & Balance<br>5663 West 13100 South<br>Herriman, UT 84096 | 63,181.00 | None Filed | | 63,181.00 | No | |
| CES & R<br>2949 Main St<br>Salt Lake City, UT 84115 | 112.82 | None Filed | | 112.82 | No | |
| CFC Connectors for Construction<br>PO Box 609<br>Roy, UT 84067 | 6,499.07 | None Filed | | 6,499.07 | No | |
| DJB Gas Services, Inc.<br>PO Box 26746<br>Salt Lake City, UT 84126 | 1,418.44 | None Filed | | 1,418.44 | No | |
| Douglas Metals<br>3075 S. West Temple<br>Salt Lake City, UT 84115 | 41,131.43 | None Filed | | 41,131.43 | No | |
| Fed Ex Freight<br>P.O. Box 840<br>Harrison, AR 72602-0840 | 625.13 | None Filed | | 625.13 | No | |
| W.W. Granger, Inc<br>P.O. Box 419267<br>Kansas City, MO 64141-6267 | 2,516.30 | 2,516.30 | 2 | 2,516.30 | No | |

| | | | | | | |
|---|---|---|---|---|---|---|
| H. R. Wagstaff Crane Company / Wagstaff Crane Service LLC 4315 So. Commerce Drive Murray, UT 84107-2629 | 11,855.00 | None Filed | | 11,855.00 | No | |
| HVAC Equipment Sales 4060 South 500 West Suite 2 Salt Lake City, UT 84123 | 931.31 | None Filed | | 931.31 | No | |
| Ind Piping Products Inc PO Box 27395 Salt Lake City, UT 84127-0395 | 273.49 | None Filed | | 273.49 | No | |
| Industrial Supply P.O. Box 30600 Salt Lake City, UT 84130 | 1,821.00 | 1,821.20 | 9 | 1,821.20 | No | |
| Internal Revenue Service P.O. Box 7346 Philadelphia PA 19101-7346 | 3,225.68 | 3,225.68 | 7 | 3,225.68 | No | |
| KOH Mechanical Contractors 5639 S. Riley Lane Murray, UT 84107 | 4,750.00 | 63,225.07 | 11 | 63,225.07 | No | Amount changed to match Proof of Claim |
| McGuire Bearing Company 947 SE Market St Portland, OR 97214-3574 | 0.79 | None Filed | | 0.79 | No | |
| Metco, Inc. 1935 S Pioneer Rd Salt Lake CIty, UT  84104 | 54,524.12 | None Filed | | 54,524.12 | No | |
| Payson Sheet Metal 451 N Main Payson, UT 84651 | 3,229.00 | None Filed | | 3,229.00 | No | |
| Peterson Company 2125 S 400 W Salt Lake City, UT 84115 | 2,025.00 | None Filed | | 2,025.00 | No | |
| Pipeline Supply & Service 2070 South 4250 West Salt Lake City, UT 84104 | 179.72 | None Filed | | 179.72 | No | |
| Rasmussen and Associates C/O ECI 3333 West 2100 So. West Valley City, UT 84119-1197 | 35,639.00 | None Filed | | 35,639.00 | No | |
| Ray Quinney & Nebeker 36 State St. #1400 Salt Lake City, UT 84111 | 67,085.94 | 69,612.94 | 5 | 69,612.94 | No | Amount changed to match Proof of Claim |
| Redd Roofing Company 2772 H Avenue P.O. Box 1304 Ogden, UT 84402 | 8,000.00 | None Filed | | 8,000.00 | No | |
| Rhoades Nut & Bolt PO Box 935 Grantsville, UT 84029 | 153.00 | None Filed | | 153.00 | No | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Rocky Mountain Advisory<br>215 South State Street<br>Salt Lake City, UT 84111 | 4,876.55 | None Filed | | 0.00 | Yes | No Proof of Claim Filed, Listed as Disputed, So Disallowed. |
| Sabol & Rice<br>P.O. Box 25957<br>Salt Lake City, UT 84125-0957 | 28,726.00 | None Filed | | 28,726.00 | No | |
| Salt      Lake      Lawns<br>P.O.      Box      701453<br>Salt Lake City, UT 84170 | 1,843.00 | None Filed | | 1,843.00 | No | |
| Scotvale Electrical Systems<br>1770 West Sequoia Vista Circle<br>#1A<br>Salt Lake City, UT 84104 | 15,434.66 | None Filed | | 15,434.66 | No | |
| Spiral-Tech LLC<br>PO Box 65037<br>Salt Lake City, UT 84165-0037 | 2,017.00 | None Filed | | 2,017.00 | No | |
| Stoel Rives<br>201 S Main St, Ste 1100<br>Salt Lake City, UT 84111 | 375,661.08 | None Filed | | 0.00 | Yes | No Proof of Claim Filed, Listed as Disputed, So Disallowed. |
| Thermal West Industrial Inc. C/O Robert G. Crockett<br>Fabian VanCott<br>215 South Main Street,<br>Suite 1200<br>Salt Lake City, UT  84111 | 657,888.96 | 874,837.63 | 4 | 874,837.63 | Yes | Disputed |
| US CAD LLC<br>355 East 2100 South<br>Salt Lake City, UT 84115 | 5,355.00 | None Filed | | 5,355.00 | No | |
| Wex Bank<br>Maverik Fleet Card Service<br>Carol Stream, IL 60197-4337<br>&Wex Bank Corporate Office<br>1 Hancock Street<br>Portland, ME 04101 | 1,805.11 | None Filed | | 1,805.11 | No | |
| **Total Unsecured Claims:** | | | | **1,317,510.90** | | |

**EXHIBIT H -- Interests**

<u>100% Ownership Interest</u>
Ralph C. Montrone
2487 South 3270 West
West Valley City, UT  84119

**EXHIBIT I  Pre-Petition Leases and Executory Contracts**

**Pre-petition Lease**

| Lessor | Property | Monthly Payment | Term | Plan- Assume or Reject | Cure Amount |
|--------|----------|-----------------|------|------------------------|-------------|
| Iron Holdings, LLC  2521 Brentwood Drive Holladay, UT 84121 | Lease of Land and Building at  2487 S 3270 W. WVC, UT | 5210 (base rent) | 10 Year Lease from 05/03/2019 | Assume | None |

**Pre-petition Executory Contracts**

| Party | Contract Description | Role of SMW | Percentage Complete | Plan- Assume or Reject | Cure Amount |
|-------|----------------------|-------------|---------------------|------------------------|-------------|
| Archer Mechanical 2745 West California Avenue Salt Lake City, UT 84104 | Job No. 2576 11/30/2016 Altaview Hospital | SMW is the Sub-contractor | Completed | Assume | None |
| Archer Mechanical 2745 West California Avenue Salt Lake City, UT 84104 | Job No. 2890 6/25/2018 Alta View BP-6C | SMW is the Sub-contractor | Completed | Assume | None |
| Archer Mechanical 2745 West California Avenue Salt Lake City, UT 84104 | Job No. 2891 05/30/18 Biofire Service TI | SMW is the Sub-contractor | Completed | Assume | None |
| Iron Mechanical 2487 South 3270 West West Valley City, UT 84119 | Job No. 2960 3/4/2019 USCF Medical/Mental Health [Prison] | SMW is the Sub-contractor | 61% | Assume | None |
| Iron Mechanical 2487 South 3270 West West Valley City, UT 84119 | Job No. 2976 5/20/19 Delta Sky Club- Nw SLC Intern. Airport | SMW is the Sub-contractor | 82% | Assume | None |
| Iron Mechanical 2487 South 3270 West West Valley City, UT 84119 | Job No. 3065 11/1/19 SLC Airport | SMW is the Sub-contractor | 0% | Assume | None |
| KJS 118 E Clear Creek Dr Sandy, UT 84070-5249 | Job No. 3056 10/8/19   Outdoor Duct | SMW is the Sub-contractor | Completed | Assume | None |
| KOH Mechanical Contractors Inc 5639 S. Riley Lane Murray, UT 84107 | Job No. 3059 10/14/19 48"Ø 90° St. El's Bldg. 4 West Cell | SMW is the Sub-contractor | Completed | Assume | None |

| | | | | | |
|---|---|---|---|---|---|
| North Monsen<br>252 S Orchard Place<br>Salt Lake City, UT 84101 | Job No. 2963<br>3/27/19 Ductwork<br>Fabrication | SMW is the<br>Contractor | 0% | Assume | None |
| North Monsen<br>252 S Orchard Place<br>Salt Lake City, UT 84101 | Job No. 2964<br>3/27/19<br>CM3 Furnish and<br>Install | SMW is the<br>Contractor | 0% | Assume | None |
| North Monsen<br>252 S Orchard Place<br>Salt Lake City, UT 84101 | Job No. 2965<br>3/27/19<br>Hazard System in<br>Tower | SMW is the<br>Contractor | 0% | Assume | None |
| North Monsen<br>252 S Orchard Place<br>Salt Lake City, UT 84101 | Job. No. 2966<br>03/27/19<br>Hexcel LIW System | SMW is the<br>Contractor | 0% | Assume | None |
| North Monsen<br>252 S Orchard Place<br>Salt Lake City, UT 84101 | Job No. 2967<br>5/20/19<br>BHS Marketing X5 | SMW is the<br>Contractor | 1% | Assume | None |
| North Monsen<br>252 S Orchard Place<br>Salt Lake City, UT 84101 | Job No. 3038<br>8/22/19<br>Baghouse Stand | SMW is the<br>Contractor | Completed | Assume | None |
| North Monsen<br>252 S Orchard Place<br>Salt Lake City, UT 84101 | Job No. 3051<br>Harland<br>Clarke Install | SMW is the<br>Contractor | Completed | Assume | None |
| North Monsen<br>252 S Orchard Place<br>Salt Lake City, UT 84101 | Job No. 3058<br>10/8/19<br>Beam Extensions | SMW is the<br>Contractor | Completed | Assume | None |
| North Monsen<br>252 S Orchard Place<br>Salt Lake City, UT 84101 | Job No. 3062<br>Carbon<br>Kiln- 304 Stainless | SMW is the<br>Contractor | Completed | Assume | None |
| North Monsen<br>252 S Orchard Place<br>Salt Lake City, UT 84101 | Job No. 3063<br>10/30/19<br>Bldg 26 | SMW is the<br>Contractor | Completed | Assume | None |
| North Monsen<br>252 S Orchard Place<br>Salt Lake City, UT 84101 | Job No. 3066<br>11/1/19<br>Big J Brigham City | SMW is the<br>Contractor | Completed | Assume | None |
| North Monsen<br>252 S Orchard Place<br>Salt Lake City, UT 84101 | Job No. 3064<br>10/31/19<br>Bldg 2440 | SMW is the<br>Contractor | Completed | Assume | None |
| North Monsen<br>252 S Orchard Place<br>Salt Lake City, UT 84101 | Job No. 3072 Boise<br>Idaho | SMW is the<br>Contractor | Completed | Assume | None |

| | | | | | |
|---|---|---|---|---|---|
| Okland Construction<br>1978 S. West Temple<br>Salt Lake City, UT 84115 | Job No. 3053   GPS<br>iMOD Assemply | SMW is the<br>Sub-contractor | Completed | Assume | None |
| Okland Construction<br>1978 S. West Temple<br>Salt Lake City, UT 84115 | Job No. 3054<br>Rehab Elevator<br>Ledge Cap | SMW is the<br>Sub-contractor | 50% | Assume | None |
| Palmer-Christiansen<br>2510 S. West Temple<br>Salt Lake City, UT 84115 | Job No. 2855<br>3/21/2018<br>UofU Rehab<br>Hospital | SMW is the<br>Sub-contractor | Completed | Assume | None |
| Pro Auto<br>2442 S 1560 W<br>Bldg. 1<br>Woods Cross, UT 840 | Job No. 3057<br>10/8/19<br>Petersen | SMW is the<br>Contractor | Completed | Assume | None |
| Schoppe<br>352 Van Buren Ave<br>Salt Lake City, UT 84115 | Job No. 3060<br>10/22/19<br>Heritage Housing V | SMW is the<br>Contractor | Completed | Assume | None |
| Schoppe<br>352 Van Buren Ave<br>Salt Lake City, UT 84115 | Job No. 3061<br>10/28/19<br>Brighton High<br>School<br>L2 Area J | SMW is the<br>Contractor | Completed | Assume | None |
| Scotia International<br>4455 South 700 East<br>Suite 300<br>Salt Lake City, UT 84107 | Air Scrubber with<br>Filters | SMW is the<br>Contractor | Completed | Assume | None |
| UofU Hospital<br>P.O. Box 2790<br>Salt Lake City, UT 84110-2790 | Job No. 3050<br>9/24/19<br>Moran Eye Center | SMW is the<br>Contractor | 0% | Assume | None |
| UofU Huntsman<br>P.O. Box 2790<br>Salt Lake City, UT 84110-2790 | Job No. 2979<br>6/4/19<br>Hinges on Ex fans | SMW is the<br>Contractor | 0% | Assume | None |

**Workers Union Contract**

| | | | | | |
|---|---|---|---|---|---|
| Sheet Metal Workers Union,<br>Local No 312<br>2261 South Redwood Road,<br>Salt Lake City, UT  84119 | Labor union contract, subject to an existing employer/union labor agreement. Provides qualified labor, facilitates payroll, provides pension and health and welfare benefits to employees. SMW would have withdrawal iability in the event that it withdraws from the union. | Perpetual -<br>Renews<br>Automatically<br>every three<br>years | Assume | None | |