Laurie A. Cayton (USB #4557)
Melinda P. Willden (USB #08533)
**UNITED STATES DEPARTMENT OF JUSTICE**
Office of the United States Trustee
405 South Main Street, Suite 300
Washington Federal Bank Building
Salt Lake City, UT 84111
Telephone:     (801) 524-5734
Facsimile:      (801) 524-5628
Email: Laurie.Cayton@usdoj.gov
           Melinda.Willden@usdoj.gov

Attorneys for Patrick S. Layng, United States Trustee

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF UTAH**

| In re: | Bankruptcy Case No. 19-28320 JTM |
|---|---|
| SHEET METAL WORKS, INC., | Chapter 11 |
| Debtor. | Judge Joel T. Marker |

**OJBECTION TO CONFIRMATION OF DEBTOR'S PLAN OF REORGANIZATION
DATED JULY 19, 2020**

The Acting United States Trustee ("United States Trustee"), objects to confirmation of Sheet Metal Works, Inc.'s ("Debtor") Chapter 11 Plan (Amended as of July 19, 2020) filed at Dkt. #140 (the "Amended Plan") for the reasons set forth below.

**PROCEDURAL HISTORY AND BACKGROUND**

1. The Debtor filed a voluntary Chapter 11 petition (the "Petition") on November 18, 2019.

2. The Debtor indicated it was a 'small business debtor' as defined in 11 U.S.C. § 101(51D). The Debtor continues to operate its business as a debtor-in-possession.

3. Ralph C. Montrone ("RC Montrone") is the principal of the Debtor.

4. No committee of creditors has been appointed.

5. The Debtor filed a Plan on and Disclosure Statement on May 7, 2020 at Dkt. #95.

6. The Debtor filed a Disclosure Statement on May 15, 2020 at Dkt. #96.

7. An Amended Plan and Amended Disclosure Statement were filed on May 19, 2020. *See* Dkt. #100 and 101.

8. The Court conditionally approved the Amended Disclosure Statement on May 20, 2020. *See* Dkt. #103.

9. Bank of the West, a creditor in this case, and Thermal West Industrial, Inc. ("TWI"), another creditor in this case, objected to the Amended Plan and Amended Disclosure Statement. *See* Dkt. #122, #123 and #124.

10. At a hearing held on June 25, 2020, the Debtor arranged to request an extension of the deadline in 11 U.S.C. § 1129(e) to August 27, 2020.

11. The Debtor filed the Amended Plan at Dkt. #140.

12. The Debtor filed a Disclosure Statement for Chapter 11 Plan (Amended as of July 19, 2020) at Dkt. #141 (the "Amended Disclosure Statement").

## DISCUSSION

A Chapter 11 Plan must be in the best interest of the Debtor's estate and creditors and satisfy the requirements for confirmation set forth in 11 U.S.C. § 1129. The plan proponent "bears the burden of proving that the requirements of § 1129(a) have been met." *In re Win*

*Trucking, Inc.*, 236 B.R. 774, 778 (Bankr. D. Utah 1999). The Amended Plan fails to meet at least the following requirements of 11 U.S.C. § 1129.[1]

### 1. **The Amended Plan Does Not Comply with the Absolute Priority Rule**

If a member of an impaired class votes against the Amended Plan, then confirmation requires the Court to consider if the conditions of 11 U.S.C § 1129(b) are met. It is likely that a creditor will vote against the Amended Plan. Thus, the Court will likely be required to determine if the Amended Plan "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1).

To find that a plan is fair and equitable with respect to an unsecured objecting creditor, the Court must conclude that "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property . . ." 11 U.S.C. § 1129(b)(2)(B)(ii). This is referred to as the Absolute Priority Rule.

The Debtor proposes to auction its stock in order to comply with the Absolute Priority Rule. The Amended Plan sets forth the auction procedure in Article 9.1.3. The Debtor proposes to conduct a telephonic auction of 100% of the stock in the Reorganized Debtor if Classes U1 and U2 do not accept the Amended Plan. The Debtor states in the Amended Plan that it wishes to be exempt from securities registration under § 4(a)(2) of the Securities Act of 1933, which means the Debtor's stock may not be offered by general solicitation or public advertising.[2] For this reason, the Debtor does not intend to market its stock through a broker or advertisements.

---

[1] The United States Trustee reserves the right to raise additional objections at the time of hearing.
[2] "The provisions of section 77e of this title shall not apply to . . . (2) transactions by an issuer not involving any public offering." Securities Act of 1933, codified at 15 U.S.C. § 77d(a)(2)

Instead, the Debtor intends to limit the auction to persons who are listed in the Debtor's Schedules. The Debtor has not explained why 11 U.S.C. § 1145 would not apply to exempt the sale of the Debtor's stock from securities laws, even if parties who are not creditors wish to participate. In addition, the Debtor has further restricted participation in the auction based on criteria that do not appear to implicate § 4(a)(2) of the Securities Act of 1933. These restrictions appear likely to chill bidding.

The Amended Plan states that in order to be exempt from securities registration under Section 4(a)(2) of the Securities Act of 1933, the auction will be limited to persons who have an allowed claim in the Schedules or who have filed proofs of claim and who are entitled to vote to accept or reject the plan, disqualifying those who have a disputed claim unless they have moved to have their claim allowed for purposes of voting. *See* Amended Plan at 9.1.3. It is unclear how allowing creditors with disputed claims to participate in the auction would trigger the need for securities registration if registration is not otherwise required. Whether a bidder holds a claim that is disputed or allowed in bankruptcy does not appear to be a criterion in determining whether a transaction must be registered under the Securities Act of 1933. Whether a bidder holds a claim that is disputed or allowed in bankruptcy also does not appear to be a criterion for the application of 11 U.S.C. § 1145. Thus, it appears that the Debtor does not need to exclude holders of disputed claims from the auction in order to gain an exemption from securities registration laws under either the Securities Act of 1933 or 11 U.S.C. § 1145.

Notably, one of the claims that would be excluded from the auction is held by TWI, one of the Debtor's competitors who may have an interest in bidding. The right to exclude parties from bidding at the auction is a means of controlling who can become the Debtor's future owners

and constitutes a retention of "property" within the meaning of 11 U.S.C. § 1129(b)(2)(B)(ii). Consequently, the auction procedures in the Amended Plan violate the Absolute Priority Rule. RC Montrone has retained enough interest in the Debtor to exclude certain potential bidders from the auction. This interest is beneficial to RC Montrone, and he holds this interest because he is an equity holder of the Debtor. In *Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999), the old equity holders retained the right to contribute new capital and receive ownership interests in a reorganized entity without allowing others to compete for that equity or to propose a competing reorganization plan. The Court found that this arrangement violated the Absolute Priority Rule.

> But this just begs the question why the opportunity should be exclusive to the old equity holders. If the price to be paid for the equity interest is the best obtainable, old equity does not need the protection of exclusiveness (unless to trump an equal offer from someone else); if it is not the best, there is no apparent reason for giving old equity a bargain. There is no reason, that is, unless the very purpose of the whole transaction is, at least in part, to do old equity a favor. And that, of course, is to say that old equity would obtain its opportunity, and the resulting benefit, because of old equity's prior interest within the meaning of subsection (b)(2)(B)(ii). **Hence it is that the exclusiveness of the opportunity**, with its protection against the market's scrutiny of the purchase price by means of competing bids or even competing plan proposals, renders the partners' right a property interest extended "on account of " the old equity position and therefore subject to an unpaid senior creditor class's objection. *LaSalle Partnership*, 526 U.S. at 456 (emphasis added).

The retention of the right to exclude a party from the auction is a retention of an interest for purposes of the Absolute Priority Rule. The Amended Plan proposes that RC Montrone, the current equity holder of the Debtor, retain control of the process of purchasing the equity interest in the Debtor by controlling the participants in the auction. Were he not the current equity holder, he would not have the power to set preferential terms for the auction which may jeopardize the rights of unsecured creditors and others to participate in the auction. Retaining control is a

property interest for purposes of the Absolute Priority Rule. *See Unruh v. Rushville State Bank of Rushville, Mo.*, 987 F.2d 1506, 1509 (10th Cir. 1993) ("Appellants in this case are retaining control of their farms and the rights to future profits. Under *Ahlers*, Appellants are receiving property within the meaning of the rule.").

The Amended Plan and Amended Disclosure Statement propose to exclude holders of disputed claims from participating in an auction. TWI's claim is identified as disputed. The Debtor filed an objection to TWI's Proof of Claim on July 28, 2020. *See* Dkt. #151. It is highly unlikely that the court will be able to rule on TWI's claim before the auction is scheduled to take place. The timeline for approving TWI's claim for purposes of voting is also uncertain. The Debtor's attempt to refer to the Securities Act of 1933 as grounds for excluding the holder of a disputed claim in bankruptcy from the auction is not supported by case law or statute. The main purpose of the Debtor's restriction on participating in the auction appears to be to exclude an unsecured creditor, TWI, from the auction.

The Amended Disclosure Statement provides at Article IV.A. that RC Montrone will provide the opening bid of $10,000 which will then be subject to overbid by those who meet certain criteria: a) successful bidder must qualify as an "accredited investor" or b) must meet the legal standard of having sufficient knowledge and experience in financial and business matters to be capable of evaluating the merits and risks of the prospective investment. *See* Dkt. #141. These requirements appear to be directed at qualifying the auction under the safe harbor of the Securities and Exchange Commission's Regulation D, Rule 506.[3] However, the exclusion of

---

3 Again, the Debtor has not explained why the exception to the securities registration laws in 11 U.S.C. § 1145 does not apply.

persons who hold disputed claims does not appear to be based on concerns about the securities laws but appears to be intended to exclude TWI from the auction.[4] Rather than allowing all creditors to participate in the auction, providing the maximum base of potential bidders which would be in the best interest of the estate, RC Montrone proposes to maintain control over the process for no other apparent purpose than to keep a competitor at bay as a potential bidder.

Besides a finding that the Amended Plan is 'fair and equitable' with respect to objecting creditors, the Court must also find that the Amended Plan also "does not discriminate unfairly." 11 U.S.C. § 1129(b)(1). Excluding disputed claims holders from the auction discriminates unfairly against holders of disputed claims.

### 2. The Amended Plan is Not Feasible

In order to confirm a chapter 11 plan, a Court must determine that the plan is feasible, and "is not likely to be followed by the liquidation, or the need for further financial reorganization." 11 U.S.C. § 1129(a)(11). "Feasibility determinations must be firmly rooted in predictions based on objective fact. When determining whether a plan is feasible, courts often consider a debtor's cash flow projections showing its ability to simultaneously make plan payments and fund projected operations. The projections must be based upon evidence of financial progress and must not be speculative, conjectural, or unrealistic." *In re Investment Company of the Southwest, Inc.*, 341 B.R. 298, 311 (10th Cir. BAP 2006) (footnotes omitted).

The Debtor's monthly operating reports provide insight into the Debtor's ability to generate income to pay its operating costs and repay creditors. The Debtor's historic

---

4 The Debtor filed an Objection to TWI's Proof of Claim on July 28, 2020. *See* Dkt. #151. This objection is unlikely to be adjudicated before the proposed auction date.

performance is below the projected revenues in Exhibit B of the Plan. The Debtor projected income of approximately $300,000 per month from September 2020 through February 2021. However, the Debtor has only averaged about $210,000 in income per month in the first six months of 2020. Cash receipts in June 2020 were $231,969. *See* Dkt. #139. The May 2020 Monthly Operating Report shows $20,740 cash income from work projects. The remaining cash receipts in May 2020 in the amount of $367,200 were from the CARES Act loan. *See* Dkt. #125. This severe fluctuation in cash receipts when the Debtor was receiving loan proceeds raises a question regarding the Debtor's ability to control its income stream.

The Plan projects $300,000 in monthly income to cover $200,000 in monthly operating expenses plus $80,000 paid to subs and suppliers on a monthly basis. *See* Exhibit B to the Amended Plan. While the payments to Bank of the West at $5,000 per month (increasing to $8,000) may be affordable, the Amended Plan also calls for periodic larger payments, totaling $575,000 over the life of the Amended Plan.[5] *See* Exhibit D to the Amended Plan. The budget does not appear to accommodate the periodic larger payments.

In addition, the Debtor's total payables appear to remain substantial. The April MOR identifies payables of $785,099. *See* Dkt. #109. The May MOR identifies payables of $809,547. *See* Dkt. #125. The June MOR identifies payables of $513,898. *See* Dkt. #139. Exhibit E to the MORs identifies the parties who hold payables as Trade Creditors. Are these Trade Creditors on Exhibit E to the MORs the same as the subs and suppliers who will receive a share of the

---

5 Exhibit D to the Plan identifies extra payments totaling $575,000. The Loan Amortization Schedule attached to the Promissory Note at Exhibit E-1 of the Plan does not reflect all of the extra payments identified on Exhibit D, although some of them appear to be included.

budgeted $80,000 per month per Exhibit B of the Amended Plan? This budgeted amount does not appear to be adequate.

There is no known new project disclosed for which the Debtor has been the successful bidder which will bring in significantly more revenue over the next six months. "A glaring discrepancy between the facts surrounding past performance and activity and predictions for the future is strong evidence that a debtor's projections are flawed and the plan is not feasible." *In re Investment Company of the Southwest, Inc*., 341 B.R. 298, 311 (10th Cir. BAP 2006).

3. **Vague Payout Provision to Class U2**

Article 5.3 of the Amended Plan proposes to pay Class U2 as follows:

> The Reorganized Debtor shall pay 20% of the Allowed Unsecured Claim of each holder of a Class U2 Claim on a pro-rated basis from profits of the Reorganized Debtor as such profits become available after (A) payment in full of (i) the BW Consolidated Note (ii) Allowed Administrative Expenses, and (iii) Priority Claims and (B) retention of amounts deemed necessary in the business judgment of the Reorganized Debtor to continued business operations. Until holders of Class U2 claims are paid 20% of their Allowed Unsecured Claims, the Reorganized Debtor shall not pay any dividends on account of its stock; provided, however, that the Reorganized Debtor may pay dividends to its shareholders from time to time in amounts necessary to enable its shareholders to pay income taxes and make estimated tax payments to satisfy their liabilities under federal and state law which arise solely because of their ownership of the Reorganized Debtor's stock.

This provision leaves Class U2 creditors with no way to know if or when their claims will be paid. In addition, the provision that allows the Debtor to retain undefined amounts that are necessary to continue business operations opens a possibility for the Debtor to allege that it cannot pay Class U2 no matter how much cash it retains. The apparent motivation to pay Class U2 is that dividends may not be paid to any equity holder until Class U2 is paid. There is no method in the Amended Plan for Class U2 to find out if dividends have been paid.

This provision is vague and leaves Class U2 creditors without a clear way to enforce their rights under the Amended Plan. A plan is to "specify the treatment of any class of claims or interests that is impaired under the plan." 11 U.S.C. § 1123(3). Vague provisions do not 'specify' how a claim will be treated. When will Class U2 be paid? How will Class U2 know if the Debtor has defaulted on payments to them? These questions are not answered by the Amended Plan. *See generally In re Mako, Inc.*, 985 F.2d 1052, 1055 (10th Cir. 1993) (holding that a plan provision purporting to grant authority to a non-party was vague and could not be enforced); *see also In re Charter Commc'ns*, 419 B.R. 221, 246 (Bankr. S.D.N.Y. 2009) (interpreting a provision in such a way to avoid a vague application, noting that "vagueness is hardly a desirable characteristic for identifying a potential default").

## CONCLUSION

The Amended Plan does not comply with the Absolute Priority Rule, the Amended Plan does not appear to be feasible, and the Amended Plan contains a vague provision that affects the rights of creditors in Class U2. For these reasons, the United States Trustee respectfully requests that confirmation of the plan be denied.

DATE: August 14, 2020

                Respectfully Submitted,

                /s/
                Melinda P. Willden
                Attorney for Patrick S. Layng,
                United States Trustee

# CERTIFICATE OF MAILING

I HEREBY CERTIFY that on August 14, 2020, I caused a true and correct copy of the foregoing **OJBECTION TO CONFIRMATION OF DEBTOR'S PLAN OF REORGANIZATION DATED JULY 19, 2020** to be electronically filed with the Court using the CM/ECF system, which sent notification to all parties of interest participating in the CM/ECF system, as noted below:

- Adam S. Affleck    adam-affleck@rbmn.com, andalin-bachman@rbmn.com;affleckar93359@notify.bestcase.com;jennifer-franklin@rbmn.com
- Megan K Baker    baker.megan@dorsey.com, long.candy@dorsey.com
- Laurie A. Cayton tr    laurie.cayton@usdoj.gov, James.Gee@usdoj.gov;Lindsey.Huston@usdoj.gov;Rinehart.Peshell@usdoj.gov
- P. Matthew Cox    bankruptcy_pmc@scmlaw.com
- Robert Crockett    rcrockett@fabianvancott.com, mcrawford@fabianvancott.com
- Allison Moon    allison.moon@usdoj.gov, marisol.solis@usdoj.gov
- Douglas J. Payne    dpayne@fabianvancott.com, mdewitt@fabianvancott.com
- Kami L. Peterson    Kami.Peterson@zionsbancorp.com, Angela.Norton@zionsbancorp.com;Deanne.Koecher@zionsbancorp.com
- Jeff D. Tuttle    jtuttle@swlaw.com, wkalawaia@swlaw.com;csmart@swlaw.com;docket_slc@swlaw.com
- United States Trustee    USTPRegion19.SK.ECF@usdoj.gov
- Steven T. Waterman    waterman.steven@dorsey.com, bingham.karen@dorsey.com;ventrello.ashley@dorsey.com
- Melinda Willden tr    melinda.willden@usdoj.gov, Lindsey.Huston@usdoj.gov;James.Gee@usdoj.gov;Rinehart.Peshell@usdoj.gov

Further, I certify that copies of the **OJBECTION TO CONFIRMATION OF DEBTOR'S PLAN OF REORGANIZATION DATED JULY 19, 2020** were forwarded via U.S. Mail, first class, postage prepaid and properly addressed to the following:

Sheet Metal Works
2487 South 3270 West
Salt Lake City, UT 84119


                                                         /s/
                                            Melinda Willden